UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WASHINGTON MUTUAL, INC.,
1301 Second Avenue
Seattle, Washington 98101,

and

WMI INVESTMENT CORP.,
1301 Second Avenue
Seattle, Washington 98101,
                    Plaintiffs,

        v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,
550 17th Street, NW
Washington, DC 20429,
in its capacity as receiver for Washington Mutual
Bank, and in its corporate capacity,

                    Defendant.

Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment" and together with WMI, the "Plaintiffs"), by their undersigned counsel alleges as follows:

## PARTIES

1.      Washington Mutual Bank, Henderson, Nevada ("WMB") was a federal savings bank chartered pursuant to the Home Owners' Loan Act, 12 U.S.C. §§ 1461-70.

2.      Defendant Federal Deposit Insurance Corporation ("FDIC") is the agency charged by law with, among other duties, administering the Federal Deposit Insurance Act and the federal bank deposit insurance system.   The FDIC is sued in its corporate capacity ("FDIC-

DC1:\272987\13\5%MZ13!.DOC\79831.0003

Corporate") and in its capacity as the Receiver of WMB ("<u>FDIC-Receiver</u>").   This Complaint uses "FDIC" to refer to FDIC-Receiver and FDIC-Corporate collectively.

3.    WMI is a holding company incorporated in the State of Washington with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101.   Prior to the Receivership Date and the Bankruptcy Petition Date (both as defined below), WMI was a savings and loan holding company that owned WMB, and indirectly owned WMB's subsidiaries, including Washington Mutual Bank fsb ("<u>WMBfsb</u>" and together with WMB and their respective banking subsidiaries, the "<u>Banking Subsidiaries</u>").

4.    WMI Investment is a corporation organized under the laws of Delaware, with its principal place of business at 1301 Second Avenue, Seattle, Washington 98101, and is a wholly-owned subsidiary of WMI.

## <u>JURISDICTION AND VENUE</u>

5.    This action arises under the Constitution and laws of the United States, including, without limitation, the Federal Deposit Insurance Act ("<u>FDI Act</u>"), 12 U.S.C. § 1811 <u>et seq.</u>, as amended, the Fifth Amendment to the United States Constitution, and the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80.   This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. § 1331.

6.    Venue is proper in this Court under 12 U.S.C. § 1821(d)(6) and 28 U.S.C. § 1391(e).

## BACKGROUND

7.      On September 25, 2008 (the "Receivership Date"), the Director of the Office of Thrift Supervision ("OTS"), by order number 2008-36, appointed FDIC-Receiver as receiver for WMB and advised that FDIC-Receiver was immediately taking possession of WMB.

8.      Immediately after its appointment as receiver, FDIC-Receiver,   together with FDIC-Corporate, sold substantially all the assets of WMB, including the stock of WMBfsb, to JPMorgan Chase Bank, National Association ("JPMorgan Chase") pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated as of September 25, 2008 (the "Purchase and Assumption Agreement").

9.      On September 26, 2008 (the "Bankruptcy Petition Date"), the Plaintiffs each commenced a voluntary case (the "WMI Bankruptcy Proceeding") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   The automatic stay in the Plaintiffs' chapter 11 cases prohibits any entity, including the FDIC and JPMorgan Chase, from, among other things, taking any action to obtain possession of property of the Plaintiffs' estates or to exercise control over such property.

## THE PROOF OF CLAIM

10.      Pursuant to section 11(d) of the FDI Act, 12 U.S.C. § 1821(d), FDIC-Receiver set December 30, 2008, as the last day to file claims against the Receivership.   As described in detail below, Plaintiffs asserted claims against the Receivership (each a "Claim") by filing a proof of claim on December 30, 2008 (the "Proof of Claim").

11.      Plaintiffs reserved all rights to amend and/or supplement the Proof of Claim at any time and in any respect and to assert any and all other claims of whatever kind or

nature that they have, or may have, against WMB.   (This includes, but is not limited to, the reservation of rights set forth in paragraphs 60-65 of the Proof of Claim.)   Plaintiffs likewise reserve all rights to amend and/or supplement this Complaint under the Federal Rules of Civil Procedure.

12.   The Claims are unsecured, unless otherwise noted, and except to the extent that WMB asserts claims against the Plaintiffs.   To the extent of any such claims asserted by WMB, Plaintiffs assert that the claims asserted hereunder are secured.

13.   On the Receivership Date, many of the Plaintiffs' books and records were seized by the FDIC and transferred to the custody of JPMorgan Chase.   As a result, the Proof of Claim was prepared, and this Complaint has been prepared, using the information available to the Plaintiffs, which was, in certain instances, only summary information set forth in the Plaintiffs' books and records.   Plaintiffs endeavored to support the Claims with documentation in the Proof of Claim, where such documentation was reasonably available to the Plaintiffs. However, Plaintiffs did not attach supporting documentation where it would have been too voluminous but rather stated that such supporting documentation may be made available upon the FDIC's request.

A.   **Intercompany Loans**

14.   As of the Receivership Date, WMB was indebted to WMI, or to one of its subsidiaries identified below, for the outstanding principal, accrued interest, and other amounts due under the following promissory notes (the "Promissory Notes"):

- $82,048,081 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Corporation, as lender.   H.S. Loan Corporation is a subsidiary of WMI, in which WMB owns 1.5748%.

- $73,670,153 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Partners, as lender. H.S. Loan Partners is an indirect, wholly-owned subsidiary of WMI.

- $7,781,240 under that certain Revolving Master Note, dated as of February 11, 2005, by and between WMB, as borrower, and WMHFA Delaware Holdings LLC, as lender. WMHFA Delaware Holdings LLC is an indirect, wholly-owned subsidiary of WMI.

- $13,576,245 under that certain Registered Security, Note A, dated as of December 17, 2004, by and between University Street, Inc., as payor and predecessor in interest to WMB, and WMRP Delaware Holdings LLC, as payee, and predecessor in interest to PCA Asset Holdings LLC. This Promissory Note is recorded on WMI's books and records as an obligation owed to PCA Asset Holdings LLC, an indirect subsidiary of WMI, by WMB.

15.     Accordingly, WMI asserts a claim in the aggregate amount of $177,075,719 on account of the outstanding principal and accrued interest due under the Promissory Notes, plus a liquidated, unsecured claim for all other amounts due under the Promissory Notes, as described in paragraphs 8-9 of the Proof of Claim and Exhibit A to the Proof of Claim.

**B.     Intercompany Receivables**

16.     Prior to the Receivership Date, Plaintiffs incurred expenses on behalf of WMB, which expenses resulted in intercompany receivables owed by WMB to the respective Plaintiff and are reflected as such in the books and records of Plaintiffs and WMB (the "Intercompany Receivable Claims").

17.     In particular, WMI has Intercompany Receivable Claims against WMB and WaMu Capital Corp., a subsidiary of WMB, for $22,528,014, relating principally to WMI's issuance of stock-based compensation to certain WMB and WaMu Capital Corp. employees. A summary of the amounts owed to WMI and the corresponding intercompany account numbers is as follows:

| Account Debtor | WMI Account Receivable Number | Amount |
|---|---|---|
| WMB | 28101 | $9,298,479 |
| WMB | 28120 | $13,200,977 |
| WaMu Capital Corp. | 28025 | $28,558 |

18.    In addition, as of the Receivership Date, pursuant to certain servicing agreements and pursuant to that certain Administrative Services Agreement (collectively, the "Servicing Agreements"), WMB or one of the Banking Subsidiaries serviced certain mortgage loans held by WMI or its subsidiaries.    Pursuant to the Servicing Agreements, WMB, as servicer, collected amounts due under the mortgage loans and, at pre-determined intervals, remitted such amounts to WMI or its subsidiaries, as the holders of such mortgage loans.    As of the Receivership Date, WMB had failed to remit certain amounts due to Plaintiffs in the aggregate approximate amount of $184,849 on account of the mortgage loans.    A summary of the amounts owed to WMI and certain of its subsidiaries on account of such Servicing Agreements is as follows:

| Account Debtor | Obligee | Amount |
|---|---|---|
| WMB | H.S. Loan Corp. | $17,477 |
| WMB | Ahmanson Obligation Co. | $143,657 |
| WMB | Sutter Bay Corp. | $11,129 |
| WMB | Flower Street Corp. | $10,396 |
| WMB | H.S. Loan Partners LLC | $2,190 |

19.    Accordingly, Plaintiffs assert Claims for each of these amounts owed, as described in paragraphs 10-14 of the Proof of Claim and Exhibit B to the Proof of Claim.

**C.    Taxes**

20.    WMI, WMB, WMBfsb, and certain other direct and indirect subsidiaries of WMI and WMB are parties to that certain Tax Sharing Agreement, dated as of August 31, 1999.    Pursuant to the Tax Sharing Agreement, all federal income taxes were paid directly by WMI on behalf of the consolidated tax group, which includes WMB and its subsidiaries.    A

copy of the Tax Sharing Agreement is set forth at Exhibit C to the Proof of Claim.    Historically, in accordance with the Tax Sharing Agreement, each subsidiary member to the Tax Sharing Agreement made federal-tax related payments to WMI in respect of the hypothetical, separate federal income tax liabilities of such member and its subsidiaries.    Prior to the Receivership Date, pursuant to the Tax Sharing Agreement, WMI paid federal taxes due and owing by the consolidated tax group, including amounts due and owing by WMB and/or its subsidiaries. However, as of the Receivership Date, WMB and its subsidiaries had not paid WMI all federal-tax related amounts under the Tax Sharing Agreement.    Accordingly, WMI asserts an unliquidated claim against WMB on account of any and all federal taxes paid on behalf of WMB and/or its subsidiaries and WMI reserved all rights to assert any and all such claims against WMB and its subsidiaries, including any claims arising from any ongoing federal tax audits, as described in paragraph 15 of the Proof of Claim.

21.    In addition, WMI has certain claims against WMB and its subsidiaries on account of state, local and possibly foreign taxes paid on behalf of WMB and its subsidiaries and WMI reserved all rights to assert any and all such claims against WMB and its subsidiaries, as described in paragraph 16 of the Proof of Claim.

22.    Further, on account of WMI's payment of federal, state and local taxes for the consolidated or combined tax group, WMI is, or will be, entitled to tax refunds currently estimated to be approximately $3 billion (the "Tax Refunds").    Pursuant to the Tax Sharing Agreement, all refunds for federal taxes are payable to WMI, regardless of whether such refunds are on account of federal taxes paid in respect of WMB or its subsidiaries or any of WMI's other subsidiaries.    In addition, certain state and local tax refunds are payable to WMI in respect of group tax filings that included WMB or its subsidiaries.    In anticipation of the receipt of certain

Tax Refunds in respect of which certain amounts would be payable by WMI to WMB pursuant to or in furtherance of the Tax Sharing Agreement, WMI paid such amounts to WMB prior to the Receivership Date by crediting such amounts against tax payments otherwise due from WMB at such time.   WMI therefore asserts a claim against WMB for the amounts so paid by WMI.   In addition, in the event that FDIC-Receiver asserts a claim to and obtains any portion of the Tax Refunds directly or indirectly from the Internal Revenue Service, WMI asserts a claim against WMB and/or its subsidiaries on account of such refunded amounts.   WMI may also have claims against WMB and its subsidiaries in respect of all or a portion of state, local and foreign tax refunds received by WMB and its subsidiaries and asserts a claim against WMB and its subsidiaries for any and all such claims, as described in paragraph 17 of the Proof of Claim.

23.   WMI is currently undergoing several federal, state, local and foreign tax audits.   To the extent that any federal, state, local or foreign taxing authority, including, without limitation, those taxing authorities that are currently auditing WMI, assesses additional taxes against WMI, WMI expressly reserves all rights to supplement and/or amend the Proof of Claim to include any amounts attributable to WMB or its subsidiaries.

24.   In the event FDIC-Receiver seeks to repudiate the Tax Sharing Agreement in accordance with section 1821(e) of title 12 of the United States Code, Plaintiffs assert a claim for any and all damages or claims that arise from such repudiation (and Plaintiffs expressly reserve all rights to oppose any such attempt to repudiate the Tax Sharing Agreement).

**D.     Capital Contribution Claims**

25.   From December, 2007, through April, 2008, WMI raised approximately $10 billion in the capital markets.   During that period, WMI's principal assets consisted of cash, the stock of WMB, and the stock of the other Plaintiff and other WMI subsidiaries.   Throughout 2008, WMI's debt obligations approximated $7 billion.   In 2007 and 2008, WMI made $6.5

billion of capital contributions to WMB in the amounts and on the dates specified below (the "Capital Contributions"):

| Date | Amount |
|------|--------|
| December 1, 2007 | $1,000,000,000.00 |
| April 18, 2008 | $3,000,000,000.00 |
| July 21, 2008 | $2,000,000,000.00 |
| September 10, 2008 | $500,000,000.00 |

The Capital Contributions are more fully described in paragraph 20 of the Proof of Claim and Exhibit D to the Proof of Claim.

26.     At the time of each of the Capital Contributions, WMB had public debt obligations of approximately $22 billion.[1]   WMI or WMB may have been insolvent at the time that the Capital Contributions were made.   If, at the time of each Capital Contribution, WMB was insolvent, had unreasonably small capital, and/or was unable to pay its own debt obligations as they matured, WMI did not receive any value in exchange for the Capital Contributions.   In addition, the Capital Contributions may have (i) been made while WMI was insolvent or rendered WMI insolvent, (ii) been made while WMI had unreasonably small capital for its business operations, and/or (iii) left WMI unable to repay its own obligations as they matured.

27.     Moreover, upon information and belief, the FDIC or the OTS induced WMI to make one or more of the Capital Contributions at a time when such agencies knew or should have known that appointment of the FDIC as receiver for WMB was imminent.

28.     Accordingly, if WMI was insolvent at the time any of the Capital Contributions were made, WMI asserts a fraudulent transfer claim pursuant to sections 544 and

---

[1] Due to some debt repurchases, the principal balance outstanding is approximately $21.3 billion.

548 of the Bankruptcy Code in an amount up to $6.5 billion, and for all other claims or causes of action, under any theory, applicable to the Capital Contributions.

### E.   Trust Preferred Securities Claims

29.   In February 2006, Washington Mutual Preferred Funding LLC ("WMPF"), a Delaware limited liability company, was formed to facilitate capital-raising transactions through the issuance of preferred securities to investors (such preferred securities are referred to herein collectively as "Trust Preferred Securities") by certain special purpose entities (the "SPEs"). These securities were offered solely to "qualified institutional buyers" or "qualified purchasers." The Trust Preferred Securities have an aggregate liquidation preference of $4 billion.

30.   WMPF's assets were limited to direct or indirect interests in mortgages or mortgage-related assets, cash and other permitted assets. These assets were held in certain Delaware statutory trusts (the "Asset Trusts"). WMPF issued preferred securities (the "WMPF Preferred Securities"), which were held by and were the sole asset of the SPEs and which were senior in priority to WMB's indirect common equity interest in WMPF. Thus, the Trust Preferred Securities issued by the SPEs (which had no material creditors) represented an interest in the WMPF Preferred Securities and, in turn, an indirect interest in the assets held by the Asset Trusts. Immediately before the Receivership Date, WMPF was an indirect subsidiary of WMB and as a result, WMB held an indirect interest in the assets held in the Asset Trusts, subordinate to the liquidation preference of the Trust Preferred Securities.

31.   The Trust Preferred Securities were sold to investors subject to a "conditional exchange" feature. This feature provided that if the OTS so directed, upon (i) WMB becoming undercapitalized, (ii) WMB being placed into receivership or conservatorship or (iii) the OTS anticipating, in its sole discretion, WMB becoming undercapitalized in the near

term or taking a supervisory action that limited the payment of dividends by WMB, then the Trust Preferred Securities were required to be exchanged into shares of preferred stock of WMI (or depositary shares representing an interest in preferred stock of WMI). The OTS notified WMI on the Receivership Date that an "exchange event" occurred, as such term is defined in the documentation governing the Trust Preferred Securities. According to the terms of the Trust Preferred Securities, the exchange of the Trust Preferred Securities for preferred stock of WMI (or depositary shares representing an interest in preferred stock of WMI) is deemed to occur automatically following the issuance by WMI of a press release announcing the exchange event. WMI issued such a press release and the conditional exchange became effective at 8:00 a.m. ET on September 26, 2008.

32.    In addition, WMI purportedly executed an assignment as of September 25, 2008, in which it purported to assign to WMB all its right, title, and interest in and to any and all of the Trust Preferred Securities or preferred securities issued by WMPF, as the case may be, in its possession or coming into its possession (the "Assignment Agreement"). Assuming arguendo that the terms of the Trust Preferred Securities (and the documents and agreements related to the issuance of such securities) and the Assignment Agreement are legally effective and enforceable, and that there are no defenses to the enforceability of such agreements under the Bankruptcy Code or other applicable law, all of which defenses and claims WMI expressly reserves and hereby asserts, the effect of these transactions was to cause the Trust Preferred Securities to be owned by WMI and then purportedly transferred to WMB immediately before the commencement of WMI's chapter 11 bankruptcy case on September 26, 2008.

33.    On information and belief, the Trust Preferred Securities have a value of as much as $4 billion. WMI may not have received any value for the purported transfer of the

Trust Preferred Securities to WMB because, at the time of such purported transfer, WMB may have been insolvent, may have had unreasonably small capital, and/or may have been unable to pay its own debt obligations as they matured.   With respect to the purported transfer of the Trust Preferred Securities, WMI asserts fraudulent transfer claims against WMB pursuant to sections 544 and 548 of the Bankruptcy Code in connection with the transfer of the Trust Preferred Securities.

34.     Furthermore, if WMI was insolvent at the time of such purported transfer and the Trust Preferred Securities were transferred to WMB on account of an antecedent debt owed to WMB, WMI also asserts a claim to recover such securities as a voidable preference pursuant to sections 544 and 547 of the Bankruptcy Code.

35.     In addition, if the Trust Preferred Securities were wrongfully transferred to WMB, WMI asserts a claim for such wrongful transfer and the return of such assets.   In the alternative, WMI asserts that the purported transfer of the Trust Preferred Securities was not properly executed, and, therefore, ineffectual.   Accordingly, WMI asserts that it is the owner of the Trust Preferred Securities.   Finally, as a result of the FDIC's actions purporting to transfer the Trust Preferred Securities from WMI to WMB, and then to JPMorgan Chase or any other party, WMI has been deprived of the use of the Trust Preferred Securities and their proceeds from the Receivership Date onward and asserts a claim with respect thereto against WMB. WMI reserves all other claims or causes of action, under any theory, with respect to the Trust Preferred Securities, as set forth in paragraphs 24-30 of the Proof of Claim.

**F.     Preference Claims**

36.     On or before the Receivership Date, on numerous occasions, WMI transferred property to, or caused its property (or an interest in its property) to be transferred to, WMB or to certain third parties for the benefit of WMB (the "Transfers") on account of

antecedent obligations of WMI to WMB.   The approximate amount of the Transfers occurring during the one-year period before the Bankruptcy Petition Date is $151,934,564.   A list of such Transfers is attached hereto as Exhibit 1.[2]

37.   At the time of the Transfers, WMB was (i) an "insider" of WMI as that term is defined in the Bankruptcy Code or under applicable non-bankruptcy law and (ii) a "creditor" of WMI, as that term is defined in the Bankruptcy Code or under applicable non-bankruptcy law.

38.   If WMI was insolvent at the time the Transfers were made to WMB, the Transfers may be voidable pursuant to, among other applicable law, (i) sections 544 (applying applicable non-bankruptcy law) and 547 of the Bankruptcy Code and (ii) applicable non-bankruptcy law.

39.   Specifically, if WMI was insolvent at the time such Transfers were made, WMI seeks to recover each Transfer from WMB as a voidable preference on the grounds that such Transfer (i) was to or for the benefit of a creditor, (ii) was to or on account of an antecedent debt of WMI, (iii) was made while WMI was insolvent, (iv) was made within one year or less from the date that WMI's bankruptcy case was commenced, and (v) would permit WMB to receive more than it would receive in a case under chapter 7 of the Bankruptcy Code if such Transfer had not been made.

40.   Accordingly, Plaintiffs assert a claim for all transactions constituting a voidable preference, as described in paragraphs 31-35 of the Proof of Claim.

---

[2] Exhibit 1 may not be an exhaustive list of all Transfers.   Accordingly, Plaintiffs reserve their rights to amend and/or supplement Exhibit 1 and the corresponding aggregate amount of the Transfers.

G.    **Vendor Contract Claims**

41.    WMI is party to numerous agreements with vendors (the "Vendors") who lease property, perform services, deliver goods, or license software that primarily benefit the banking operations formerly owned by WMB (the "Vendor Contracts").    Typically, prior to the Receivership, WMB, as the primary beneficiary, paid Vendors for goods and services received pursuant to the Vendor Contracts.    After the Receivership Date, JPMorgan Chase paid certain Vendors for outstanding pre- and post-Receivership obligations incurred in connection with the Vendor Contracts.    Notwithstanding these payments, there continue to be unpaid obligations outstanding in connection with certain of the Vendor Contracts.    Accordingly, as a party to the Vendor Contracts, WMI asserts a claim against WMB for any and all outstanding liabilities on account of goods or services provided to WMB.    Similarly, to the extent Vendors assert claims against WMI for WMI's rejection of any of the Vendor Contracts in its bankruptcy cases, WMI asserts a claim against WMB for any and all such Vendor claims.

H.    **Subrogation Claims**

42.    Predecessors in interest to WMB issued the debt securities identified below (the "WMB Predecessor Notes") pursuant to the indentures listed opposite such WMB Predecessor Notes below (the "Indentures").    The WMB Predecessor Notes were issued to evidence loans made to WMB's predecessors in interest of the proceeds from the issuance by certain statutory trusts (the "CCB Capital Trusts") of preferred and common beneficial interests in the assets of such trusts:

- 10.18% Junior Subordinated Deferrable Interest Debentures due 2031 issued pursuant to that certain Indenture by and between Hawthorne Financial Corporation, as Issuer, and Wilmington Trust Company, as Debenture Trustee, dated as of March 28, 2001, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2033 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as

Issuer, and Wilmington Trust Company, as Trustee, dated as of September 25, 2003, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issues pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of December 19, 2003, as amended from time to time.

- Floating Rate Junior Subordinated Notes due 2034 issued pursuant to that certain Junior Subordinated Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Deutsche Bank Trust Company Americas, as Trustee, dated as of March 31, 2004, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of May 27, 2004, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of June 22, 2004, as amended from time to time.

- Junior Subordinated Notes due 2035 issued pursuant to that certain Junior Subordinated Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Deutsche Bank Trust Company Americas, as Trustee, dated as of February 2, 2005, as amended from time to time.

43.     By supplemental indentures or other agreements relating to each of the Indentures, dated as of November 1, 2007, WMB assumed all obligations of the issuers pursuant to the Indentures.   Pursuant to the terms of certain Indenture Guarantees, dated as of November 1, 2007, WMI guaranteed WMB's obligations under the WMB Predecessor Notes.

44.     WMI asserts a subrogation claim against WMB for any amount it is obligated to pay pursuant to the Indenture Guarantees or any other guarantee of WMB's obligations, as described in paragraphs 37-39 of the Proof of Claim and Exhibit F to the Proof of Claim.

**I.     Improper Asset Sales**

45.     On the Receivership Date, the FDIC may have taken possession and control of certain property (including, but not limited to, furniture, fixtures, equipment, and other tangible and intangible assets) owned by Plaintiffs or for which transfer of such property from Plaintiffs' ownership was improper or subject to avoidance and recovery.   To date, the FDIC has neither accounted for nor compensated the Plaintiffs for this property.   The FDIC, may have converted Plaintiffs' property by purporting to transfer an ownership interest in some or all of such property to JPMorgan Chase.   Plaintiffs thus assert a claim against WMB for recovery of such property or payment, in full, for such transferred property, to the extent applicable, in an amount to be determined.

46.     Plaintiffs expressly reserve their rights to make additional claims against WMB for reasonable payment for the use-value of such property, plus interest, until such time as the property is returned to Plaintiff's use.

**J.     Deposit Claim**

47.     On the Receivership Date, WMI and its subsidiaries maintained twenty-eight separate demand deposit accounts with WMB (the "WMB Deposits Accounts") and a twenty ninth account with WMBfsb (the "FSB Deposit Account").   Of the accounts owned by non-debtor subsidiaries of WMI, as of the date of the Proof of Claim and this Complaint, twenty of the accounts (the "Non-Debtor Deposit Accounts") have been moved to other financial institutions and three (3) accounts remain on deposit with JPMorgan Chase (the "Non-Debtor WMB Deposit Accounts").   Furthermore, as of the date of the Proof of Claim and this Complaint, six (6) accounts owned by WMI or WMI Investment (the "Debtor Deposit Accounts") also remain on deposit with JPMorgan Chase.

48.   On information and belief, each of the WMB Deposit Accounts was transferred to JPMorgan Chase pursuant to the Purchase and Assumption Agreement and JPMorgan Chase assumed all liability to WMI as a depositor with respect to the WMB Deposit Accounts.   On information and belief, JPMorgan Chase acquired the stock of WMBfsb pursuant to the Purchase and Assumption Agreement and subsequently merged WBMfsb into JPMorgan Chase, thereby assuming all liability to WMI as a depositor with respect to the FSB Deposit Account.

49.   Although WMI believes that it now is a depositor of JPMorgan Chase with respect to the Debtor Deposit Accounts and the Non-Debtor WMB Deposit Accounts and a depositor of an unrelated financial institution with respect to the Non-Debtor Deposit Accounts, on information and belief the FDIC and JPMorgan Chase continue to reserve certain rights with respect to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, and/or the Non-Debtor Deposit Accounts, including rights under the Purchase and Assumption Agreement. If Plaintiffs' rights to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts are in any way compromised or modified, WMI asserts a claim against WMB for any lost value or other consequential damages.   Without prejudice to WMI's position that it is a depositor of JPMorgan Chase, Plaintiffs asserted a protective claim for the outstanding balance on each of the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, and the Non-Debtor Deposit accounts in the event FDIC exercises any rights it may have under the Purchase and Assumption Agreement, or otherwise, with respect to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts, as described in paragraphs 43-45 of the Proof of Claim.   This claim is entitled to priority pursuant to 12 U.S.C. § 1821(d)(11)(a)(ii).   Furthermore, the FDIC does not have any

right of setoff with respect to either the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts on account of any claims it may assert against WMI or the other Plaintiffs.

50.     In addition, by reason of the Receivership and the subsequent sale of substantially all of WMB's assets to JPMorgan Chase, Plaintiffs have been denied access to, control, and use of the WMB Deposit Accounts and the FSB Deposit Account by JPMorgan Chase and were unable to, among other things, invest the funds in the WMB Deposit Accounts and the FSB Deposit Account, move the funds to another institution, or transfer the funds to interest-bearing accounts.   Accordingly, Plaintiffs hereby assert a claim against WMB for damages, including interest, for the lost use of the funds in the WMB Deposit Accounts and the FSB Deposit Account from September 25, 2008, until such time as Plaintiffs are able to transfer such funds to interest bearing accounts at other institutions.

### K.     Administrative Claims

51.     In certain instances, WMI may have paid or become liable for costs and/or expenses that inured to the benefit of WMB subsequent to the Receivership Date.   These amounts may include, without limitation, liability incurred by WMI as a result of JPMorgan Chase's decision to exclude certain contracts from the Purchase and Assumption Agreement and expenses incurred by WMI that may have benefited WMB.   WMI asserts claims against WMB for all such costs and expenses, as described in paragraph 47 of the Proof of Claim.

### L.     Employee/Employer Related Costs and Insurance Claims

52.     Prior to the Receivership, WMI was the sponsor of all employee benefit plans, including, among others, the Washington Mutual, Inc. Cash Balance Pension Plan, the Washington Mutual, Inc. Savings Plan, and the Washington Mutual, Inc. Flexible Benefits Plan (the "Benefit Plans").   These plans covered all of WMI's employees, as well as employees of

WMB.  WMI may transfer sponsorship of certain of the Benefit Plans to JPMorgan Chase; however, WMI reserves all rights to assert a claim against WMB on account of all amounts paid by WMI on account of such plans for the benefit of WMB employees for which WMI was not reimbursed, as described in paragraph 48 of the Proof of Claim.

53.     In addition, prior to the Receivership, WMI sponsored certain deferred compensation plans.  To the extent that WMI is or becomes liable for amounts due under such deferred compensation plans, WMI asserts a claim for amounts due on account of past and/or present WMB employees and directors.

54.     In addition, with respect to the Cash Balance Pension Plan (the "Pension Plan"), if it is determined that the Pension Plan is underfunded, WMI asserts a claim against WMB for the amount of such underfunding that is attributable to WMB and any other costs, expenses or liabilities associated therewith.

55.     WMI also reserves all rights to assert claims against WMB for any and all other employee or employer related costs incurred by WMI on behalf of WMB and its employees, which may include, without limitation, payroll, severance and related taxes, as described in paragraphs 48-51 of the Proof of Claim.

56.     In addition, WMI is the owner of certain bank-owned and corporation-owned life insurance policies (the "BOLI-COLI Policies").  In certain instances, as reflected in WMI's Schedules, WMI's ownership interest in the BOLI-COLI Policies is reflected on its books and records and in certain other instances, WMI may have an ownership interest in BOLI-COLI Policies reflected on WMB's books and records.  WMI asserts a claim against WMB for any and all premiums and other charges paid by WMI on account of BOLI-COLI Policies owned by WMB.  WMI also reserves all rights to assert a claim against WMB for the value and

proceeds of any BOLI-COLI Policies owned by WMI, but reflected on the books and records of WMB, as described in paragraph 52 of the Proof of Claim.

57.     WMI also has an ownership interest in a variety of insurance policies. Certain of WMI's insurance policies name WMI and its subsidiaries, including WMB and its subsidiaries as insured persons.   To the extent that WMB asserts claims to proceeds of such insurance policies, WMI asserts a claim against WMB for such amounts, as described in paragraph 53 of the Proof of Claim.

**M.     Indemnification Claims**

58.     WMI's bylaws provide for the indemnification of all WMI directors and officers.   Prior to the Bankruptcy Petition Date, approximately sixty employees of WMB were officers of WMI.   To the extent that such officers (or any directors, officers, or employees of WMB) assert indemnification or contribution claims against WMI, WMI asserts claims for reimbursement of such claims against WMB.

59.     In addition, after the Bankruptcy Petition Date, WMI purchased an extension of the coverage period for its directors' and officers' liability insurance policy.   To the extent that this extended insurance coverage benefits officers of WMB, WMI asserts a claim against WMB and/or its subsidiaries for their share of the cost of procuring the extended coverage.

**N.     Other Claims**

60.     Out of an abundance of caution, Plaintiffs assert contingent, unliquidated claims against WMB to the extent any of Plaintiffs are obligated, or become obligated, on account of WMB, including, but not limited to, on account of claims arising from WMB's mortgage loan origination business, as described in paragraph 53 of the Proof of Claim.

61.     Plaintiffs further assert a claim for any other amounts due to Plaintiffs described in the Proof of Claim, including, but not limited to the amounts more fully described in paragraphs 57-59 of the Proof of Claim that are due to Plaintiffs for fees, costs, and expenses, for interest, and pursuant to WMI's equity interest in WMB.

### THE FDIC'S DENIAL OF PLAINTIFFS' PROOF OF CLAIM

62.     As alleged more fully above, Plaintiffs filed their proof of claim with FDIC-Receiver on December 30, 2008.

63.     In a letter dated January 23, 2009, FDIC-Receiver provided WMI notice that Plaintiffs' claims had been disallowed.   A copy of the FDIC-Receiver's notice is attached as Exhibit 2.

64.     The FDIC-Receiver's notice stated that Plaintiffs' claims were disallowed because:

> The claims presented are unproven to the satisfaction of the Receiver since they lack sufficient documentation or specificity, they fail to state claims against the receivership, they appear to assert claims against a third party or there is no legal basis for the claims.   Equity claims are paid in accordance with 12 U.S.C. sec. 1821(d)(11).

65.     The notice provides no additional detail or explanation regarding the FDIC-Receiver's decision.

66.     On information and belief, it is the FDIC-Receiver's practice to request further information from claimants if the FDIC-Receiver requires further information to determine whether a claim and/or the amount of such claim is valid.   See, e.g., ALLTEL Info. Servs., Inc. v. FDIC, 970 F. Supp. 775, 776 (C.D. Cal. 1997) ("In response to a request by an FDIC claims representative, ALLTEL provided the FDIC a letter . . . which provided calculations in support of both Proofs of Claims.")

67.    FDIC-Receiver did not request any further information from Plaintiffs or their counsel regarding the Proof of Claim.

68.    On information and belief, FDIC-Receiver typically issues receivership certificates when it allows a claim, but has not yet determined the amount (if any) that the claimant will receive when the proceeds of the receivership estate are distributed.

69.    FDIC-Receiver did not provide Plaintiffs with any receivership certificates, but rather disallowed their Claims outright.

70.    Section 11(d)(2)(H) of the FDI Act states that FDIC-Receiver "shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."    12 U.S.C. § 1821(d)(2)(H).

71.    FDIC-Receiver's refusal to consider Plaintiffs' Claims and cryptic disallowance of those Claims violated the FDIC-Receiver's statutory duty to pay all valid claims in accordance with the FDI Act.

72.    Section 11(d)(5)(B) of the FDI Act further obligates FDIC-Receiver to "allow any claim received on or before the date specified in the notice published under paragraph (3)(B)(i) by the receiver from any claimant which is proved to the satisfaction of the receiver." 12 U.S.C. § 1821(d)(5)(B).

73.    FDIC-Receiver provided no grounds regarding why Plaintiffs' claims were not proven to its satisfaction.    The FDIC-Receiver's failure to do so is a violation of its statutory duties.

74.    The FDI Act provides that, when FDIC Receiver has disallowed a claim, the claimant may "request administrative review of the claim" or "file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial

court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."   12 U.S.C. § 1821(d)(6)(A).

75.    The FDI Act further provides that, "[i]f any claimant requests review under this subparagraph in lieu of filing or continuing any action under paragraph (6) and the Corporation agrees to such request, the Corporation shall consider the claim after opportunity for a hearing on the record."   12 U.S.C. § 1821(d)(7)(A).   "The Corporation shall also establish such alternative dispute resolution processes as may be appropriate for the resolution of claims . . . ."   12 U.S.C. § 1821(d)(7)(B)(i).

76.    Notwithstanding these statutory directives, the FDIC-Receiver's notice sets forth no administrative review process in which Plaintiffs could seek a hearing regarding their claims.   Nor does it appear that the FDIC has established any alternative dispute resolution mechanism to resolve proof of claim disputes.

77.    Rather, FDIC-Receiver's notice directs Plaintiffs to file a lawsuit if Plaintiffs disagree with the disallowance of their claims.   Accordingly, Plaintiffs filed this action.

## CLAIMS FOR RELIEF

### Count I
### Determination of Plaintiffs' Proof of Claim

78.    Plaintiffs incorporate the allegations and averments contained in paragraphs 5 through 77 as if set forth fully herein.

79.    Under 12 U.S.C. § 1821(d)(6)(A), the Court has de novo jurisdiction to consider Plaintiffs' Claims set forth in the Proof of Claim.   See, e.g. Freeman v. FDIC, 56 F. 3d 1394, 1400 (D.C. Cir. 1995) ("[U]nder section 1821(d)(6) [claimant] had recourse to de novo

judicial review of the FDIC's denial of [their] claim."); <u>Benjamin Franklin Shareholders Litig.</u>

<u>Fund v. FDIC</u>, 501 F. Supp. 2d 103, 106 (D.D.C. 2007) ("[T]his Court reviews de novo claims

filed with, and processed by the FDIC under its administrative claims process.") (citing <u>Freeman</u>

<u>v. FDIC</u>, 56 F. 3d 1394, 1400 (D.C. Cir. 1995)).

80.   Each Claim is a valid and proven claim against the Receivership and

FDIC-Receiver is obligated to pay such Claims (subject to, and in accordance with, 12 U.S.C.

§ 1821(d)(11)).

**Count II**
**Dissipation of WMB's Assets**

81.   Plaintiffs incorporate the allegations and averments contained in

paragraphs 5 through 80 as if set forth fully herein.

82.   According to the OTS's press release announcing the FDIC's appointment

as receiver for WMB, the OTS stated that WMB had "insufficient liquidity to meet its

obligations" and thus "was in an unsafe and unsound condition to transact business."   A fact

sheet accompanying that press release further stated that "[s]ignificant deposit outflows began on

September 15, 2008" and that "[g]iven the Bank's limited sources of funds and significant

deposit outflows, it was highly likely to be unable to pay its obligations and meet its operating

liquidity needs."   (Copies of the press release and fact sheet are attached as Exhibit 3.)

Accordingly, on information and belief, the OTS's rationale for placing WMB into receivership

was illiquidity, rather than insolvency.

83.   According to the OTS fact sheet (<u>see</u> Exhibit 3), the OTS stated that WMB

qualified as "well-capitalized" under the OTS's regulatory capital regulations through the

Receivership Date.

84.     Notwithstanding this, the FDIC has indicated that it "does not anticipate that subordinated debt holders of the bank will receive any recovery on their claims."[3]   On information and belief, general creditors of WMB are unlikely to be paid in full as well.

85.     Rather than a straight liquidation of WMB's assets, the FDIC entered into the Purchase and Assumption Agreement with JPMorgan Chase, described more fully above, for the purchase price of $1.9 billion.

86.     On information and belief, the assets of WMB sold, less the liabilities assumed, were worth more than $1.9 billion, had such assets been liquidated in a prudent and reasonable manner.

87.     On information and belief, Plaintiffs will not receive payments from the Receivership for their Claims that would be equal to or greater than the payments for that Plaintiffs would have received had the FDIC conducted a straight liquidation of WMB's assets and liabilities (and had the FDIC not improperly disallowed Plaintiffs' Claims).

88.     The FDI Act requires "the Corporation [to] conduct its operations in a manner which . . . maximizes the net present value return from the sale or disposition of such assets . . . ."   12 U.S.C. § 1821(d)(13)(E)(i).

89.     By failing to liquidate WMB in a manner allowing WMB's creditors and other claimants to recover what they would have recovered in a straight liquidation, the FDIC breached its statutory duty to maximize the net present value of WMB's assets.

90.     The FDI Act further provides that "[t]he maximum liability of the [FDIC], acting as receiver or in any other capacity, to any person having a claim against the receiver or

---

[3]   FDIC, Information for Washington Mutual Bank, Henderson, NV and Washington Mutual Bank, FSB, Park City, UT, *available at* http://www.fdic.gov/bank/individual/failed/wamu.html

the insured depository institution for which such receiver is appointed shall equal the amount

such claimant would have received if the [FDIC] had liquidated the assets and liabilities of such

institution . . . ."   12 U.S.C. § 1821(i)(2).   Pursuant to this provision, the FDIC is obligated to

pay damages to Plaintiffs equal to the difference between what Plaintiffs would have received in

a straight liquidation of WMB and what they actually received.

## Count III
### Taking of Plaintiffs' Property Without Just Compensation

91.   Plaintiffs incorporate the allegations and averments contained in paragraphs 5 through 90 as if set forth fully herein.

92.   The FDIC's wasting of WMB's assets and failure to compensate Plaintiffs for their claims against WMB equivalent to what Plaintiffs would have received for such claims in a straight liquidation of WMB's assets constitutes a taking of Plaintiffs' property without just compensation in violation of the Fifth Amendment to the United States Constitution.

## Count IV
### Conversion of Plaintiffs' Property

93.   Plaintiffs incorporate the allegations and averments contained in paragraphs 5 through 90 as if set forth fully herein.

94.   The FDIC's refusal to compensate Plaintiffs for property taken into the Receivership that (a) belonged to Plaintiffs rather than WMB, (b) was improperly transferred to WMB, and/or (c) is property that otherwise should be returned to Plaintiffs under applicable law, constitutes conversion of Plaintiffs' property.

95.   The FDIC's conversion of Plaintiffs' property is actionable under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671-80).

## Count V
### Declaration That the FDIC-Receiver's Disallowance Is Void

96.   Plaintiffs incorporate the allegations and averments contained in paragraphs 5 through 90 as if set forth fully herein.

97.   FDIC-Receiver's failure to consider Plaintiffs' Proof of Claim and the FDIC-Receiver's summary disallowance of the Proof of Claim without any meaningful explanation is an abrogation of FDIC-Receiver's statutory duties.   Therefore, FDIC-Receiver's disallowance should be declared void and FDIC-Receiver should be required to reconsider Plaintiffs' Proof of Claim as if FDIC-Receiver's January 23rd disallowance never occurred.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to grant the following relief:

1. An order declaring Plaintiffs' Claims to be valid and proven against the Receivership;

2. An order directing FDIC-Receiver to pay the Claims from the assets of the Receivership in accordance with 12 U.S.C. § 1821(d)(11);

3. An order directing FDIC-Receiver to provide Plaintiffs with an accounting of the disposition of the assets of the Receivership if any Claim is not satisfied in full;

4. An order directing FDIC-Receiver to provide Plaintiffs with an accounting of all property transferred from Plaintiffs in connection with the Receivership;

5. Enter a judgment against FDIC-Corporate and FDIC-Receiver for damages, in an amount to be determined, equal to the amount of money Plaintiffs would have received in a straight liquidation of WMB's assets and liabilities less any amounts actually received from the Receivership;

6. Enter a judgment against FDIC-Corporate and FDIC-Receiver for damages, in an amount to be determined, equal to the value of Plaintiffs' property converted by the FDIC;

7. An order declaring that the FDIC's January 23, 2009 disallowance to be void, and that the parties should proceed as if such disallowance never occurred;

8. Award Plaintiffs costs and attorneys fees as may be permitted by law; and

9.  Award Plaintiffs such other relief as may be just.

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their attorneys, hereby demand a trial by jury on all claims otherwise triable by jury asserted in the complaint.

Dated: Washington, D.C.
       March 20, 2009

_____
David R. Berz, Esq. (D.C. Bar No. 182105)
Adam P. Strochak, Esq. (D.C. Bar No. 439308)
WEIL. GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7001
Facsímile: (202) 857-0939

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
Michael F. Walsh, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsímile:   (212) 310-8007


Attorneys for Plaintiffs WMI and WMI Investment

# EXHIBIT 1

**Exhibit 1**
**(Payments to WMB)**

| Date Paid | Amount Paid to WMB |
|---|---|
| 10/11/2007 | 857,230.47 |
| 10/18/2007 | 3,446,107.42 |
| 11/8/2007 | 1,189.73 |
| 11/15/2007 | 254,364.42 |
| 12/13/2007 | 186,438.82 |
| 1/10/2008 | 6,863,343.95 |
| 1/17/2008 | 2,190.72 |
| 2/7/2008 | 2,319,329.88 |
| 3/6/2008 | 7,948.56 |
| 3/13/2008 | 773,837.68 |
| 3/31/2008 | 14,030,414.67 |
| 4/10/2008 | 4,488,747.40 |
| 4/24/2008 | 3,759,043.02 |
| 5/8/2008 | 2,598,863.39 |
| 5/30/2008 | 1,240.005.70 |
| 6/19/2008 | 170.28 |
| 6/26/2008 | 10,520,771.72 |
| 7/24/2008 | 581,788.51 |
| 8/14/2008 | 1,431,922.60 |
| 8/21/2008 | 4,194,820.96 |
| 9/11/2008 | 112,923.51 |
| 9/25/2008 | 4,101,278.69 |
| 10/18/2007 | 175,635.71 |
| 10/25/2007 | 305,110.56 |
| 10/31/2007 | 1,434,522.37 |
| 11/8/2007 | 4,966,409.90 |
| 11/15/2007 | 725,599.67 |
| 12/13/2007 | 8,865,013.39 |
| 12/31/2007 | 6,205.49 |
| 1/10/2008 | 6,362,822.58 |
| 1/17/2008 | 914,011.32 |
| 1/31/2008 | 12,447,072.22 |
| 2/7/2008 | 3,377,908.39 |
| 2/14/2008 | 292,691.98 |
| 2/21/2008 | 671,242.69 |
| 2/29/2008 | 750,288.31 |
| 3/13/2008 | 3,256,230.57 |
| 3/20/2008 | 1,096,451.96 |

| Date Paid | Amount Paid to WMB |
|:---:|---:|
| 4/10/2008 | 3,429,936.11 |
| 5/15/2008 | 1,956,466.25 |
| 5/22/2008 | 3,062,583.76 |
| 6/19/2008 | 1,422,177.59 |
| 6/30/2008 | 5,284,659.08 |
| 7/10/2008 | 2,598,631.45 |
| 7/24/2008 | 2,879,785.16 |
| 8/7/2008 | 1,805,099.83 |
| 8/14/2008 | 2,573,609.62 |
| 9/11/2008 | 614,326.45 |
| 9/18/2008 | 17,205,753.61 |
| 9/25/2008 | 1,681,646.07 |
| **Total:** | 151,934,564.19 |

# EXHIBIT 2


**FDIC**

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201                                  Division of Resolutions and Receiverships

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7008 1830 0000 8032 2550**

January 23, 2009

Washington Mutual, Inc.
ATTN:  John Marciel
1301 Second Avenue, WMC3501
Seattle, WA 98101

SUBJECT:       10015–Washington Mutual Bank
               Henderson, NV -- In Receivership
               <u>**NOTICE OF DISALLOWANCE OF CLAIM**</u>

Dear Claimant:

The Receiver of  Washington Mutual Bank has reviewed your claim against the receivership.  After a
thorough review of your filed claim along with your supporting documentation, the Receiver has
determined to disallow your claim for the following reason(s) :

> The claims presented are unproven to the satisfaction of the Receiver since they lack
> sufficient documentation or specificity, they fail to state claims against the receivership,
> they appear to assert claims against a third party or there is no legal basis for the claims.
> Equity claims are paid in accordance with 12 U.S.C. sec. 1821(d)(11).

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right
to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the
Receiver), in the United States District (or Territorial) Court for the District within which the failed
institution's principal place of business was located or the United States District Court for the District of
Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the
Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL,
YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR
REMEDIES WITH RESPECT TO YOUR CLAIM.  12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but
rather is against the FDIC in its "corporate" capacity as deposit insurer.  An insured depositor's rights are
prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8049.

Sincerely,

*Donald Grieser*

Donald Grieser
Claims Department

RECEIVED
FEB 0 2 2009
LEGAL DEPARTMENT
SEATTLE

RLS7218

# EXHIBIT 3

## Press Releases

September 25, 2008

### OTS 08-046 - Washington Mutual Acquired by JPMorgan Chase

FOR RELEASE:
Thursday, Sept. 25, 2008

CONTACT: William Ruberry
(202) 906-6677
Cell – (202) 368-7727

Recent Upd
Press Relea
Events
Speeches
Testimony
Website Su

**Washington, DC —** Washington Mutual Bank, the $307 billion thrift institution headquartered in Seattle, was acquired today by JPMorgan Chase, the Office of Thrift Supervision (OTS) announced.

The change will have no impact on the bank's depositors or other customers. Business will proceed uninterrupted and bank branches will open on Friday morning as usual.

Washington Mutual, or WaMu, specialized in providing home mortgages, credit cards and other retail lending products and services. WaMu became an OTS-regulated institution on December 27, 1988 and grew through acquisitions between 1996 and 2002 to become the largest savings association supervised by the agency. As of June 30, 2008, WaMu had more than 43,000 employees, more than 2,200 branch offices in 15 states and $188.3 billion in deposits.

"The housing market downturn had a significant impact on the performance of WaMu's mortgage portfolio and led to three straight quarters of losses totaling $6.1 billion," noted OTS Director John Reich.

Pressure on WaMu intensified in the last three months as market conditions worsened. An outflow of deposits began on September 15, 2008, totaling $16.7 billion. With insufficient liquidity to meet its obligations, WaMu was in an unsafe and unsound condition to transact business. The OTS closed the institution and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. The FDIC held the bidding process that resulted in the acquisition by JPMorgan Chase.

Customer questions regarding the institution, including questions about federal deposit insurance coverage, should be directed to the FDIC at 1-877-ASK-FDIC. WaMu customers with questions can also call the bank's service center at 1-800-788-7000.



# Office of Thrift Supervision

# FACT SHEET

1700 G Street, N.W., Washington, D.C. 20552 • Telephone (202) 906-6677 • www.ots.treas.gov

FOR RELEASE:
Thursday, September 25, 2008
OTS 08-046A

CONTACT:
William Ruberry
(202) 906-6677
Cell – (202) 368-7727

## OTS Fact Sheet on Washington Mutual Bank

**Institution Profile**

- Total assets as of June 30, 2008: $307.02 billion
- Primary executive and business segment headquarters are located in Seattle, Washington.
- Branches: 2,239 retail branch offices operating in 15 states
- 4,932 owned and branded ATMs
- Employees: 43,198 at June 30, 2008

**Recent Deposit Flows**

- Because of adverse events in the financial markets, material outflows began on September 15, 2008. Coupled with further rating agency downgrades of Washington Mutual Inc. (WMI, the top-tier holding company) and Washington Mutual Bank (WMB or the Bank), the Bank experienced a net deposit loss of $16.7 billion through September 24, 2008.

**Other Financial Details (as of June 30, 2008)**

- Total deposits: $188.3 billion
- Brokered deposits: $34.04 billion
- Total borrowings: $82.9 billion primarily comprising Federal Home Loan Bank advances of $58.4 billion and $7.8 billion of subordinated debt
- Loans held: $118.9 billion in single-family loans held for investment - this includes $52.9 billion in payment option ARMs and $16.05 billion in subprime mortgage loans
- Home Equity Lines of Credit (HELOCs): $53.4 billion
- Credit Card Receivables: $10.6 billion

- Total loan servicing: $689.7 billion total loans serviced, including $442.7 billion in loans serviced for others and $26.3 billion of subprime mortgage loans
- Non-performing assets: $11.6 billion, including $3.23 billion payment option ARMs and $3.0 billion subprime mortgage loans

**Institution History**

- WMI is the top-tier savings and loan holding company and owns two banking subsidiaries, WMB and Washington Mutual Bank, fsb (WMBfsb), as well as nonbank subsidiaries.
- Since the early 1990s, WMI expanded its retail banking and lending operations organically and through a series of key acquisitions of retail banks and mortgage companies. The majority of growth resulted from acquisitions between 1996 and 2002. On October 1, 2005, the Bank entered the credit card lending business by acquiring Providian Financial Corporation. These acquisitions enabled WMB to expand across the country, build its customer base, and become the largest savings and loan association in the country.
- The Bank had four business segments: the Retail Banking Group, the Card Services Group, the Commercial Group and the Home Loans Group. WMB is a leading originator and servicer of both single- and multi-family mortgages and a major issuer of credit cards.

**Recent Events**

- *Changes in Business Strategy* - Beginning in late 2006 through today, WMB was proactively changing its business strategy to respond to declining housing and market conditions. Changes included tightening credit standards, eliminating purchasing and originating subprime mortgage loans, and discontinuing underwriting option ARM and stated income loans. Management reduced loans originated for sale and transferred held for sale loans to the held for investment portfolio. WMB was focusing on shrinking its balance sheet and developing a retail strategy through its branch operations.

- *Reduction of Overhead Expenses* - In December 2007, WMB announced the resizing of its Home Loans business including the elimination of approximately 2,600 employee positions, closure of approximately 190 home loan centers and sales offices, and closure of nine loan processing and call centers.

- *Maintaining Capital* - In late 2006 and 2007, WMB began to build its capital level through asset shrinkage and the sale of lower-yielding assets. In April 2008, WMI received $7.0 billion of new capital from the issuance of common stock. Since December 2007, WMI infused $6.5 billion into WMB. WMB met the well-capitalized standards through the date of receivership.

2

- *Operating Losses* - WMB recorded a net loss of $6.1 billion for the three quarters ended June 30, 2008. In the second quarter of 2008, WMB management disclosed that the Bank's credit quality had deteriorated and it might incur up to $19 billion in losses on its single-family residential mortgage portfolio. WMB increased its loan loss provisioning in response to the deteriorating housing market. Loan loss provisions increased from $1.6 billion in the fourth quarter of 2007, to $3.6 billion in the first quarter of 2008 and $6.0 billion in the second quarter of 2008.

- *Deposit Outflows* – Since July 2008, the pressure on WMB increased as market conditions continued to worsen. Significant deposit outflows began on September 15, 2008. During the next eight business days, WMB deposit outflows totaled $16.7 billion, shortening the time available to augment capital, improve liquidity, or find an equity partner. Given the Bank's limited sources of funds and significant deposit outflows, it was highly likely to be unable to pay its obligations and meet its operating liquidity needs.

- *Receivership* - With insufficient liquidity to meet its obligations, WMB was in an unsafe and unsound condition to transact business. OTS placed WMB into receivership on September 25, 2008. WMB was acquired today by JPMorgan Chase. The change will have no impact on the bank's depositors or other customers. Business will proceed uninterrupted and bank branches will open on Friday morning as usual.

**OTS Enforcement Actions**

- October 17, 2007 – Issued a Cease and Desist Order related to deficiencies in Bank Secrecy Act/Anti-Money Laundering (BSA/AML) programs
- October 17, 2007 – Assessed Civil Money Penalties (CMPs) related to violation of flood insurance regulations
- November 14, 2007 – Initiated a formal examination of the appraisal process to assess the validity of a complaint filed by the New York Attorney General's (NYAG) Office
- February 27, 2008 – Issued overall composite ratings downgrade and received a Board resolution in response to the supervisory action
- June 30, 2008 – Initiated discussions about Memorandums of Understanding with WMI and WMB
- September 7, 2008 - Issued Memorandums of Understanding to WMI and WMB
- September 18, 2008 – Issued overall composite ratings downgrade

**OTS Profile**
Established - 1989
Thrift institutions supervised as of June 30, 2008 - 829
Thrift industry assets supervised as of June 30, 2008 - $1.51 trillion
OTS employees - 1,055
Washington Mutual Bank assessment revenue – 12.2 percent of 2008 OTS budget