EXHIBIT 2

**Federal Deposit Insurance Corporation as Receiver for:**

**10015 – Washington Mutual Bank Henderson, NV**

(Name of Bank/Financial Institution and Location)

## PROOF OF CLAIM

SSN/Tax ID # (1) <u>91-1653725</u>

The undersigned, (2) <u>John Maciel, Chief Financial Officer of Washington Mutual, Inc.</u>

(Name of person making the claim)

says that the **<u>Washington Mutual Bank</u>** <u> </u> now in liquidation is

(Name of Bank/Financial Institution)

justly indebted to (3) **<u>Washington Mutual, Inc. and its subsidiaries identified in Schedule 1 to the attached Addendum (collectively, the "Claimants")</u>** in the sum of

(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4) <u>See attached Addendum to Proof of Claim</u> Dollars upon the following Claim:

| | Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | **(5) See attached Addendum to Proof of Claim** | | |
| | | Total Claim:(6)<br>**See attached<br>Addendum to<br>Proof of Claim** | |

The undersigned further states that he/she makes this claim on behalf of

(7) <u>the Claimants</u> ,

that no part of said debt has been paid, that

(8) <u>the Claimants (except as provided in the attached Addendum) have</u>

(Individual/Joint/Corporation/Partnership/Firm/Agency)

given no endorsement or assignment of the same or any part thereof.

NAME (9) _John Maciel_ (signature)     Chief Financial Officer

(Signature of Person making the Claim)     (Title)

FIRM     <u>Washington Mutual, Inc.</u>

(If applicable)

ADDRESS (10)     <u>1301 Second Avenue, WMC3501</u>

CITY/STATE/ZIP     <u>Seattle, WA 98101</u>

TELEPHONE NUMBER     <u>(415) 490-2307</u>

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. Section 1007).

**ADDENDUM TO PROOF OF CLAIM OF WASHINGTON MUTUAL, INC.
AND ITS SUBSIDIARIES AGAINST THE FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK**

Washington Mutual, Inc. ("WMI"), WMI Investment Corp. ("WMI Investment" and together with WMI, the "Debtors"), and each of WMI's direct and indirect non-banking subsidiaries listed on Schedule 1 hereto (the "Non-Debtor Subsidiaries," and together with the Debtors, the "Claimants")[1] file this proof of claim (the "Proof of Claim") with the Federal Deposit Insurance Corporation (the "FDIC"), as receiver for Washington Mutual Bank, Henderson, Nevada ("WMB").

## Background

1.      WMI is a holding company incorporated in the State of Washington and headquartered at 1301 Second Avenue, Seattle, Washington 98101.  Prior to the Receivership Date and the Bankruptcy Petition Date (both as defined below), WMI was a savings and loan holding company that owned WMB, and WMB's subsidiaries, including Washington Mutual Bank fsb ("WMBfsb" and together with WMB and their respective banking subsidiaries, the "Banking Subsidiaries").

2.      WMI, like all savings and loan holding companies, was subject to regulation by the Office of Thrift Supervision (the "OTS") and the FDIC.  WMB and WMBfsb, like all depository institutions with federal thrift charters, were also subject to regulation and examination by the OTS and the FDIC.  In addition, WMI's banking and non-banking subsidiaries were overseen by various other federal and state authorities.

3.      On September 25, 2008 (the "Receivership Date"), the Director of the OTS, by order number 2008-36, appointed the FDIC as receiver for WMB and advised that the

---

[1]  For ease of use, unless otherwise indicated, reference to "WMI" shall include all direct and indirect non-banking subsidiaries of WMI.

receiver was immediately taking possession of WMB (the "Receivership").  Immediately after its

appointment as receiver, the FDIC sold substantially all the assets of WMB, including the stock

of WMBfsb, to JPMorgan Chase Bank, National Association ("JPMorgan Chase") pursuant to

that certain Purchase and Assumption Agreement, Whole Bank, dated as of September 25, 2008

(the "Assumption Agreement").

        4.     On September 26, 2008 (the "Bankruptcy Petition Date"), the Debtors

each commenced a voluntary case pursuant to chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court").  The automatic stay in the Debtors' chapter 11 cases prohibits any entity,

including the FDIC and JPMorgan Chase, from, among other things, taking any action to obtain

possession of property of the Debtors' estates or to exercise control over such property.

        5.     Pursuant to section 1821(d) of title 12 of the United States Code, the FDIC

set December 30, 2008, as the last day to file claims against the Receivership.  As described in

detail below, the Debtors and the other Claimants assert claims against the Receivership.  WMI

has authority to file this Proof of Claim on behalf of itself and on behalf of WMI Investment and

each of the Non-Debtor Subsidiaries.  The tax identification numbers and addresses for those

entities are listed on Schedule 1.

### Summary of Claims

        6.     In connection with the events described above, and as more fully

described herein, Claimants assert a liquidated claim against WMB in the aggregate approximate

amount of $6,851,723,146 as of the Receivership Date (the "Liquidated Claim").  In addition to

the Liquidated Claim, upon information and belief, Claimants assert the contingent and/or

unliquidated claims described below.  Claimants reserve all rights to amend and/or supplement

this Proof of Claim at any time and in any respect and to assert any and all other claims of

whatever kind or nature that they have, or may have, against WMB.  The claims asserted are

unsecured, unless otherwise noted, and except to the extent that WMB asserts claims against the

Claimants.  To the extent of any such claims asserted by WMB, Claimants assert that the claims

asserted hereunder are secured.

       7.     On the Receivership Date, many of the Claimants' books and records were

seized by the FDIC and transferred to the custody of JPMorgan Chase.  As a result, this Proof of

Claim has been prepared using the information available to the Claimants, which was, in certain

instances, only summary information set forth in the Claimants' books and records.  The

Claimants have endeavored to support the claims asserted herein with documentation, where

such documentation was reasonably available to the Claimants.  However, the Claimants have

not attached supporting documentation where it is too voluminous.  Supporting documentation,

however, may be made available upon request.

## Proof of Claim

## I.    Intercompany Loans

       8.     As of the Receivership Date, WMB was indebted to WMI, or to one of its

subsidiaries identified below, for the outstanding principal, accrued interest, and other amounts

due under the following promissory notes (the "Promissory Notes"):

    a.    $82,048,081 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Corporation, as lender. H.S. Loan Corporation is a subsidiary of WMI, in which WMB owns 1.5748%.

    b.    $73,670,153 under that certain Revolving Master Note, dated as of December 22, 2005, by and between WMB, as borrower, and H.S. Loan Partners, as lender. H.S. Loan Partners is an indirect, wholly-owned subsidiary of WMI.

    c.    $7,781,240 under that certain Revolving Master Note, dated as of February 11, 2005, by and between WMB, as borrower, and WMHFA Delaware Holdings

LLC, as lender.  WMHFA Delaware Holdings LLC is an indirect, wholly-owned subsidiary of WMI.

d.  $13,576,245 under that certain Registered Security, Note A, dated as of December 17, 2004, by and between University Street, Inc., as payor and predecessor in interest to WMB, and WMRP Delaware Holdings LLC, as payee, and predecessor in interest to PCA Asset Holdings LLC.  This Promissory Note is recorded on WMI's books and records as an obligation owed to PCA Asset Holdings LLC, an indirect subsidiary of WMI, by WMB.

9.  Accordingly, WMI asserts an unsecured claim in the aggregate amount of $177,075,719 on account of the outstanding principal and accrued interest due under the Promissory Notes, plus an unliquidated, unsecured claim for all other amounts due under the Promissory Notes.  Copies of the Promissory Notes are attached hereto as Exhibit A.[2]

## II.   Intercompany Receivables

10.  Prior to the Receivership Date, the Claimants incurred expenses on behalf of WMB, which expenses resulted in intercompany receivables owed by WMB to the respective Claimant and are reflected as such in the books and records of the Claimants and WMB (the "Intercompany Receivable Claims.")

11.  In particular, WMI has Intercompany Receivable Claims against WMB and WaMu Capital Corp., a subsidiary of WMB, for $22,528,014, relating principally to WMI's issuance of stock based compensation to certain WMB and WaMu Capital Corp. employees.  A summary of the amounts owed to WMI and the corresponding intercompany account numbers is as follows:

| Account Debtor | WMI Account Receivable Number | Amount |
|---|---|---|
| WMB | 28101 | $9,298,479 |
| WMB | 28120 | $13,200,977 |

---

[2]  The attached copies of the Promissory Notes were printed on "safety paper" and accordingly, the word "void" is stamped on certain of the attached copies.  The Promissory Notes, however, are not void, and remain operative.  Original copies of the Promissory Notes will be made available for inspection, upon request.

| Account Debtor | WMI Account Receivable Number | Amount |
|---|---|---|
| WaMu Capital Corp. | 28025 | $28,558 |

12.     In addition, as of the Receivership Date, pursuant to certain servicing agreements and pursuant to that certain Administrative Services Agreement, copies of which are attached hereto as Exhibit B (collectively, the "Servicing Agreements"), WMB or one of the Banking Subsidiaries serviced certain mortgage loans held by WMI or its subsidiaries.  Pursuant to the Servicing Agreements, WMB, as servicer, collected amounts due under the mortgage loans and, at pre-determined intervals, remitted such amounts to WMI or its subsidiaries, as the holders of such mortgage loans.  As of the Receivership Date, WMB had failed to remit certain amounts due to the Claimants in the aggregate approximate amount of $184,849 on account of the mortgage loans.  A summary of the amounts owed to WMI and certain of its subsidiaries on account of such Servicing Agreements is as follows:

| Account Debtor | Obligee | Amount |
|---|---|---|
| WMB | H.S. Loan Corporation | $17,477 |
| WMB | Ahmanson Obligation Company | $143,657 |
| WMB | Sutter Bay Corporation | $11,129 |
| WMB | Flower Street Corp. | $10,396 |
| WMB | H.S. Loan Partners LLC | $2,190 |

13.     On information and belief, JPMorgan Chase may be crediting the Claimants' accounts for the above-referenced amounts and if this is the case, the Claimants will reduce or withdraw this portion of the Proof of Claim.

14.     WMI continues to investigate claims by Claimants against WMB and its subsidiaries and reserves all rights to assert additional claims on account of any and all other intercompany receivables owed to WMI by such entities.

### III.   Taxes

15.     WMI, WMB, WMBfsb, and certain other direct and indirect subsidiaries of WMI and WMB are parties to that certain Tax Sharing Agreement, dated as of August 31, 1999.  A copy of the Tax Sharing Agreement is annexed hereto as Exhibit C.  Pursuant to the Tax Sharing Agreement, all federal income taxes were paid directly by WMI on behalf of the consolidated tax group, which includes WMB and its subsidiaries.  Historically, in accordance with the Tax Sharing Agreement, each subsidiary member to the Tax Sharing Agreement made federal-tax related payments to WMI in respect of the hypothetical, separate federal income tax liabilities of such member and its subsidiaries.  Prior to the Receivership Date, pursuant to the Tax Sharing Agreement, WMI paid federal taxes due and owing by the consolidated tax group, including amounts due and owing by WMB and/or its subsidiaries.  However, as of the Receivership Date, WMB and its subsidiaries had not paid WMI all federal-tax related amounts under the Tax Sharing Agreement.  Accordingly, WMI asserts an unliquidated claim against WMB on account of any and all federal taxes paid on behalf of WMB and/or its subsidiaries and WMI reserves all rights to amend this Proof of Claim to assert any and all such claims against WMB and its subsidiaries, including any claims arising from any ongoing federal tax audits.

16.     In addition, WMI may have claims against WMB and its subsidiaries on account of state, local and foreign taxes paid on behalf of WMB and its subsidiaries and WMI reserves all rights to amend this Proof of Claim to assert any and all such claims against WMB and its subsidiaries.

17.     Further, on account of WMI's payment of federal, state and local taxes for the consolidated tax group, WMI is, or will be, entitled to tax refunds currently estimated to be approximately $3 billion (the "Tax Refunds").  Pursuant to the Tax Sharing Agreement, all refunds for federal taxes are payable to WMI, regardless of whether such refunds are on account

of federal taxes paid in respect of WMB or its subsidiaries or any of WMI's other subsidiaries. In the event the FDIC, as receiver for WMB, asserts a claim to and obtains any portion of the Tax Refunds directly or indirectly from the Internal Revenue Service, WMI asserts a claim against WMB and/or its subsidiaries on account of such refunded amounts. WMI may also have claims against WMB and its subsidiaries in respect of all or a portion of state, local and foreign tax refunds received by WMB and its subsidiaries and asserts a claim against WMB and its subsidiaries for any and all such claims.

18.     In addition, WMI is currently undergoing several federal, state, local and foreign tax audits. To the extent that any taxing authority, including, without limitation, those taxing authorities that are currently auditing WMI, assesses additional taxes against WMI, WMI expressly reserves all rights to supplement and/or amend this Proof of Claim to include any amounts attributable to WMB or its subsidiaries.

19.     In the event the FDIC seeks to repudiate the Tax Sharing Agreement in accordance with section 1821(e) of title 12 of the United States Code, the Claimants reserve all rights to supplement or amend this Proof of Claim to include any and all damages or claims that arise from such repudiation (and Claimants expressly reserve all rights to oppose any such attempt to repudiate the Tax Sharing Agreement).

## IV.     Capital Contribution Claims

20.     From December, 2007, through April, 2008, WMI raised approximately $10 billion in the capital markets. During that period, WMI's principal assets consisted of its cash, the stock of WMB, and the stock of the other Claimants. Throughout 2008, WMI's debt obligations approximated $7 billion. In 2007 and 2008, WMI made $6.5 billion of capital contributions to WMB in the amounts and on the dates specified below (the "Capital Contributions"):

| Date | Amount |
|---|---|
| December 1, 2007 | $1,000,000,000.00 |
| April 18, 2008 | $3,000,000,000.00 |
| July 21, 2008 | $2,000,000,000.00 |
| September 10 , 2008 | $500,000,000.00 |

Documentation relating to each of the Capital Contributions is attached hereto as Exhibit D.

21.     At the time of each of the Capital Contributions, WMB had public debt obligations of approximately $22 billion.  At this time, it has not yet been determined whether WMI or WMB were solvent at the time that any of the Capital Contributions were made.  WMI alleges that it did not receive any value in exchange for the Capital Contributions if, at the time of each Capital Contribution, WMB was insolvent, had unreasonably small capital, and/or was unable to pay its own debt obligations as they matured.  In addition, the Capital Contributions may have (i) been made while WMI was insolvent or rendered WMI insolvent, (ii) been made while WMI had unreasonably small capital for its business operations, and/or (iii) left WMI unable to repay its own obligations as they matured.

22.     Moreover, the FDIC or the OTS may have induced WMI to make one or more of the Capital Contributions at a time when such agencies knew or should have known that appointment of the FDIC as receiver for WMB was imminent.

23.     Accordingly, in the event it is determined that WMI was insolvent at the time any of the Capital Contributions were made, WMI asserts a fraudulent transfer claim pursuant to sections 544 and 548 of the Bankruptcy Code in an amount up to $6.5 billion.  Claimants reserve all other claims or causes of action, under any theory, with respect to the Capital Contributions.

**V.     Trust Preferred Securities Claims**

24.     In February 2006, Washington Mutual Preferred Funding LLC ("WMPF"), a Delaware limited liability company, was formed to facilitate "core" capital-

financing transactions for WMB through the issuance of preferred securities to investors (such preferred securities are referred to herein collectively as "Trust Preferred Securities") by certain special purpose entities (the "SPEs").  These securities were offered solely to "qualified institutional buyers" or "qualified purchasers."  The Trust Preferred Securities have an aggregate liquidation preference of $4 billion.

        25.      WMPF's assets were limited to direct or indirect interests in mortgages or mortgage-related assets, cash and other permitted assets.  These assets were held in certain Delaware statutory trusts (the "Asset Trusts").  WMPF issued preferred securities (the "WMPF Preferred Securities"), which were held by and were the sole asset of the SPEs and which were senior in priority to WMB's indirect common equity interest in WMPF.  Thus, the Trust Preferred Securities issued by the SPEs (which had no material creditors) represented an interest in the WMPF Preferred Securities and, in turn, an indirect interest in the assets held by the Asset Trusts.  Immediately before the Receivership Date, WMPF was an indirect subsidiary of WMB and as a result, WMB held an indirect interest in the assets held in the Asset Trusts, subordinate to the liquidation preference of the Trust Preferred Securities.

        26.      The Trust Preferred Securities were sold to investors subject to a "conditional exchange" feature.  This feature provided that if the OTS so directed, upon (i) WMB becoming undercapitalized, (ii) WMB being placed into receivership or conservatorship or (iii) the OTS anticipating, in its sole discretion, WMB becoming undercapitalized in the near term or taking a supervisory action that limited the payment of dividends by WMB, then the Trust Preferred Securities were required to be exchanged into shares of preferred stock of WMI (or depositary shares representing an interest in preferred stock of WMI).  The OTS notified WMI on the Receivership Date that an "exchange event" occurred,

as such term is defined in the documentation governing the Trust Preferred Securities.

According to the terms of the Trust Preferred Securities, the exchange of the Trust Preferred

Securities for preferred stock of WMI (or depositary shares representing an interest in preferred

stock of WMI) is deemed to occur automatically following the issuance by WMI of a press

release announcing the exchange event.  WMI issued such a press release and the conditional

exchange became effective at 8:00 a.m. ET on September 26, 2008.

27.     In addition, WMI purportedly executed an assignment as of September 25,

2008, in which it purported to assign to WMB all its right, title, and interest in and to any and all

of the Trust Preferred Securities or preferred securities issued by WMPF, as the case may be, in

its possession or coming into its possession (the "Assignment Agreement").  Assuming arguendo

that the terms of the Trust Preferred Securities (and the documents and agreements related to the

issuance of such securities) and the Assignment Agreement are legally effective and enforceable,

and that there are no defenses to the enforceability of such agreements under the Bankruptcy

Code or other applicable law, all of which defenses WMI expressly reserves, the effect of these

transactions was to cause the Trust Preferred Securities to be owned by WMI and then

purportedly transferred to WMB immediately before the commencement of WMI's chapter 11

bankruptcy case on September 26, 2008.

28.     On information and belief, the Trust Preferred Securities have a value of

as much as $4 billion.  WMI may not have received any value for the purported transfer of the

Trust Preferred Securities to WMB because, at the time of such purported transfer, WMB may

have been insolvent, may have had unreasonably small capital, and/or may have been unable to

pay its own debt obligations as they matured.  With respect to the purported transfer of the Trust

Preferred Securities, WMI asserts fraudulent transfer claims against WMB pursuant to sections

544 and 548 of the Bankruptcy Code in connection with the transfer of the Trust Preferred Securities.

29.     Furthermore, in the event it is determined that WMI was insolvent at the time of such purported transfer and the Trust Preferred Securities were transferred to WMB on account of an antecedent debt owed to WMB, WMI also asserts a claim to recover such securities as a voidable preference pursuant to sections 544 and 547 of the Bankruptcy Code.

30.     In addition, to the extent that the Trust Preferred Securities were wrongfully transferred to WMB, WMI asserts a claim for such wrongful transfer and the return of such assets.  In the alternative, WMI asserts that the purported transfer of the Trust Preferred Securities was not properly executed, and, therefore, ineffectual.  Accordingly, WMI asserts that it is the owner of the Trust Preferred Securities.  Finally, as a result of the FDIC's actions purporting to transfer the Trust Preferred Securities from WMI to WMB, and then to JPMorgan Chase, WMI has been deprived of the use of the Trust Preferred Securities and their proceeds from the Receivership Date onward and asserts a claim with respect thereto against WMB.  WMI reserves all other claims or causes of action, under any theory, with respect to the Trust Preferred Securities.

## VI.     Preference Claims

31.     On or before the Receivership Date, on numerous occasions, WMI transferred property to, or caused its property (or an interest in its property) to be transferred to, WMB or to certain third parties for the benefit of WMB (the "Transfers") on account of antecedent obligations of WMI to WMB.  The approximate amount of the Transfers occurring

during the one-year period before the Bankruptcy Petition Date is $151,934,564.  A list of such

Transfers is attached hereto as Exhibit E.[3]

32.     At the time of the Transfers, WMB was (i) an "insider" of WMI as that

term is defined in the Bankruptcy Code or under applicable non-bankruptcy law and (ii) a

"creditor" of WMI, as that term is defined in the Bankruptcy Code or under applicable non-

bankruptcy law.

33.     In the event that WMI was insolvent at the time the Transfers were made

to WMB, the Transfers may be voidable pursuant to, among other applicable law, (i) sections

544 (applying applicable non-bankruptcy law) and 547 of the Bankruptcy Code and

(ii) applicable non-bankruptcy law.  Consequently, WMI and/or its subsidiaries may be entitled

to recover from WMB the property or the value of the property transferred on account of such

antecedent obligations.

34.     Specifically, in the event WMI was insolvent at the time such Transfers

were made, WMI seeks to recover each Transfer from WMB as a voidable preference on the

grounds that such Transfer (i) was to or for the benefit of a creditor, (ii) was to or on account of

an antecedent debt of WMI, (iii) was made while WMI was insolvent, (iv) was made within one

year or less from the date that WMI's bankruptcy case was commenced, and (v) would permit

WMB to receive more than it would receive in a case under chapter 7 of the Bankruptcy Code if

such Transfer had not been made.

35.     The Claimants expressly reserve all rights to assert as voidable preferences

additional amounts transferred to WMB.

---

[3] Exhibit E may not be an exhaustive list of all Transfers.  Accordingly, Claimants reserve their rights to amend
and/or supplement Exhibit E and the corresponding aggregate amount of the Transfers.

## VII.   Vendor Contract Claims

36.     WMI is party to numerous agreements with vendors (the "Vendors") who lease property, perform services, deliver goods, or license software that primarily benefit the banking operations formerly owned by WMB (the "Vendor Contracts").  Typically, prior to the Receivership, WMB, as the primary beneficiary, paid Vendors for goods and services received pursuant to the Vendor Contracts.  After the Receivership Date, JPMorgan Chase paid certain Vendors for outstanding pre- and post-Receivership obligations incurred in connection with the Vendor Contracts.  Notwithstanding these payments, there continue to be unpaid obligations outstanding in connection with certain of the Vendor Contracts.  Accordingly, as a party to the Vendor Contracts, WMI reserves all rights to assert any and all claims against WMB for outstanding liabilities on account of goods or services provided to WMB.  Similarly, to the extent Vendors assert claims against WMI for WMI's rejection of any of the Vendor Contracts in its bankruptcy cases, WMI reserves all rights to assert any and all claims against WMB.

## VIII.   Subrogation Claims

37.     Predecessors in interest to WMB issued the debt securities identified below (the "WMB Predecessor Notes") pursuant to the indentures listed opposite such WMB Predecessor Notes below (the "Indentures").  The WMB Predecessor Notes were issued to evidence loans made to WMB's predecessors in interest of the proceeds from the issuance by certain statutory trusts (the "CCB Capital Trusts") of preferred and common beneficial interests in the assets of such trusts:

- 10.18% Junior Subordinated Deferrable Interest Debentures due 2031 issued pursuant to that certain Indenture by and between Hawthorne Financial Corporation, as Issuer, and Wilmington Trust Company, as Debenture Trustee, dated as of March 28, 2001, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2033 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of September 25, 2003, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issues pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of December 19, 2003, as amended from time to time.

- Floating Rate Junior Subordinated Notes due 2034 issued pursuant to that certain Junior Subordinated Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Deutsche Bank Trust Company Americas, as Trustee, dated as of March 31, 2004, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of May 27, 2004, as amended from time to time.

- Floating Rate Junior Subordinated Debt Securities due 2034 issued pursuant to that certain Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Wilmington Trust Company, as Trustee, dated as of June 22, 2004, as amended from time to time.

- Junior Subordinated Notes due 2035 issued pursuant to that certain Junior Subordinated Indenture by and between Commercial Capital Bancorp, Inc., as Issuer, and Deutsche Bank Trust Company Americas, as Trustee, dated as of February 2, 2005, as amended from time to time.

38.     By supplemental indentures or other agreements relating to each of the Indentures, dated as of November 1, 2007, WMB assumed all obligations of the issuers pursuant to the Indentures.  Pursuant to the terms of certain Indenture Guarantees, dated as of November 1, 2007, WMI guaranteed WMB's obligations under the WMB Predecessor Notes.  Copies of the Indenture Guarantees are attached hereto as Exhibit F.  In the event any party asserts a claim against WMI and WMI pays any portion of the WMB Predecessor Notes, WMI asserts a subrogation claim against WMB.  WMI reserves all rights to assert additional claims on account of the Indenture Guarantees against WMB.

39.     In addition to the foregoing Indenture Guarantees, WMI may have guaranteed other obligations of WMB and its subsidiaries from time to time by virtue of its ownership of WMB.  WMI reserves all rights to assert claims on account of such guarantees for which it is required to pay or may become liable to pay, claims on behalf of WMB or its subsidiaries.

## IX.   <u>Improper Asset Sales</u>

40.     On the Receivership Date, the FDIC, as receiver for WMB, may have taken possession and control of certain property (including, but not limited to, furniture, fixtures, equipment, and other tangible and intangible assets) owned by Claimants.  To date, the FDIC, as receiver, has neither accounted for nor compensated the Claimants for this property.  The FDIC, as receiver, may have converted Claimants' property by purporting to transfer an ownership interest in some or all of such property to JPMorgan Chase.  Claimants thus assert a claim against WMB for payment, in full, for such transferred property, to the extent applicable, in an amount to be determined.

41.     In addition, as set forth above, to the extent the Trust Preferred Securities were improperly transferred to WMB, WMI asserts a claim against WMB for any and all damages relating thereto.

42.     Claimants expressly reserves their rights to make additional claims against WMB for reasonable payment for the use-value of such property, plus interest, for each month the transferred property is and has been used.

## X.   <u>Deposit Claim</u>

43.     On the Receivership Date, WMI and its subsidiaries maintained twenty eight separate demand deposit accounts with WMB (the "<u>WMB Deposits Accounts</u>") and a twenty ninth account with WMBfsb (the "<u>FSB Deposit Account</u>").  These twenty nine deposit

accounts, and their balances as of September 25, 2008 and December 26, 2008, are identified in Exhibit G hereto.  Of the accounts owned by non-debtor subsidiaries of WMI, as of the date of this proof of claim, twenty of the accounts (the "Non-Debtor Deposit Accounts") have been moved to other financial institutions and three (3) accounts remain on deposit with JPMorgan Chase (the "Non-Debtor WMB Deposit Accounts").  Furthermore, as of the date of this proof of claim, six (6) accounts owned by WMI or WMI Investment (the "Debtor Deposit Accounts") also remain on deposit with JPMorgan Chase.

44.   On information and belief, each of the WMB Deposit Accounts was transferred to JPMorgan Chase pursuant to the Assumption Agreement and JPMorgan Chase assumed all liability to WMI as a depositor with respect to the WMB Deposit Accounts.  On information and belief, JPMorgan Chase acquired the stock of WMBfsb pursuant to the Assumption Agreement and subsequently merged WBMfsb into JPMorgan Chase, thereby assuming all liability to WMI as a depositor with respect to the FSB Deposit Account.

45.   Although WMI believes that it now is a depositor of JPMorgan Chase with respect to the Debtor Deposit Accounts and the Non-Debtor WMB Deposit Accounts and a depositor of an unrelated financial institution with respect to the Non-Debtor Deposit Accounts, on information and belief the FDIC and JPMorgan Chase continue to reserve certain rights with respect to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, and/or the Non-Debtor Deposit Accounts, including rights under the Assumption Agreement.  In the event that Claimants' rights to the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit Accounts are in any way compromised or modified, WMI asserts a claim against WMB for any lost value or other consequential damages.  Without prejudice to WMI's position that it is a depositor of JPMorgan Chase, Claimants hereby assert a protective

claim for the outstanding balance on each of the Debtor Deposit Accounts, the Non-Debtor

WMB Deposit Accounts, and the Non-Debtor Deposit accounts in the event FDIC exercises any

rights it may have under the Assumption Agreement, or otherwise, with respect to the Debtor

Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor Deposit

Accounts.  Claimants also assert that the FDIC does not have any right of setoff with respect to

either the Debtor Deposit Accounts, the Non-Debtor WMB Deposit Accounts, or the Non-Debtor

Deposit Accounts on account of any claims it may assert against WMI or the other Claimants.

This claim is entitled to priority pursuant to 12 U.S.C. § 1821(d)(11)(a)(ii).

46.     In addition, by reason of the Receivership and the subsequent sale of

substantially all of WMB's assets to JPMorgan Chase, Claimants were denied access to, control,

and use of the WMB Deposit Accounts and the FSB Deposit Account by JPMorgan Chase and

were unable to, among other things, invest the funds in the WMB Deposit Accounts and the FSB

Deposit Account, move the funds to another institution, or transfer the funds to interest-bearing

accounts.  Accordingly, Claimants hereby assert a claim against WMB for damages, including

interest, for the lost use of the funds in the WMB Deposit Accounts and the FSB Deposit

Account from September 25, 2008, until such time as Claimants were able to transfer, or will in

the future be able to transfer, such funds to interest bearing accounts at other institutions.

## XI.     <u>Administrative Claims</u>

47.     In certain instances, WMI may have paid or become liable for costs and/or

expenses that inured to the benefit of WMB subsequent to the Receivership Date.  These

amounts may include, without limitation, liability incurred by WMI as a result of JPMorgan

Chase's decision to exclude certain contracts from the Purchase and Assumption Agreement and

expenses incurred by WMI that may have benefited WMB.  WMI reserves all rights to assert

claims against WMB for all such costs and expenses.  WMI will provide documentation with respect to any and all administrative claims when such documents become available.

## XII.   Employee/Employer Related Costs and Insurance Claims

48.   Prior to the Receivership, WMI was the sponsor of all employee benefit plans, including, among others, the Washington Mutual, Inc. Cash Balance Pension Plan, the Washington Mutual, Inc. Savings Plan, and the Washington Mutual, Inc. Flexible Benefits Plan (the "Benefit Plans").  These plans covered all of WMI's employees, as well as employees of WMB.  WMI may transfer sponsorship of certain of the Benefit Plans to JPMorgan Chase; however, WMI reserves all rights to assert a claim against WMB on account of all amounts paid by WMI on account of such plans for the benefit of WMB employees for which WMI was not reimbursed.

49.   In addition, prior to the Receivership, WMI sponsored certain deferred compensation plans.  To the extent that WMI is or becomes liable for amounts due under such deferred compensation plans, WMI expressly reserves its right to assert a claim for amounts due on account of past and/or present WMB employees and directors.

50.   WMI also reserves all rights to assert claims against WMB for any and all other employee or employer related costs incurred by WMI on behalf of WMB and its employees, which may include, without limitation, payroll, severance and related taxes.

51.   In addition, with respect to the Cash Balance Pension Plan (the "Pension Plan"), in the event it is determined that the Pension Plan is underfunded, WMI reserves all rights to assert a claim against WMB for the amount of such underfunding that is attributable to WMB and any other costs, expenses or liabilities associated therewith.

52.   In addition, WMI is the owner of certain bank-owned and corporation-owned life insurance policies (the "BOLI-COLI Policies").  In certain instances, as reflected in

WMI's Schedules, WMI's ownership interest in the BOLI-COLI Policies is reflected on its books and records and in certain other instances, WMI may have an ownership interest in BOLI-COLI Policies reflected on WMB's books and records.  WMI reserves all rights to assert a claim against WMB for any and all premiums and other charges paid by WMI on account of BOLI-COLI Policies owned by WMB.  WMI also reserves all rights to assert a claim against WMB for the value and proceeds of any BOLI-COLI Policies owned by WMI, but reflected on the books and records of WMB.

53.     WMI also has an ownership interest in a variety of insurance policies. Certain of WMI's insurance policies name WMI and its subsidiaries, including WMB and its subsidiaries as insured persons.  To the extent that WMB asserts claims to proceeds of such insurance policies, WMI reserves all rights to assert a claim against WMB for such amounts.

## XIII.   Indemnification Claims

54.     WMI's bylaws provide for the indemnification of all WMI directors and officers.  Prior to the Bankruptcy Petition Date, approximately sixty employees of WMB were officers of WMI.  To the extent that such officers (or any directors, officers, or employees of WMB) assert indemnification or contribution claims against WMI, WMI hereby asserts claims for reimbursement of such claims against WMB.

55.     In addition, after the Bankruptcy Petition Date, WMI purchased an extension of the coverage period for its directors' and officers' liability insurance policy.  To the extent that this extended insurance coverage benefits officers of WMB, WMI asserts a claim against WMB and/or its subsidiaries for their share of the cost of procuring the extended coverage.

## XIV.   Other Contingent, Unliquidated Claims

56.   Out of an abundance of caution, Claimants assert contingent, unliquidated claims against WMB to the extent it is obligated or becomes obligated on account of WMB, including, but not limited to, on account of claims arising from WMB's mortgage loan origination business.

## XV.   Fees, Costs and Expenses

57.   As a direct result of the actions of the FDIC, Claimants have been forced to incur substantial fees, costs, and expenses, including, without limitation, attorneys' fees, costs, and expenses.  These fees, costs, and expenses relate not only to the Debtors' bankruptcy proceedings, which were a direct result of the acts of the FDIC, but also to the numerous other actions and proceedings that have been, or will be, commenced in connection with the Receivership.  As a result, Claimants hereby assert claims against WMB for all such fees, costs, and expenses incurred on or after the Receivership Date forward, until such time as those fees, costs, and expenses are paid in full.

## XVI.   Interest

58.   Claimants assert a claim against WMB for interest, at a reasonable market rate, on account of amounts owed to Claimants pursuant to their Liquidated Claim and any and all contingent and/or unliquidated claims from the Receivership Date until receipt of payment.

## XVII.  Equity Interests

59.   WMI owns 100% of the outstanding stock of WMB.  Without waiving any other claim set forth herein, WMI makes a claim against WMB, pursuant to 12 U.S.C. § 1821(d)(11)(B), for the right to have distributed to it all funds, property, or interests remaining after all depositors, creditors, other claimants and administrative expenses of the receivership are paid, together with the required accounting report.

## XVIII. <u>General Reservation of Rights</u>

60.     Prior to the Receivership Date, WMI and WMB jointly maintained their respective financial records.  The FDIC's sale of substantially all the assets of WMB to JPMorgan Chase has made it difficult for WMI to obtain information for the preparation of this Proof of Claim.  In particular, many of the Claimants' books and records were seized by the FDIC and transferred to the custody of JPMorgan Chase.  Accordingly, the Claimants find themselves in the unique and inequitable position of not being in control of certain information relating to their operations and financial affairs, including, but not limited to, certain accounting information.  Information relevant the Claimants' Liquidated Claim was prepared, in part, based upon the information and work product and/or representations made available to the Claimants and their professionals by representatives of WMB and JPMorgan Chase.  Given the Claimants' limited, and in most cases indirect, access to the information relating to this Proof of Claim, the Claimants are still in the process of verifying the accuracy or completeness of all the information, statements and representations of WMB and JPMorgan Chase.

61.     Accordingly, WMI and its subsidiaries reserve the right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or that it may have, including, but not limited to, interest, costs of collection, and other expenses incurred prior to payment in full of the amounts described above.  In addition, as part of the claims reconciliation process to occur in connection with the Debtors' chapter 11 cases, claims will be asserted against the Debtors' estates up until the Bankruptcy Court ordered bar date, some of which may be properly attributable to WMB or its subsidiaries.  The Debtors further reserve their rights to assert any and all claims against WMB and its subsidiaries that arise as a result of such claims.

62.     The filing of this Proof of Claim shall not be deemed a waiver or release of any claims whatsoever.

63.     In addition, Claimants reserve all rights to assert any or all of the claims described herein and any additional claims against JPMorgan Chase and/or WMB's subsidiaries.

64.     The filing of this Proof of Claim shall not be deemed to constitute a waiver of any rights that the Debtors may have against the FDIC or any other entity.

65.     The Claimants reserve all rights to present any and all claims in any forum of competent jurisdiction.

66.     All notices concerning this Proof of Claim should be sent to:

Washington Mutual, Inc.
1301 Second Avenue, WMC3501
Seattle, Washington 98101
Attn:   Robert J. Williams
        William C. Kosturos
        John Maciel

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Marcia L. Goldstein
        Michael F. Walsh
        Brian S. Rosen

Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007