# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WASHINGTON MUTUAL, INC., <br><br> and <br><br> WMI INVESTMENT CORP., <br><br>            Plaintiffs, <br><br>   v. <br><br> FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver of Washington Mutual Bank, and FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, <br><br>            Defendants. | Case No. 1:09-cv-00533 (RMC) |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO
(I) THE PARTIAL MOTION TO DISMISS OF DEFENDANT FEDERAL DEPOSIT
INSURANCE CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK,
AND (II) THE MOTION TO DISMISS OF DEFENDANT FEDERAL DEPOSIT
INSURANCE CORPORATION, ACTING ITS CORPORATE CAPACITY**

Daniel H. Bromberg (D.C. Bar No. 442716)
Quinn Emanuel Urquhart Oliver & Hedges, LLP
555 Twin Dolphin Drive, Suite 520
Redwood Shores, CA 94306
Telephone: (650) 801-5008
Facsimile:  (650) 801-5100

– and –

Peter E. Calamari
David L. Elsberg
Deborah K. Brown
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

David R. Berz, Esq. (D.C. Bar No. 182105)
Adam P. Strochak, Esq. (D.C. Bar No. 439308)
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 682-7001
Facsímile: (202) 857-0939

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsímile:  (212) 310-8007

Attorneys for Plaintiffs WMI and WMI Investment

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF THE CASE........................................................ 3

    A.    The Placement of WMB into Receivership ................................ 3

    B.    JPMC's Purchase of WMB's Assets for Less Than Liquidation Value ............... 4

    C.    The FDIC's Failure to Negotiate the Best Price for Another Distressed Bank .................................................................. 5

    D.    Plaintiffs' Bankruptcy............................................... 6

    E.    The FDIC's Disallowance of Plaintiffs' Proof of Claim ...................... 6

    F.    Procedural History in this Action and the Bankruptcy Proceeding ............... 6

ARGUMENT ....................................................................... 8

I.    Plaintiffs Have Sufficiently Alleged That the FDIC Sold WMB's Assets For Less Than Their Liquidation Value .................................... 8

II.    FIRREA's Exhaustion Provisions Do Not Apply to Counts II, III, and IV.................. 10

III.    The FDI Act Grants Plaintiffs a Right of Action Against the FDIC for Dissipating WMB's Assets ................................................ 13

    A.    The FDIC Has a Duty to Maximize the Value of Receivership Assets............... 13

    B.    Plaintiffs May Bring an Action for the FDIC's Breach of its Duty to Maximize the Value of Receivership Assets ........................... 16

        1.    In Enacting Section 1821(i), Congress Recognized That Creditors Have a Private Right of Action Under the FDI Act............................ 17

        2.    A Private Right of Action Is Inherent in the FDIC's Role As Receiver ...................................................... 19

        3.    A Private Right of Action For Breach of the FDIC's Obligations to Maximize the Value of Receivership Assets Should Be Implied ........... 20

            a.    The FDI Act's Receivership Provisions Were Enacted to Resolve Failed Banks for the Benefit of Their Creditors ............ 21

            b.    The FDI Act Indicates Intent to Create a Private Right of Action.................................................... 22

            c.    A Private Right of Action Is Consistent with the FDI Act's Purpose.................................................... 23

            d.    A Private Right of Action Implicates only Federal Law ............. 24

        4.    Cases Refusing to Imply a Private Right of Action under the FDI Act Are Distinguishable.......................................... 25

# TABLE OF CONTENTS
## (continued)

Page

      5.      Alternatively, the FDIC's Failure to Pay Plaintiffs' Share of the Liquidation Value of WMB's Assets to Plaintiffs is an Illegal Exaction ................................................................................................ 26

      6.      The Doctrine of Constitutional Avoidance Requires Finding a Right of Action Against the FDIC for Breaching Its FDI Act Obligations ........................................................................................... 27

IV.    The FDIC Must Provide Just Compensation For Taking Plaintiffs' Portion of WMB's Liquidation Value ................................................................. 28

    A.    The FDIC's Sale of WMB's Assets Below Their Liquidation Value Is a Taking ............................................................................................ 29

    B.    Plaintiffs Do Not Claim that the OTS's Appointment of FDIC-Receiver Is a Taking .......................................................................................... 29

    C.    FDIC v. Meyer Does Not Shield FDIC-Receiver or FDIC-Corporate from Plaintiffs' Takings Claim ............................................................... 30

      1.      FDIC v. Meyer Addresses Claims Premised on a Bivens Action, Not Upon the Just Compensation Clause.................................................. 30

      2.      Because the Just Compensation Clause Is Self Executing, a Takings Claim Is Not a "Constitutional Tort" Proscribed by FDIC v. Meyer ............................................................................................... 31

      3.      In the Alternative, If the United States is the Only Proper Party, the United States Should Be Substituted as the Defendant and Plaintiffs' Takings Claim Transferred to the Federal Court of Claims ........................................................................................... 32

V.     FDIC-Receiver Has Converted Plaintiffs' Property ........................................ 33

VI.    Section 1821(j) Does Not Bar This Court From Declaring the FDIC's Disallowance to Be Void ...................................................................... 35

VII.   Plaintiffs Have Stated a Claim Against FDIC-Corporate ................................ 35

VIII.  Plaintiffs Have Stated a Claim for Avoidance of the Capital Contributions ................. 37

    A.    WMI Did Not Receive Reasonably Equivalent Value for the Capital Contributions............................................................................. 38

    B.    The Complaint's Allegations Are Consistent ..................................... 42

    C.    Plaintiffs Adequately Alleged WMI's Insolvency Under the Federal Rules....... 43

      1.      Plaintiffs Have Adequately Pleaded Insolvency Under Rule 8 .............. 43

**TABLE OF CONTENTS**
(continued)

Page

2.    Time Constraints Imposed on Plaintiffs' Skeleton Staff Further
Support Denial of Dismissal ................................................................ 44

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adagio Inv. Holding Ltd. v. FDIC*,
 338 F. Supp. 2d 71 (D.D.C. 2004) ...............................................................2, 27

*Adams v. Walker*,
 No. 95-2015, 2000 U.S. Dist. LEXIS 22658 (D.D.C. March 30, 2000) ...........................33

*Aerolineas Argentinas v. United States*,
 77 F.3d 1564 (Fed. Cir. 1996) ...................................................................26

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
 525 F.3d 8 (D.C. Cir. 2009) ...................................................................9, 43

*Ass'n of Bituminous Contractors, Inc. v. Andrus*,
 581 F.2d 853 (D.C. Cir. 1978) ...................................................................17

*In re AstroPower Liquidating Trust*,
 335 B.R. 309 (Bankr. D. Del. 2005) ...............................................................43

*Auction Co. of Am. v. FDIC*,
 132 F.3d 746 (D.C. Cir. 1997) ...................................................................2

*Auction Co. of Am. v. FDIC*
 141 F.3d 1198 (D.C. Cir. 1998) ...............................................................10, 11

*Barr v. Dramatists Guild, Inc.*,
 573 F. Supp. 555 (S.D.N.Y. 1983) ...............................................................44

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ...........................................................................8

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
 403 U.S. 388 (1971) ...................................................................30, 31, 32

*Branch v. FDIC*,
 825 F. Supp. 384 (D. Mass. 1993) ...........................................................39, 40, 41

*Ciralsky v. CIA*,
 355 F.3d 661 (D.C. Cir. 2004) ...................................................................43

## TABLE OF AUTHORITIES
### (continued)

*Commerce Bank of Kansas City, N.A., v. Achtenberg*,
 No.90-0950-cv-W-6, 1993 WL 476510 (W.D. Mo. Nov. 10, 1993)............................39, 41

*Corbin v. Fed. Reserve Bank of New York*,
 458 F. Supp. 143 (S.D.N.Y. 1978) ...............................................................................19

*Cort v. Ash*,
 422 U.S. 66 (1975) .................................................................................17, 20, 21, 25

*Court-Appointed Receiver for Lancer Management Group LLC v. 169838 Canada, Inc.*,
 No. 05-60235-CIV, 2008 WL 2262063 (S.D. Fla. May 30, 2008)...................................43

*Courtney v. Halleran*,
 No. 02 C 6926, 2004 WL 2095674 (N.D. Ill. Sept. 17, 2004)..........................................29

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*,
 344 F. Supp. 2d 936 (M.D. Pa. 2004) ..........................................................................44

*In re Duque Rodriguez*,
 77 B.R. 939 (Bankr. S.D. Fla. 1987)..............................................................................39

*In re Duque Rodriguez*,
 895 F.2d 725 (11th Cir. 1990) ......................................................................................42

*Eastport Steamship Corp. v. United States*,
 372 F.2d 1002 (Fed. Cl. 1967).......................................................................................26

*Eberhard v. Marcu*,
 530 F.3d 122 (2d Cir. 2008)...........................................................................................14

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
 485 U.S. 568 (1988).......................................................................................................27

*E.I. du Pont de Nemours and Co. v. FDIC*,
 32 F.3d 592 (D.C. Cir. 1994).........................................................................................22

*Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*,
 03-93172 (AJG), 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ..........................43

*Erickson v. Pardus*,
 551 U.S. 89 (2007)...........................................................................................................8

## TABLE OF AUTHORITIES
### (continued)

Page

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .................................................................29, 30, 31, 32, 33

*In re First City Bancorp. of Tex., Inc.*,
    No.392-39474-HCA-11, 1995 WL 710912 (Bankr. N.D. Tex. May 15, 1995) ..........39, 41

*First Empire Bank-New York v. FDIC*,
    572 F.2d 1361 (9th Cir. 1978) ........................................................................18

*First English Evangelical Lutheran Church v. County of Los Angeles*,
    482 U.S. 304 (1987)......................................................................................32

*First Hartford Corp. Pension Plan & Trust v. United States*,
    194 F.3d 1279 (Fed. Cir. 1999)) ......................................................................29

*First Nat. Ins. Co. v. FDIC*,
    977 F. Supp. 1051 (S.D. Cal. 1997)..................................................................16

*First Pac. Bancorp, Inc. v. Helfer*,
    224 F.3d 1117 (9th Cir. 2000) ........................................................................22

*In re First Republicbank Corp. & IFRB Corp.*,
    No. 388-34546-S, 1990 Bankr. LEXIS 2840
    (Bankr. N.D. Tex. June 19, 1990).................................................................40, 42

*Freeman v. FDIC*,
    56 F.3d 1394 (D.C. Cir. 1995) ........................................................................11

*FTC v. Certified Merchant Servs., Ltd*, 126 Fed. App'x 651, 653-56 (5th Cir. 2005) .................17

*Geisinger Med. Ctr. v. Gough*,
    160 F.R.D. 467 (M.D. Pa. 1994).......................................................................45

*General Acquisition, Inc. v. GenCorp Inc.*,
    766 F. Supp. 1460 (S.D. Ohio 1990) .............................................................44, 45

*Gold v. Winget (In re NM Holdings Co.)*,
    No. 04-4373, 2009 WL 1372982 (Bankr. E.D. Mich. May 18, 2009)..............................43

*Golden Pac. Bancorp. v. FDIC*,
    375 F.3d 196 (2d Cir. 2004)....................................................................13, 21, 23

# TABLE OF AUTHORITIES
## (continued)

Page

*Hall v. Admin. Office of U.S. Courts*,
    496 F. Supp. 2d 203 (D.D.C. 2007) ...................................................................................33

*Hindes v. FDIC*,
    137 F.3d 148 (3d Cir. 1998)..............................................................................................25

*Hudson United Bank v. Chase Manhattan Bank of Conn., N.A.*,
    832 F. Supp. 881 (D.N.J. 1993) ........................................................................................12

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*,
    26 F.3d 370 (2d Cir. 1994)(C)(i) ......................................................................................13

*Jan's Helicopter Serv., Inc. v. FAA*,
    525 F.3d 1299 (Fed. Cir. 2008)........................................................................................33

*Klein v. Tabatchnick*,
    610 F.2d 1043 (2d Cir. 1979)...........................................................................................38

*Landeen v. Riley  Bennet Egloff LLC*,
    No 1:07-CV-0544 (LJM-WTL), 2008 WL 1766961 (S.D. Ind. April 11, 2008) ..............19

*Monongahela Navigation Co. v. United States*,
    148 U.S. 312 (1893)..........................................................................................................32

*Mosseri v. FDIC*,
    No. 95 Civ. 0723 (BSJ), 2001 WL 1478809 (S.D.N.Y. Nov. 20, 2001) ....................25, 26

*Nat'l Trust for Historic Preservation in U.S. v. FDIC*,
    21 F.3d 469 (D.C. Cir. 1994) ...........................................................................................27

*Nat'l Trust for Historic Preservation in U.S. v. FDIC*,
    995 F.2d, 238 (D.C. Cir. 1993) ........................................................................................35

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994)............................................................................................................20

*Owens v. Republic of Sudan*,
    531 F.3d 884 (D.C. Cir. 2008) .........................................................................................45

*In re Papst Licensing GMBH & Co. KG Litig.*,
    No. 07-493 (RMC), 2009 WL 1911676 (D.D.C. 2009) .....................................................8

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Pen-Del Mortgage Assocs. v. FDIC*,
  Civ. A. No. 94-0067, 1994 WL 675502 (E.D. Pa. Nov. 23, 1994)..............................25, 26

*Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer
  Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*,
  444 F.3d 203 (3d Cir. 2006)........................................................................38, 40

*Phelps v. Ocean Shores Assocs., L.P.*,
  No. C06-5512RJB, 2007 WL 2005259 (W.D. Wash. July 09, 2007) ...............................20

*RCI Entertainment (San Antonio) v. City of San Antonio, No. Civ. A SA06CA48FB*,
  2006 WL 1149173 (W.D. Tex. Apr. 14, 2006)..................................................42

*In re R.M.L., Inc.*,
  92 F.3d 139 (3d Cir. 1996)........................................................................38, 40

*RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*,
  169 F.3d 448 (7th Cir. 1999) .......................................................................23

*In re Roco Corp.*,
  701 F.2d 978 (1st Cir. 1983) .......................................................................38

*Rubin v. Mfrs. Hanover Trust Co.*,
  661 F.2d 979 (2d Cir. 1981)....................................................38, 39, 40, 41, 42

*Salt Lick Bancorp. v. FDIC*, 187 Fed. App'x 428, 435 (6th Cir. 2006) ........................32

*Schock v. FDIC*,
  118 F. Supp. 2d 165 (D.R.I. 2000).................................................................22

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) .......................................................................14

*Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*,
  749 F. Supp. 758 (N.D. Tex. 1990) ...............................................................18

*Seven Up Pete Venture v. Schweitzer*,
  523 F.3d 948 (9th Cir. 2008) .......................................................................32

*Sharpe v. FDIC*,
  126 F.3d 1147 (9th Cir. 1997) ................................................................12, 35

## TABLE OF AUTHORITIES
### (continued)

Page

*Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant, Inc.)*,
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ..............................................................39

*Starks v. Perloff Bros., Inc.*,
    760 F.2d 52 (3d Cir. 1985) ............................................................................45

*In re Sunrise Sec. Lit.*,
    793 F. Supp. 1306 (E.D. Pa. 1992) ................................................................44

*Tax Analysts v. IRS*,
    214 F.3d 179 (D.C. Cir. 2000) .......................................................................21

*Texas American Bancshares, Inc. v. Clarke*,
    954 F.2d 329 (5th Cir. 1992) ...........................................................................8

*Tooley v. Napolitano*,
    556 F.3d 836 (D.C. Cir. 2009) .........................................................................9

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982) ........................................................................................29

*United States v. Testan*,
    424 U.S. 392 (1976) ......................................................................................27

*United States v. White Mountain Apache Tribe*,
    537 U.S. 465 (2003) ......................................................................................27

*Webster v. Hope (In re Hope)*,
    231 B.R. 403 (Bankr. D.D.C. 1999) ..............................................................43

*Woodbridge Plaza v. Bank of Irvine*,
    815 F.2d 538 (9th Cir. 1987) .........................................................................18

## RULES AND STATUTES

11 U.S.C. § 542 ..................................................................................................7

12 U.S.C. §§ 1464-70 ........................................................................................25

12 U.S.C. § 1819(a) .............................................................................................2

**TABLE OF AUTHORITIES**
(continued)

**Page**

12 U.S.C. § 1821(d) ............................................................................................ *passim*

12 U.S.C. § 1821(g) ......................................................................................................3

12 U.S.C. § 1821(i) ...............................................................................16, 17, 18, 25, 29

12 U.S.C. § 1821(j) .....................................................................................................35

12 U.S.C. § 1823 .........................................................................................................15

12 U.S.C. § 1823(c) ....................................................................................................15

12 U.S.C. § 1823(d) .......................................................................................... *passim*

12 U.S.C. § 1831g(d) ..................................................................................................22

28 U.S.C. § 2675(a) ....................................................................................................34

28 U.S.C. § 2675(b) ....................................................................................................34

12 C.F.R. Part 552 ......................................................................................................25

12 C.F.R. § 360.1 ........................................................................................................15

Fed. R. Civ. P. 4(i) ......................................................................................................33

Fed. R. Civ. P. 8 ...................................................................................................38, 41

Fed. R. Civ. P. 8(a)(2) ............................................................................................8, 36

Fed. R. Civ. P. 8(d)(2)....................................................................................42, 43, 44

Fed. R. Civ. P. 8(e) ....................................................................................................45

Fed. R. Civ. P. 9(b) .....................................................................................................43

H.R. Rep. 102-330, at 124 (1991).............................................................................15

## TABLE OF AUTHORITIES
### (continued)

Page

## OTHER AUTHORITIES

A. Wright & Arthur R. Miller, Federal Practice and Procedure (3d ed. rev. 2009) ......................43

Ari Levy and Elizabeth Hester, *JPMorgan's WaMu Windfall Turns Bad Loans Into Income*, Bloomberg.com, (May 26, 2009 .............................................................................9

Bill Virgin, *Cantwell Seeks Explanation of WaMu Seizure by Feds*, Seattle Intelligencer (Oct. 8, 2008) ........................................................................................................................10

Black's Law Dictionary (6th ed. 1991)........................................................................................19

Citi Acquisition of Wachovia's Banking Operations (Sept. 29, 2008)..........................................5

Clark on Receivers (3rd ed. vol. 3 1992) .......................................................................10, 14, 20

Dictionary of Accounting Terms (2d ed. 1995)..............................................................................5

FDIC 2009 Annual Performance Plan, Receivership Management Program.................................14

FDIC, *Managing the Crisis: The FDIC and RTC Experience* (1998)........................13, 15, 18, 24

FDIC Resolution Handbook (2003)...............................................................................15, 16, 23

FDIC, *The First Fifty Years: A History of the FDIC 1933-1983* (1984)......................................13

Investor Presentation, JPMorgan Chase & Co., Acquisition of assets, deposits, and certain liabilities of Washington Mutual's banks by JPMorgan Chase (Sept. 25 2008) .......................................................................................................................4, 9

JPMC News release (Oct. 15, 2008) ..............................................................................................4

Roman L. Weil & Michael W. Maher, *Handbook of Cost Management* (2d ed. 2005).................5

Testimony of John F. Bovenzi, Director of FDIC Division of Depositor and Asset Services, The FDIC's Handling of Small Business Asset Foreclosures, House Comm. on Small Business (Sept. 25, 1996) ...................................................................24

Wells Fargo + Wachovia : A Combined Premier Financial Services Company, A Superior Deal for Shareholders (Oct. 3, 2009) ..................................................5

Plaintiffs Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment" and together with WMI, the "Plaintiffs"), respectfully submit this consolidated response to (i) the motion for partial dismissal of the complaint in this action (the "Complaint") filed by Defendant Federal Deposit Insurance Corporation, as receiver for Washington Mutual Bank ("FDIC-Receiver"); and (ii) the motion for the dismissal of the Complaint filed by Defendant Federal Deposit Insurance Corporation, acting in its corporate capacity ("FDIC-Corporate").[1]

## PRELIMINARY STATEMENT

The Complaint alleges that the Federal Deposit Insurance Corporation ("FDIC") sold the assets of Washington Mutual Bank, Henderson, Nevada ("WMB") to JPMorgan Chase Bank, National Association ("JPMC") for less than their liquidation value. While the FDIC asserts that this claim is merely "speculative," the publicly available facts indicate that WMB's assets were worth substantially more than the $1.88 billion JPMC paid.[2]  Indeed, in less than one year from the acquisition, JPMC already has recognized *a profit* from this transaction far in excess of the purchase price.  The FDIC breached its irrefutable obligation to maximize the value of WMB's assets.  Now the FDIC seeks to avoid accountability by shifting the loss onto Plaintiffs.[3]  The Federal Deposit Insurance Act ("FDI Act") and the Just Compensation Clause of the Fifth Amendment both require that Plaintiffs be compensated for the FDIC's failure to pay to

---

[1] This brief uses the term "the FDIC" to refer to both Defendants collectively.

[2] As discussed in greater detail below, WMB's assets were substantially greater than its *deposit* liabilities, which were roughly 60% of WMB's reported assets at the time of closure.  WMB's *total* liabilities may have exceeded those assets, rendering WMB insolvent.

[3] FDIC-Receiver also has attempted to circumvent the bankruptcy process by filing counterclaims, most recently in its Amended Answer and Counterclaims filed on July 13, 2009, that are void pursuant to the automatic stay. Plaintiffs' response to the Amended Counterclaims is due to be filed on July 27, 2009.  Plaintiffs intend to file a motion to dismiss FDIC-Receiver's counterclaims and will move to stay these proceedings in their entirety.

Plaintiffs their portion of WMB's liquidation value.  As a separate but related issue, the FDIC also took possession of property that WMB did not own or that WMB was required to return to Plaintiffs.  Because that property was not property of the receivership estate, the FDIC has converted it.  Plaintiffs also must be compensated for this conversion.

The FDIC seeks to have this Court interpret the law in a manner that grants the FDIC unlimited discretion, completely immunizing its actions from any review, and unlimited power to resolve a bank in receivership – without regard to the actual powers and duties Congress provided in the FDI Act.[4]  The FDIC asserts a variety of arguments in support of its position, each of which are refuted below.[5]  The FDIC's position is fundamentally lawless and should be rejected, as this Court has done before.  "[D]espite the receiver's significant authority to resolve the affairs of a failed bank, . . . FDIC-R[eceiver] does not enjoy *carte blanche*, for there is no federal policy that the deposit insurance fund should always win."  *Adagio Inv. Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71, 79-80 (D.D.C. 2004) (internal citation and quotation omitted).  "Courts have ruled numerous times that, despite its '800-pound gorilla'-like statutory powers, the FDIC overstepped its legal authority . . . ."  *Id*. at 80 (internal citation omitted).  The FDI Act required the FDIC to maximize the value of WMB's assets for the benefit of Plaintiffs and the

---

[4]  Because FDIC-Corporate largely joined the arguments asserted by FDIC-Receiver, Plaintiffs refer to these arguments as the FDIC's collectively.

[5]  While neither FDIC-Receiver nor FDIC-Corporate raise the issue of sovereign immunity, because the issue is relevant to this Court's subject matter jurisdiction, it warrants a brief discussion.  In the typical case, the Tucker Act provides a waiver of sovereign immunity for claims premised upon a federal statute or the U.S. Constitution, and thus such cases should be brought in the United States Court of Federal Claims.  However, here the FDI Act provides an independent waiver of sovereign immunity to sue the FDIC.  *See* 12 U.S.C. § 1819(a) (Fourth); *Auction Co. of Am. v. FDIC*, 132 F.3d 746, 751 (D.C. Cir. 1997).  As the D.C. Circuit has noted, where there is an independent waiver of sovereign immunity, claims otherwise covered by the Tucker Act may be brought in district court because there is no need to rely on the Tucker Act waiver of sovereign immunity.  *Id*. at 753.  Therefore, this Court may hear Plaintiffs' claims premised on the FDI Act and the Just Compensation Clause of the Fifth Amendment.

receivership's other claimants. The FDIC failed to do so and its attempts to immunize its actions from judicial scrutiny should be rejected.

The FDIC attempts to justify its breach, as a matter of policy, by asserting that the sale to JPMC resulted in no cost to the deposit insurance fund. (FDIC-Receiver Mov. Br. 2.) Because WMB's assets were worth significantly more than its deposit liabilities, selling WMB for more than those liabilities was neither difficult nor laudable. Indeed, it suggests a motive for the FDIC's breach. In the ordinary case, a bank placed into receivership is sufficiently insolvent that its assets are not sufficient to cover its insured deposits, much less the amounts owed to other creditors. FDIC-Corporate is subrogated to the rights of insured depositors. 12 U.S.C. § 1821(g). As a result, FDIC-Corporate often is the largest beneficiary of the receivership's liquidation.[6] Here, however, WMB's assets substantially exceeded its deposit liabilities, and the FDIC lacked its usual economic incentive to maximize the value of the receivership's assets. Therefore, the FDIC ignored its obligations to the WMB receivership's claimants. This Court should not allow the FDIC's conduct to go unexamined.

## STATEMENT OF THE CASE

### A.    The Placement of WMB into Receivership

On September 7, 2008, the Office of Thrift Supervision ("OTS") entered into Memorandums of Understanding ("MOUs") with WMB and WMI. The MOUs required WMI to submit a revised business plan for the OTS's review and "non-objection" within 30 days (October 7, 2008). The MOUs further required WMI and WMB to submit a contingency capital plan within 90 days (December 6, 2008) showing how WMI and WMB would continue to meet their minimum capital requirements under scenarios assuming more adverse financial conditions.

---

[6] *See infra* note 34, and accompanying text for a more detailed discussion.

On September 25, 2008 (the "Receivership Date") – thirteen days before a business plan was due under the MOUs – the Director of the OTS appointed the FDIC as receiver for WMB.  In its order appointing the FDIC as receiver, the OTS asserted that WMB "was in unsafe and unsound condition to transact business" and had "insufficient liquidity to meet its obligations."  (*See* Compl. Ex. 3.)  The OTS did not assert undercapitalization or insolvency as a ground for receivership.  (*Id.*)  The OTS further advised that the FDIC was immediately taking possession of WMB.

**B.    JPMC's Purchase of WMB's Assets for Less Than Liquidation Value**

Shortly after its appointment as receiver, the FDIC, both in its capacity as receiver for WMB and in its corporate capacity, sold substantially all of the assets of WMB to JPMC pursuant to a Purchase and Assumption Agreement (Whole Bank) dated September 25, 2008 (the "P&A Agreement") for $1.88 billion.  Article VII of the P&A Agreement specified that JPMC would pay the $1.88 billion purchase price to FDIC-Corporate.[7]

In JPMC's presentation to investors on September 26, 2008, it projected that its purchase of WMB would add $2.4 billion in after tax net operating income in 2009, $3.0 billion in 2010, and $3.4 billion in 2011.[8]  JPMC recorded negative goodwill on its balance sheet as a result of the P&A Agreement.[9]  Negative goodwill results when the purchase price of assets is less than

---

[7] The P&A Agreement is attached as Exhibit A to JPMC's Proposed Answer and Counterclaim.  Article VII states: "On the Payment Date, the Assuming Bank will pay to the *Corporation* . . . the Initial Payment [plus interest, if applicable.]" (emphasis added).  The P&A Agreement defines FDIC-Corporate as the "Corporation" and FDIC-Receiver as the "Receiver".

[8] Investor Presentation, JPMorgan Chase & Co., Acquisition of assets, deposits, and certain liabilities of Washington Mutual's banks by JPMorgan Chase, at 19 (Sept. 25 2008), http://files.shareholder.com/downloads/ONE/592706870x0x236706/a742ea73-1b31-4a49-9112-03f08ab03a20/JPM_WM%20analyst%20presentation.pdf.

[9] JPMC News release, at 15 (Oct. 15, 2008) ("The fair value of Washington Mutual net assets acquired exceeded the purchase price which resulted in negative goodwill."), http://files.shareholder.com/downloads/ONE/592706870x0x240954/516966dc-b596-47cc-9b21-0c22ccbd21a6/3Q08EarningsPressRelease.pdf.

their fair market value.[10]  Acquisitions typically result in positive goodwill (rather than negative goodwill), reflecting a purchase price premium relative to the acquisition's book value.[11]

### C.    The FDIC's Failure to Negotiate the Best Price for Another Distressed Bank

Shortly after its sale of WMB to JPMC for less than liquidation value, the FDIC negotiated another deal to sell a troubled bank of significant size – Wachovia.  On September 29, 2008 the FDIC attempted to broker a deal between Wachovia Corporation ("Wachovia"), which reportedly was at the cusp of failure, and Citigroup, Inc. ("Citigroup").  The FDIC announced that Citigroup had entered into a letter of intent outlining a deal to acquire Wachovia for $2.2 billion, plus (and unlike WMB's and WMI's case) the assumption of Wachovia's secured and unsecured debt, and to receive "open bank assistance" from the FDIC whereby the FDIC would commit to absorb certain loan losses incurred in connection with acquired Wachovia assets.[12] Days later, Wells Fargo and Wachovia negotiated an alternative transaction on terms superior to those initially brokered by the FDIC.  On October 3, 2008, pursuant to a definitive agreement, Wells Fargo agreed to acquire Wachovia for $15.1 billion and to do so without FDIC assistance.[13]

---

[10] *See* Dictionary of Accounting Terms, at 271 (2d ed. 1995) ("Negative goodwill is [accrued] . . . when the fair market value of the net assets of the acquired company exceeds the purchase price paid.")

[11] *See* Roman L. Weil & Michael W. Maher, *Handbook of Cost Management* 95-96 (2d ed. 2005) (defining "negative goodwill" as "[w]hen a firm acquires another company, and the fair market value of the net assets acquired exceeds the purchase price . . . *For negative goodwill to exist, someone must be willing to sell a company for less than the fair market value of a net current assets and marketable securities.  Because such bargain purchases are rare, one seldom sees negative goodwill in the financial statements . . . .*") (emphasis added).

[12] *See* Citi Acquisition of Wachovia's Banking Operations (Sept. 29, 2008), http://www.citi.com/citi/fin/data/p090829a.pdf.

[13] *See* Wells Fargo + Wachovia : A Combined Premier Financial Services Company, A Superior Deal for Shareholders (Oct. 3, 2009), https://www.wellsfargo.com/downloads/pdf/press/WFC_WACHOVIA_100308.pdf

### D.   Plaintiffs' Bankruptcy

On September 26, 2008, Plaintiffs commenced voluntary cases pursuant to chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  *See In re Washington Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del.) (the "Bankruptcy Proceeding").   Plaintiffs are operating as debtors in possession.  FDIC-Receiver has filed a proof of claim in the Bankruptcy Proceeding asserting substantially the same claims as its counterclaims in this action.

### E.   The FDIC's Disallowance of Plaintiffs' Proof of Claim

On December 30, 2008, Plaintiffs asserted claims against the receivership of WMB (the "Receivership") by filing a proof of claim on December 30, 2008 (the "Proof of Claim").  In a letter dated January 23, 2009, the FDIC provided WMI notice (the "Notice of Disallowance") that Plaintiffs' claims had been disallowed.  The Notice of Disallowance provided a two sentence "explanation" for disallowing Plaintiffs' claims.   A copy of the Notice of Disallowance is attached as Exhibit 2 to the Complaint.

### F.   Procedural History in this Action and the Bankruptcy Proceeding

As authorized by the FDI Act, Plaintiffs initiated this action on March 20, 2009 to challenge the FDIC's perfunctory disallowance of its claims.  *See* 12 U.S.C. § 1821(d)(6)(A)(ii). JPMC then filed an adversary proceeding in the Bankruptcy Court on March 24, 2009, asserting claims to numerous assets allegedly purchased pursuant to the P&A Agreement (the "JPMC Adversary Proceeding").   On May 29, 2009, Plaintiffs filed an answer and counterclaims asserting, among other things, affirmative claims under the Bankruptcy Code's avoidance powers and under state law for the avoidance of potentially more than $10 billion in WMI's assets fraudulently or preferentially transferred to JPMC.

Plaintiffs also filed a turnover action in the Bankruptcy Court, on April 27, 2009, asserting their right to deposits held by JPMC and demanding the return of those funds pursuant to 11 U.S.C. § 542 (the "Turnover Action"). As Plaintiffs detailed in the turnover complaint, JPMC has withheld approximately $4 billion in WMI's deposits. On May 19, 2009, Plaintiffs filed a motion for summary judgment, demonstrating with affidavits and exhibits that it is beyond genuine dispute that WMI owns the accounts.

On June 1, 2009, FDIC-Receiver moved to intervene in the Turnover Action for the purpose of moving to stay proceedings in that action. FDIC-Receiver further moved to stay the JPMC Adversary Proceeding, asserting in both instances that sections 11(d)(6) & 11(d)(13)(D) of the FDI Act, 12 U.S.C. §§ 1821(d)(6), 1821(d)(13)(D) (the "FIRREA Exhaustion Provisions"), required WMI's claims against JPMC (and vice versa) to proceed in this action. WMI opposed the FDIC's motions, *inter alia*, on the ground that FIRREA Exhaustion Provisions do not apply to WMI's claims against JPMC. The Bankruptcy Court denied FDIC-Receiver's motions to stay both adversary proceedings holding that FIRREA is not "a jurisdictional bar to the debtors' claims to property that is no longer in the hands of the FDIC as receiver."[14] In refusing the FDIC's motions to stay the adversary proceedings, the Bankruptcy Court asserted its "exclusive jurisdiction to decide what is property of the estate" and is moving towards resolution of the claims between JPMC and the Plaintiffs in both adversary proceedings.[15] Meanwhile, in

---

[14] *See* June 24, 2009 Transcript at 93:19-22, *In re Washington Mutual, Inc.*, No. 08-12229 (Bankr. D. Del, Jun. 24, 2009); *see also* Order Deny. (A) Mot. of Def. JPMorgan Chase Bank, N.A. to Stay and (B) Mot. of Intervenor-Def. Federal Deposit Insurance Corporation, as Receiver, to Stay or Dis. Adversary Proceeding, Adv. Pro. No. 09-50934, (Bankr. D. Del. July 6, 2009); and Order Deny. Mot. of Federal Deposit Insurance Company to Stay Adversary Proceeding, Adv. Pro. No. 09-50551, (Bankr. D. Del. July 6, 2009).

[15] *See* June 24, 2009 Transcript at 95:7-8, *In re Washington Mutual, Inc.*, No. 08-12229 (Bankr. D. Del Jun. 24, 2009). Having resolved all matters for which FDIC-Receiver's intervention was granted, the Bankruptcy Court ordered that "no further pleading or response shall be required from the FDIC-Receiver" in the Turnover Action. *See* Order Den. (A) Motion of Defendant JPMorgan Chase Bank, N.A. to Stay and (B) Motion of Intervenor-

this action, the FDIC-Receiver moved to dismiss Counts II, III, IV, & V of the Complaint on

June 11, 2009.  FDIC-Corporate further moved to dismiss the Complaint as to itself on June 15,

2009, arguing that Plaintiffs did not allege conduct by FDIC-Corporate tying it to Plaintiffs'

claims.  (*See* FDIC-Corporate Mov. Br. 3.)  Plaintiffs oppose the FDIC's motions to dismiss for

the reasons set forth below.

## ARGUMENT

## I.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT THE FDIC SOLD WMB'S ASSETS FOR LESS THAN THEIR LIQUIDATION VALUE

The FDIC argues that Plaintiffs' allegation that the FDIC sold WMB's assets for less than

their liquidation value is merely "speculative" and thus is insufficient under Federal Rule of Civil

Procedure 8(a)(2), citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  (FDIC-Receiver

Mov. Br. 11 n.6.)[16]  That argument lacks lack merit.  First, Federal Rule of Civil Procedure

8(a)(2) requires Plaintiffs only to *allege* facts that plausibly suggest a right to relief.  *Twombly*,

550 U.S. at 570.  This Court is required to accept as true Plaintiffs' factual allegation that the

FDIC sold WMB's assets for less than their liquidation value.  *Erickson v. Pardus*, 551 U.S. 89,

94 (2007) (A court "must accept as true all of the factual allegations contained in the

complaint."); *In re Papst Licensing GMBH & Co. KG Litig.*,  No. 07-493 (RMC), 2009 WL

1911676, at *2 (D.D.C. 2009) ("A court must treat the complaint's factual allegations as true,

'even if doubtful in fact' . . . .") (quoting *Twombly*, 550 U.S. at 555).  "A court deciding a motion

to dismiss must not make any judgment about the probability of the plaintiff's success, for a

Defendant Federal Deposit Insurance Corporation, as Receiver, to Stay or Dismiss Adversary Proceeding, Adv. Pro. No. 09-50934, Bankr. D. Del. (July 6, 2009).

[16] The FDIC cites *Texas American Bancshares, Inc. v. Clarke*, 954 F.2d 329 (5th Cir. 1992) to support its argument that this claim is "speculative."  The FDIC's reliance on *Clarke* is misplaced because the bank failure at issue involved a substantial loss to the deposit insurance fund.  Where, unlike WMB's receivership, the deposit insurance fund has suffered a loss, FDIC-Corporate recovers before most other creditors.  Here, however, FDIC-Corporate did not suffer a loss, and its recovery is not a barrier to recovery by Plaintiffs.

complaint may proceed even if it appears that a recovery is very remote and unlikely; a complaint may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2009) (internal quotation and citation omitted).[17]

Second, Plaintiffs' allegations are far from speculative. Immediately after the transaction, JPMC projected that the transaction would add $2.4 billion to JPMC's net after tax operating income in 2009 alone.[18] JPMC expected the transaction to be immediately profitable – or as JPMC put it: "[a]ccretive immediately; should be substantially so in future."[19] JPMC has recently announced that it is now poised to recognize significant gains (*i.e.*, as much as $29 billion), as it recognizes the actual market value of many of the WMB assets it purchased.[20] Furthermore, JPMC recorded negative goodwill in accounting for the transaction – indicating that, immediately upon consummating the transaction that the fair market value of assets acquired exceeded the purchase price. (*See supra* note 9.) Such negative goodwill is unheard of in a major acquisition. (*See supra* note 11.) Indeed, the facts surrounding JPMC's purchase price are sufficiently suspicious that one U.S. Senator has called for an investigation.[21] Finally, shortly after WMB was placed into receivership, the FDIC attempted to broker a sale of

---

[17] *See also Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) ("This liberal pleading standard requires a court to deny a motion to dismiss 'even if it strikes a savvy judge that . . . recovery is very remote and unlikely.'") (quoting *Twombly*, 550 U.S. at 556).

[18] Investor Presentation, JPMorgan Chase & Co., Acquisition of assets, deposits and certain liabilities of Washington Mutual's banks by JPMorgan Chase at 19 (Sept. 25 2008), http://files.shareholder.com/downloads/ONE/ 592706870x0x236706/a742ea73-1b31-4a49-9112-03f08ab03a20/JPM_WM%20analyst%20presentation.pdf.

[19] *Id.* at 2.

[20] *See* Ari Levy and Elizabeth Hester, *JPMorgan's WaMu Windfall Turns Bad Loans Into Income*, Bloomberg.com, (May 26, 2009), http://www.bloomberg.com/apps/news?pid=20601087&sid=aYhaiSOq_Tbc&refer=home.

[21] *See* Bill Virgin, *Cantwell Seeks Explanation of WaMu Seizure by Feds*, Seattle Intelligencer (Oct. 8, 2008), *available at* http://www.seattlepi.com/business/382407_cantwellwamu09.html.

Wachovia, announcing a letter of intent to sell Wachovia to Citigroup for approximately $2 billion. Wells Fargo announced only a few days later that it was willing to purchase Wachovia for more than $15 billion. The fact that Wells Fargo was willing to purchase Wachovia on terms substantially superior to the original deal arranged by the FDIC calls into question the FDIC's commitment to negotiating the best price for a troubled bank. Indeed, this episode demonstrates the FDIC's indifference to its obligation to negotiate a fair market price once the deposit insurance fund no longer stands to suffer a loss.

## II.    FIRREA'S EXHAUSTION PROVISIONS DO NOT APPLY TO COUNTS II, III, AND IV

The FDIC asserts that this Court lacks subject matter jurisdiction over Counts II, III, and IV of the Complaint because those Counts were not asserted in Plaintiffs' Proof of Claim. (FDIC-Receiver Mov. Br. 10.) However, existing D.C. Circuit precedent and the FDI Act itself refute the FDIC's position. The FDIC fails to distinguish between Plaintiffs' claims against WMB (for which FDIC-Receiver is now responsible because it "stands in the shoes" of WMB) and Plaintiffs' claims against FDIC-Corporate and FDIC-Receiver as a federal agency, rather than WMB.[22] The FIRREA Exhaustion Provisions do not apply to claims against the FDIC as an agency.

This is not the first time that the FDIC has attempted to use the FIRREA Exhaustion Provisions inappropriately as a shield. In *Auction Co. of America v. FDIC*, FDIC-Receiver argued that the plaintiff could not pursue its breach of contract claims against FDIC-Receiver because the plaintiff had not submitted a claim through the process required by the FIRREA

---

[22] The law of receivers also recognizes the distinction between a receiver's liability in its "official capacity" for claims against the receivership and the receiver's personal liability for breach of its receivership duties. *See* Clark on Receivers § 901 (3rd ed. vol. 3 1992) ("Although according to the American courts a receiver in the proper and legal conduct of the estate is only liable officially, nevertheless in certain cases he may be personally liable. In such cases, if the res suffers, someone representing the res must sue the former receiver to make the res whole.").

Exhaustion Provisions.  141 F.3d 1198, 1200 (D.C. Cir. 1998).  FDIC-Receiver asserted this, notwithstanding the fact that the plaintiff's contract was not with the failed bank, but rather with FDIC-Receiver itself.  *Id.* at 1201.  The D.C. Circuit noted that the jurisdictional bar in section 1821(d)(13)(D) must be read such that it only serves as a bar for claims "against a depository institution" that must be submitted and then challenged pursuant to section 1821(d)(6)(A).  *Id.* The court further noted that "bankruptcy law is a useful aid in understanding FIRREA" and that a "bankruptcy-modeled approach would draw a distinction between claims against the depository [institution], which accrue before the appointment of the receiver and are subject to administrative determination, and claims against the receiver, which accrue after appointment and are not."  *Id.*  The court went on to state that an interpretation barring all claims against the FDIC and not limited to those "against a depository institution" would effectively "foreclose judicial jurisdiction altogether, a result troubling from a constitutional perspective and certainly not the goal of FIRREA."  *Id.*  Therefore, claims against the FDIC, as a federal agency, as opposed to the failed bank (*i.e.*, WMB) are not covered by the FIRREA Exhaustion Provisions.[23]

The FDIC's implicit position that the claims process set forth in sections 1821(d)(3)-(6) applies to claims against the FDIC as an agency as well as claims against the failed bank also is contrary to the FDI Act's text.  The Act specifies in several places that the claims to be submitted are claims against the depository institution.  *See* 12 U.S.C. § 1821(d)(5)(A)(i) ("Before the end of the 180-day period beginning on the date *any claim against a depository* institution is filed with the Corporation as receiver . . . ."); *id.* § 1821(d)(6)(A) ("Before the end of the 60-day period beginning on the earlier of . . . (i) the end of the period described in paragraph (5)(A)(i)

---

[23] *Accord Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) (The FIRREA Exhaustion Provisions bar "any court from hearing claims against, or actions to determine rights with respect to, *the assets of a failed bank held by the FDIC as receiver* unless the claimant first exhausts his administrative remedies . . . .") (emphasis added).

with respect to *any claim against a depository institution . . . .*"); *id.* § 1821(d)(8)(A) ("The Corporation shall establish a procedure for expedited relief . . . for claimants who . . . allege the existence of legally valid and enforceable or perfected security interests in assets of *any depository institution . . . .*") (emphasis added in all); *see also id.* § 1821(d)(3)(B)(i) (FDIC-Receiver shall "promptly publish a notice to the *depository institution's creditors* to present their claims….") (emphasis added).[24]

Moreover, the FDIC's position is illogical. Counts II, III, and IV are premised on the FDIC's refusal to pay the value of the claims set forth in the Proof of Claim to Plaintiffs. (*See generally* Compl. ¶¶ 82-97.) It was impossible for Plaintiffs to assert those Counts until the FDIC disallowed the Proof of Claim, thereby refusing to pay. Until then, Plaintiffs' claims against the FDIC as an agency had not yet accrued. This case is yet another instance where the FDIC has attempted to use the FIRREA Exhaustion Provisions as a substantive shield against valid claims, rather than the administrative exhaustion requirement that Congress intended.[25] Furthermore, even if Plaintiffs could have set forth Counts II, III, and IV in the Proof of Claim, the FDIC's perfunctory disallowance demonstrates doing so would have been futile. The FDIC was not prejudiced by these Counts not being included in the Proof of Claim.

---

[24] Some courts have interpreted the FIRREA Exhaustion Provisions as applicable to post-receivership claims against FDIC-Receiver in addition to pre-receivership claims against the failed bank. *See Hudson United Bank v. Chase Manhattan Bank of Conn.*, N.A., 832 F. Supp. 881, 883 (D.N.J. 1993) (holding that a lender liability claim against FDIC-Receiver for termination of a line of credit is subject to the FIRREA Exhaustion Provisions), *aff'd* 43 F.3d 843 (3d Cir. 1994). Even if the FIRREA Exhaustion Provisions were read broadly to include post-receivership claims (which is not the law of the D.C. Circuit), the provisions still would not bar Counts II, III and IV. These cases involve FDIC-Receiver acting in place of the failed bank (*e.g.*, the termination of a contract in *Hudson*). Counts II, III and IV involve the FDIC's conduct as a federal agency. Thus, even under the broader reading used in some other circuits, the FIRREA Exhaustion Provisions do not apply to claims regarding the FDIC's conduct as a federal agency. *See Sharpe v. FDIC*, 126 F.3d 1147, 1154-55 (9th Cir. 1997) (holding that the FIRREA Exhaustion Provisions do not apply to FDIC-Receiver's breach of a settlement agreement.)

[25] Both FDIC-Receiver and JPMC have attempted to argue that Plaintiffs' claims against JPMC in the Bankruptcy Court are barred by the FIRREA Exhaustion Provisions. The Bankruptcy Court has rejected those arguments. *See supra* note 14.

III.    **THE FDI ACT GRANTS PLAINTIFFS A RIGHT OF ACTION AGAINST THE FDIC FOR DISSIPATING WMB'S ASSETS**

The FDIC takes the position that it has unlimited, unchecked discretion to dispose of the assets of a failed bank in any manner that it deems best.  Neither the text nor the structure of the FDI Act support that interpretation.  Indeed, the FDIC's position is inherently inconsistent with the FDIC's role as receiver[26] – a role that by the FDIC's own description is for the benefit of creditors with claims against the receivership:  "[w]hen appointed receiver, the FDIC assumes a fiduciary obligation to all creditors of the receivership and stockholders of the bank, with the responsibility to maximize the amounts recovered for them in as timely a manner as possible." FDIC, *The First Fifty Years: A History of the FDIC 1933-1983*, at 85 (1984);[27] *see also Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004) ("It is undisputed that, as a receiver, the FDIC owes a fiduciary duty to the Bank's creditors and to Bancorp.").[28]

A.    **The FDIC Has a Duty to Maximize the Value of Receivership Assets**

The FDIC has a duty to maximize the value of the Receivership's assets when it liquidates the Receivership estate.  The FDI Act specifically commands the FDIC to maximize the value of such assets.  12 U.S.C. § 1821(d)(13)(E)(i); *see also* FDIC, *Managing the Crisis: The FDIC and RTC Experience*, at 211 (1998) ("When a depository institution fails, the FDIC has statutory responsibility to the creditors of the receivership to recover for them, as quickly as

---

[26] As discussed in greater detail in *infra* Part VII, by entering into the P&A Agreement, FDIC-Corporate also has assumed the statutory duties of FDIC-Receiver under 12 U.S.C. § 1823(d).

[27] *Available at* http://www.fdic.gov/bank/analytical/firstfifty/.

[28] *See also IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 372 (2d Cir. 1994) ("A primary function of RTC is to act as the conservator or receiver for failed thrift institutions, operating 'in a manner which . . . maximizes the net present value return from the sale or other disposition' of assets under its control.") (quoting 12 U.S.C. § 1441a(b)(3)(C)(i).).  (Congress created the Resolution Trust Corporation ("RTC") to serve as receiver for failed thrifts in the savings and loan crisis and then later merged it into the FDIC.  During its existence, RTC had the same powers and duties as FDIC-Receiver.)

it can, *the maximum amount possible on their claims*.") (emphasis added);[29] FDIC 2009 Annual

Performance Plan, Receivership Management Program ("When an insured institution fails, the

FDIC is ordinarily appointed as receiver.  In that capacity, *it assumes responsibility for efficiently*

*recovering the maximum amount possible from the disposition of the receivership's assets . . .*

*.*").[30]  The duty also is inherent in the FDIC-Receiver's role as a receiver.  It is a receiver's duty

to maximize the value of the receivership's assets.  *See, e.g.*, *Eberhard v. Marcu*, 530 F.3d 122,

133-34 (2d Cir. 2008) ("[T]he receiver's only object was to maximize the value of the

corporations for the benefit of their investors and any creditors.") (internal quotation and citation

omitted); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) ("[The receiver's] only object is

to maximize the value of the corporations for the benefit of their investors and any creditors.");

Clark on Receivers § 412 (3rd ed. vol. 2 1992) ("It is the affirmative duty of a receiver, when

selling property of the estate, to realize under lawful measures the largest possible amount.").

     The FDIC argues that it is not so obligated because the FDI Act requires the FDIC to

seek the "least cost resolution" of a failing bank.  (FDIC-Receiver Mov. Br. 12.)  This argument

lacks merit because the FDIC's "least cost" resolution mandate is (1) inapplicable to FDIC-

Receiver, (2) inapplicable to the FDIC's disposition of receivership assets (as opposed to its use

of the deposit insurance fund), and (3) not inconsistent with the FDIC's duty to maximize the

value of the receivership's assets.

     Prior to the enactment of the "least cost resolution" requirement in the FDIC

Improvement Act of 1991 ("FDICIA"), the FDIC routinely used money from the deposit

insurance fund to induce an assuming bank to assume uninsured deposits, in addition to insured

---

[29] *Available at* http://www.fdic.gov/bank/historical/managing/history1-08.pdf.

[30] http://www.fdic.gov/about/strategic/performance/2009/Rcvrship.html (last updated Apr. 29. 2009).

deposits, as part of a purchase and assumption agreement.[31]   The least cost resolution requirement prohibits this practice, as the FDIC itself has recognized.[32]   It operates as a constraint on FDIC-Corporate's use of the deposit insurance fund, *e.g.*, to facilitate purchase and assumption agreements.  *See generally* 12 U.S.C. § 1823 (captioned "Corporation monies").  It does not address FDIC-Receiver's liquidation of the receivership's assets.  Indeed, the FDIC refutes its own argument when it fails to discuss any of FDIC-Corporate's statutory powers that actually are constrained by the FDI Act's "least cost" provision and how such powers are relevant to this action.  *See* 12 U.S.C. § 1823(c)(4) ("[T]he Corporation may not exercise any authority *under this subsection or subsection (d), (f), (h), (i), or (k) of this section* with respect to any insured depository institution unless . . . . . [it meets the "least cost" resolution test]") (emphasis added).[33]

Finally, there is no inconsistency between maximizing the Receivership's assets and fulfilling FDIC-Corporate's "least cost" mandate.  As discussed in greater detail below, where the deposit insurance fund has suffered a loss, FDIC-Corporate is the receivership's largest creditor, and FDIC-Corporate effectively is first in line to receive the proceeds from a failed

---

[31] H.R. Rep. 102-330, at 124 (1991); *see also* FDIC, *Managing the Crisis: The FDIC and RTC Experience*, 744-45 (1998) ("The new 'least cost test' requires that *any assistance the FDIC provided under section 13 of the FDI Act* be (1) necessary to meet the FDIC's obligation to protect the insured deposits in a failed or failing institution and (2) the least costly to the deposit insurance fund of all possible methods of meeting that obligation. . . . *The least cost resolution of FDICIA ended the FDIC's preference for whole bank transactions and compelled the FDIC to consider more transaction options than it had previously.*") (emphasis added); *available at* http://www.fdic.gov/bank/historical/managing/history3-A.pdf.

[32] FDIC Resolution Handbook, at 23 n.10 (2003) ("After the Federal Deposit Insurance Corporation Improvement Act (FDICIA) of 1991 was signed, the FDIC was required to select the least costly resolution method available. The requirement had a significant effect on the FDIC's resolution practices.  Previously, the FDIC had structured most of its transactions to transfer both insured and uninsured deposits along with certain failed bank assets. Under FDICIA, however, when transferring the uninsured deposits was not the least cost solution, the FDIC began entering into P&A transactions that included only the insured deposits."), *available at* http://www.fdic.gov/bank/historical/reshandbook/ch3pas.pdf

[33] *See also* 12 C.F.R. § 360.1 ("[T]he FDIC shall not take any action, directly or indirectly, *under sections 13(c), 13(d), 13(f), 13(h) or 13(k) of the FDI Act* (12 U.S.C. 1823 (c), (d), (f), (h) or (k)) with respect to any insured depository institution that would have the effect of increasing losses to any insurance fund . . . .") (emphasis added).

bank's liquidation under the FDI Act's priority scheme.[34]    Maximizing the value of the receivership estate enhances the likelihood that FDIC-Corporate will recoup the loss to the deposit insurance fund and is therefore consistent with the "least cost resolution" of a failed bank.

> **B.    Plaintiffs May Bring an Action for the FDIC's Breach of its Duty to Maximize the Value of Receivership Assets**

The FDI Act requires the FDIC to maximize the value of the Receivership estate.  (*See supra* Argument, Part III.A.)  By selling WMB's assets to JPMC for less than their liquidation value, the FDIC has breached this duty.  *See First Nat. Ins. Co. v. FDIC*, 977 F. Supp. 1051, 1059-60 (S.D. Cal. 1997) ("Just as a trustee in bankruptcy may breach his fiduciary duty to the bankruptcy estate by negligently or intentionally taking actions which cause the estate to forfeit its assets, so may a receiver breach its fiduciary duty by negligently or intentionally causing the receivership estate to forfeit its assets.") (ordering the FDIC to show cause why independent counsel should not be appointed for the receivership).

The FDIC asserts that, notwithstanding the breach of its fiduciary duty under the FDI Act, receivership creditors have no recourse against the FDIC.  (FDIC-Receiver Mov. Br. 11-14.)  In fact, creditors have a right of action against the FDIC.  Congress has limited the damages that may be recovered to the amount that the creditor would have recovered in a straight liquidation.  12 U.S.C. § 1821(i)(2).  By doing so, Congress has recognized the right to proceed against the FDIC when it breaches its duty to receivership creditors.  The FDIC's interpretation that receivership creditors have no right of action cannot be correct because it would render section

---

[34] *See* FDIC Resolution Handbook, 69 (2003) ("Congress believed that the appointment of the FDIC simplified procedures, eliminated duplication of records, and vested responsibility for liquidation in the largest creditor (the FDIC in its corporate capacity, as subrogee for the insured deposits it had paid), whose interest was to obtain the maximum possible recovery."), *available at* http://www.fdic.gov/bank/historical/reshandbook/; *infra* Part III.B.3.c.

1821(i) superfluous.  If the FDI Act did not provide that the FDIC was liable to creditors, then there would be no need for Congress to limit that liability.  *See Ass'n of Bituminous Contractors, Inc. v. Andrus*, 581 F.2d 853, 862 n.22 (D.C. Cir. 1978) ("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.") (internal quotation and citation omitted). Moreover, the ability of a failed bank's creditors to seek redress against FDIC-Receiver is inherent in its duties as a receiver.  It is axiomatic that the beneficiaries of a receivership may bring suit against a receiver for breach of its duties.  *E.g.*, *FTC v. Certified Merchant Servs., Ltd*, 126 Fed. App'x 651, 653-56 (5th Cir. 2005) (affirming an order requiring a receiver to disgorge a portion of its fees for breach of the receiver's fiduciary duty); *see also infra* note 38, and accompanying text.

Furthermore, even if the FDI Act does not grant a right of action for the FDIC's breach to Plaintiffs directly, Plaintiffs nevertheless may bring a claim against the FDIC.  A right of action for Plaintiffs should be implied under *Cort v. Ash*, 422 U.S. 66, 78 (1975).  In the alternative, the FDIC's failure to pay Plaintiffs their portion of WMB's liquidation value is an illegal exaction, which Plaintiffs may sue to recover.

        1.      In Enacting Section 1821(i), Congress Recognized That Creditors Have a Private Right of Action Under the FDI Act

The FDIC argues that section 1821 does not indicate that creditors have a right of action because it "only" sets the "maximum liability" for claims.  (FDIC-Receiver Mov. Br. 11-12 n.6.) The FDIC's argument is structurally incoherent.  If creditors did not have a right of action against the FDIC, there would be no reason for Congress to limit the FDIC's liability.  Moreover, Congress enacted Section 1821(i) in response to cases finding the FDIC liable for the claims of creditors arguing that the FDIC had breached its duties as receiver by entering into purchase and assumption agreements whereby the plaintiffs' claims were not assumed, but the claims of

creditors of a similar priority were assumed, and thus paid in full in violation of the then applicable priority scheme. *See, e.g.*, *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 774 (N.D. Tex. 1990) (upholding a claim attacking an FDIC purchase and assumption agreement where the "net effect was that depositors and general outside creditors received 100% payment on their claims, while intrabank creditors were left to pursue their claims against receiverships with insufficient assets to pay the claims"). Congress addressed these cases by capping the relief creditors could recover at the value of their claims in a straight liquidation, not by eliminating the right of creditors to seek relief against the FDIC altogether.[35] Accordingly, section 1821(i) recognizes the existence of a private right of action for the failed bank's creditors.

In enacting section 1821(i), Congress acquiesced to prior decisions finding that the FDIC is liable to bank creditors when it breaches its statutory receivership duties. *See First Empire Bank-New York v. FDIC*, 572 F.2d 1361, 1369-71 (9th Cir. 1978), *cert. denied*, 439 U.S. 919 (1978) ("We conclude that the responsibility lies on the FDIC under [section] 194 to compensate appellants for its failure as Receiver to make distributions ratably."); *Woodbridge Plaza v. Bank of Irvine*, 815 F. 2d 538, 540-42 (9th Cir. 1987) (finding the FDIC's alleged breach of its receivership responsibilities under California law for the receivership of a California-chartered bank to be actionable). The FDIC's denial of Plaintiffs' right to seek redress against it is an attempt to rewrite history. While Congress limited the FDIC's liability with section 1821(i), Congress opted not to shield the FDIC completely from actions by failed bank creditors when the FDIC breaches its statutory duties to those creditors.

---

[35] *See* FDIC, *Managing the Crisis: The FDIC and RTC Experience*, 253 (1998) ("FIRREA clarified existing law so that the FDIC's maximum liability to any receivership claimant was limited to the amount the claimant would have received if the institution's assets had been liquidated."), *available at* http://www.fdic.gov/bank/historical/managing/history1-10.pdf.

2.    A Private Right of Action Is Inherent in the FDIC's Role As Receiver

By accepting appointment as receiver for WMB, FDIC-Receiver has accepted the obligations of a receiver to the creditors of the Receivership.  This includes a fiduciary duty to the Receivership's creditors, as the FDI Act expressly provides.  12 U.S.C. § 1823(d)(3)(C) ("In exercising any right, power, privilege, or authority described in subparagraph (A),[36] the Corporation shall continue to be subject to the *fiduciary duties and obligations of the Corporation as receiver* to claimants against the insured depository institution in receivership.") (emphasis added).  The fiduciary duty to marshal the assets of the receivership for the benefit of its creditors likewise is a fundamental obligation of all receivers.[37]   The existence of such fiduciary obligations is meaningless if creditors have no recourse against the receiver when it fails to execute its duties.  *See Corbin v. Fed. Reserve Bank of New York*, 458 F. Supp. 143, 146 (S.D.N.Y. 1978), *aff'd* 629 F.2d 233 (2d Cir. 1980) (allowing the plaintiff to assert a claim against the FDIC for breach of its fiduciary duty as receiver because "[the FDI Act] do[es] not give unlimited discretion to a Receiver to fix the terms and conditions of a sale of receivership assets. . . [;] the fairness of the terms to which [FDIC-Receiver] agrees are not beyond the scope of traditional judicial review").   At common law, creditors have a right of action against the receiver (personally) for breach of its fiduciary duty to the creditors.  *E.g.*, *Landeen v. Riley Bennet Egloff LLC*, No 1:07-CV-0544 (LJM-WTL), 2008 WL 1766961, at *2 (S.D. Ind. April 11, 2008) ("CORPUS JURIS SECUNDUM teaches that '[a] receiver who acts outside his

---

[36] This subparagraph grants FDIC-Corporate the same receivership powers held by FDIC-Receiver in connection with any asset acquired or liability assumed in connection with assets transfers.  *See* 12 U.S.C. § 1823(d)(3)(A).  As discussed in greater detail in *infra* Part VII, FDIC-Corporate also has assumed the duties of a receiver under section 1823(d).

[37] *See* Black's Law Dictionary (6th ed. 1991) ("**Receivership.** . . . The state or condition of a corporation, partnership, financial institution, or individual over whom a receiver has been appointed for protection of its assets and for ultimate sale and distribution to creditors.").

statutory authority or orders of the appointing court, or who is guilty of negligence or misconduct in the administration of the receivership, *is personally liable for any loss resulting therefrom.*' 75 C.J.S. Receivers § 192 (2002). Similarly, American Jurisprudence, Second Edition teaches that '[a] receiver is *personally liable for improper distribution of assets.*' 65 Am.Jur.2d Receivers § 298 (2001).") (emphasis added).[38]   Congress has not provided differently in the FDI Act. Therefore, in mandating that the FDIC act as receiver, Congress also mandated that the FDIC take on the obligations of a receiver, which includes the obligation of being held accountable when the FDIC breaches its fiduciary duty to the receivership's creditors. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86-87 (1994) (bank attorneys subject to a state law duty of care standard because Congress did not provide differently in the FDI Act).

> 3.    A Private Right of Action For Breach of the FDIC's Obligations to Maximize the Value of Receivership Assets Should Be Implied

A private right of action should be implied for creditors to assert claims against the FDIC for breaches of its duties under the FDI Act.  Whether a private right of action should be implied is a question of Congressional intent.  As discussed above, independent of the factors set forth in *Cort*, Congress has expressed its intent that there be a private right of action.  Nevertheless, application of the *Cort* factors also provides a private right of action.  The four *Cort* factors are:

> (1) whether the plaintiff is one of the class for whose benefit the statute was enacted;
>
> (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy;
>
> (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and

---

[38] *See also Phelps v. Ocean Shores Assocs., L.P.*, No. C06-5512RJB, 2007 WL 2005259, at *4 (W.D. Wash. July 09, 2007) ("[A] receiver is personally liable if it willfully and deliberately breached a duty.") (citing *Mosser v. Darrow*, 341 U.S. 267 (1951)); Clark on Receivers §§ 392(c), 406.

(4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.

*Tax Analysts v. IRS*, 214 F.3d 179, 185-86 (D.C. Cir. 2000). In connection with the *Cort* analysis, the D.C. Circuit has found that where Congress has enacted "an integrated system of procedures for enforcement," there is a presumption that a private right of action should not be implied. *Id.* at 186. Here, however, there is no such enforcement mechanism because the violations of law are by the government itself. There can be no enforcement mechanism over the FDIC other than a private right of action.

a. *The FDI Act's Receivership Provisions Were Enacted to Resolve Failed Banks for the Benefit of Their Creditors*

The FDIC, as Defendants note, acts in two distinct capacities – its capacity as receiver and its corporate capacity. The FDI Act contains provisions pertaining to both roles. FDIC-Corporate controls the deposit insurance fund, and thus is the entity that pays deposit insurance claims, determines whether to fund purchase and assumption agreements,[39] and otherwise uses money from the deposit insurance fund to facilitate resolution of a failed bank. FDIC-Receiver "steps into the shoes of the failed bank and has a responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders. Generally speaking, *a receiver owes a duty of strict impartiality to all persons interested in the receivership estate*, and also must endeavor to realize the largest possible amount for assets of the estate." *Golden Pac. Bancorp.*, 375 F.3d at 201 (emphasis added) (internal quotation and citation omitted). The FDI Act's receivership provisions pertain to FDIC-Receiver's power to liquidate the receivership's assets, and its duty to distribute that value to those with valid claims against the receivership.

---

[39] Unlike the case here, the FDIC sometimes must pay the assuming bank to enter into a purchase and assumption agreement because the remaining assets are insufficient to cover the insured deposits.

*See generally* 12 U.S.C. § 1821(d).  Claimants (which may include FDIC-Corporate) are the beneficiaries of these provisions.  *See E.I. du Pont de Nemours and Co. v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1994) ("As receiver the FDIC has a responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders.").

The FDI Act's appointment of the FDIC as the receiver for a failed bank is for the benefit of the failed bank's creditors.  *Schock v. FDIC*, 118 F. Supp. 2d 165, 169 (D.R.I. 2000) ("[A]ll actions taken by the FDIC in its role as receiver are done on behalf of the bank and for the benefit of the bank's depositors and creditors.").  The FDIC's breach of its receivership duties in this action uniquely harms Plaintiffs by depriving them of value that they should have realized from the liquidation of WMB.  Therefore, Plaintiffs should have a right of action against the FDIC to hold it accountable.  *See First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1122-23 (9th Cir. 2000) (finding that bank shareholders have a private right of action to compel the FDIC to provide an accounting of the receivership pursuant to 12 U.S.C. § 1821(d)(15)(C)).

                    b.     *The FDI Act Indicates Intent to Create a Private Right of Action*

The FDI Act contains several indicia of intent to create a private right of action.  The FDI Act sets the FDIC's maximum liability with respect to claims at the amount the claimant would have received in a straight liquidation.  (*See supra* Argument, Part III.B.1.)  The FDI Act recognizes the FDIC's fiduciary duty to receivership claimants.  12 U.S.C. § 1823(d)(3)(C).  The FDI Act provides claimants with a right to an accounting of payments from the receivership, providing a mechanism to monitor the FDIC's actions.  *See* 12 U.S.C. § 1821(d)(11)(C).  Furthermore, Congress labeled the FDIC as a "receiver" – a role where creditors have a right to bring suit against the receiver for breach of its receivership duties.  (*See supra* note 38, and accompanying text.)  Finally, Congress has expressly disclaimed the existence of a private right of action in other parts of the FDI Act.  *See* 12 U.S.C. § 1831g(d) ("This section may not be

construed as creating any private right of action."). Congress, however, did not adopt such language in connection with the FDI Act's receivership provisions.

> ### c. *A Private Right of Action Is Consistent with the FDI Act's Purpose*

Providing a private right of action to failed bank's creditors is consistent with the FDI Act's purpose. Congress enacted the FDI Act to provide for the orderly resolution of failed banks. If bank creditors have no confidence that they will recover at least the liquidation value of their claims against the bank, but rather will be subject to the FDIC's whims, creditors will have every incentive to cease their relationships at the first sign of trouble – further exacerbating bank runs. Moreover, the purpose of the FDI Act's receivership provisions is to distribute a failed bank's assets to its creditors.[40]

A private right of action is consistent with the FDI Act's purpose of minimizing the cost to the taxpayer of deposit insurance.[41] The FDIC's assertion otherwise is flawed on two levels. First, while FDIC-Corporate has responsibility for the deposit insurance fund, FDIC-Receiver – like all receivers – is required to act in a neutral, unbiased capacity. *See Golden Pacific Bancorp.* 375 F.3d at 201 (quoted above); *supra* note 27, and accompanying text. FDIC-Corporate's role as deposit insurer is irrelevant to FDIC-Receiver's liability.[42] Indeed, in the

---

[40] *See* FDIC Resolution Handbook, 2 (2003) ("In its role as receiver for a failed depository institution, the FDIC has a statutory obligation generally to maximize the return on the sale or disposition of the receivership estate's assets. The receiver distributes any funds realized from its liquidation efforts to the failed institution's creditors and shareholders in accordance with the FDIC's priority scheme.") (footnote omitted), *available at* http://www.fdic.gov/bank/historical/reshandbook/; *see also supra* notes 14-16 and accompanying text).

[41] Additionally, it is myopic to assert that the FDI Act's only purpose is to minimize costs to the deposit insurance fund. Congress also intended the FDIC to maximize the value of receivership assets. *See, e.g., RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*, 169 F.3d 448, 456 (7th Cir. 1999) ("Congress enacted FIRREA in the face of a national banking crisis, *with the intent of maximizing the recovery of assets* that the federal receivers (FDIC, RTC) held in the failed banks they inherited.") (emphasis added).

[42] FDIC-Corporate is liable under the FDI Act with respect to the P&A Agreement, *inter alia*, because it assumed the obligations of FDIC-Receiver pursuant to 12 U.S.C. § 1823(d), as discussed further in *infra* Part VII.

past, the FDIC itself has recognized its statutory obligation to act for all of a bank's creditors.[43]

Second, compelling the FDIC to act in the best interests of the failed bank's creditors does not impede FDIC-Corporate's mission. In the typical case – but not in this one – FDIC-Corporate is the receivership's largest creditor, since FDIC-Corporate is subrogated to insured depositors, and it recovers before other creditors in the FDI Act's priority scheme (other than administrative expenses).[44] It is only in cases, such as this one, where a bank placed in receivership has assets exceeding the value of its deposits – and thus where there is no loss to the deposit insurance fund – that the rights of receivership creditors other than FDIC-Corporate become significant. Because there has been no loss to the deposit insurance fund, FDIC-Corporate has no interest in minimizing losses to the fund. Hence, allowing receivership creditors a right of action where the FDIC has breached its duty to maximize the receivership estate will not impede that goal.

d.    *A Private Right of Action Implicates only Federal Law*

No state law is implicated by a private right of action for creditors in the FDI Act. Bank resolutions, and the FDIC's role as receiver, largely are a matter of federal law. Likewise, because WMB was a federal savings bank, the corporate law governing it is federal law –

---

[43] *See* Testimony of John F. Bovenzi, Director of FDIC Division of Depositor and Asset Services, The FDIC's Handling of Small Business Asset Foreclosures, House Comm. on Small Business (Sept. 25, 1996) ("In addition to making sure that insured depositors receive their funds as soon as possible after a bank fails, *the FDIC has a statutory responsibility to the creditors and shareholders of the bank* under [FDICIA] *to minimize losses by obtaining maximum recovery from the assets of the receivership*. The assets are owned by the estate of the failed bank, and many of our asset disposition activities are similar to those of a bankruptcy trustee in that funds we recover benefit other creditors of the estate as well.") (emphasis added) *available at* http://www.fdic.gov/news/news/speeches/archives/1996/sp27sept96.html.; *supra* note 27, and accompanying text.

[44] *See* 12 U.S.C. § 1821(d)(11) (placing depositors in the payment priority immediately after administrative expenses); FDIC, *Managing the Crisis: The FDIC and RTC Experience*, 6 (1998) ("The FDIC's role as receiver is important because it holds the responsibility to the creditors of the receivership to efficiently recover for them the maximum amount possible on their claims. The FDIC itself also becomes a creditor of the receivership. By paying the insured depositors or by arranging their assumption by another institution, the FDIC steps into the shoes of the depositors as a creditor (the FDIC is the subrogee).") *available at* http://www.fdic.gov/bank/historical/managing/history1-01.pdf.

specifically the Home Owners' Loan Act and the OTS's regulations. *See generally* 12 U.S.C. §§ 1464-70; 12 C.F.R. Part 552. Accordingly, the fourth *Cort* factor does not augur against implying a private right of action.

###### 4. Cases Refusing to Imply a Private Right of Action under the FDI Act Are Distinguishable

FDIC-Receiver cites three cases for the proposition that no private right of action can be implied under the FDI Act: *Hindes v. FDIC*, 137 F.3d 148, 170 (3d Cir. 1998), *Mosseri v. FDIC*, No. 95 Civ. 0723 (BSJ), 2001 WL 1478809, at \*3 (S.D.N.Y. Nov. 20, 2001)), and *Pen-Del Mortgage Assocs. v. FDIC*, Civ. A. No. 94-0067, 1994 WL 675502 (E.D. Pa. Nov. 23, 1994). (*See* FDIC-Receiver Mov. Br. 12-13.) Each of these cases is distinguishable.

*Hindes* involved the assertion by a shareholder that the FDI Act's requirement that FDIC-Receiver maximize the value of the receivership's assets was *solely* for the benefit of the failed bank's shareholders, in addition to a litany of other claims. The *Hindes* court rejected that argument, noting that Congress appeared to be concerned with minimizing the cost to the taxpayer in FIRREA. *Hindes*, 137 F.3d at 170. The *Hindes* court also considered solely whether shareholders have a private right of action under 12 U.S.C. § 1821(d)(13)(E). *See id.* at 170-71. It did not consider FDIC-Receiver's fiduciary obligations to bank creditors, the historical ability for creditors to challenge the actions of receivers, or the fact that section 1821(i) recognizes the FDIC's liability to bank creditors. Accordingly, *Hindes* is distinguishable. Moreover, the analysis of *Hindes* does not properly distinguish between the FDIC's dual roles as deposit insurer and receiver. FDIC-Receiver – by the FDIC's own admission – has a fiduciary obligation to all of the bank's creditors and stockholders. (*See, e.g., supra* note 27, and accompanying text.) FDIC-Corporate, not FDIC-Receiver, is the guardian of the deposit insurance fund, and thus

charged with protecting the U.S. taxpayer (consistent with its other obligations, such as its assumption of FDIC-Receiver's obligations under section 1823).

Mosseri and *Pen-Del Mortgage* both involved allegations by disappointed bidders that they had a right to recover from the FDIC under section 1821(d)(13)(E) because they purportedly submitted a better offer than the winning bidders. *See Mosseri*, 2001 WL 1478809, at *1; *Pen-Del Mortgage*, 1994 WL 675502, at *1. Bidders are not similarly situated to receivership creditors, and thus these cases have no bearing on Plaintiffs' right of action under the FDI Act. While the FDI Act contains extensive claims procedures for bank creditors, it contains no similar provisions regarding bidders for the failed bank's assets. Nor have receivers traditionally owed duties to bidders for assets similar to the duties owed to creditors.

### 5. Alternatively, the FDIC's Failure to Pay Plaintiffs' Share of the Liquidation Value of WMB's Assets to Plaintiffs is an Illegal Exaction

Even if the FDI Act did not provide Plaintiffs with a direct right of action against the FDIC, Plaintiffs still may recover damages from the FDIC under the theory of illegal exaction. An illegal exaction is money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1007 (Fed. Cl. 1967). The FDI Act obligated the FDIC to liquidate WMB's assets for their maximum value, and then distribute the proceeds to WMB's creditors (such as Plaintiffs) pursuant to 12 U.S.C. § 1821(d)(11). Rather than paying the liquidation value owed to Plaintiffs under the FDI Act, the FDIC transferred that value to JPMC. By doing so, the FDIC illegally exacted money due to Plaintiffs. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1568 (Fed. Cir. 1996) (INS refusal to compensate airline for costs born despite the INS's statutory obligation was an illegal exaction). Likewise, the FDIC, after assuming the obligations of a receiver for WMB, owed a fiduciary duty to WMB's creditors.

(*See*, *e.g.*, *supra* notes 27-28, and accompanying text.)  The damage caused by the FDIC due to its breach of that obligation is actionable as an illegal exaction.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474-76 (2003) (finding that an alleged breach of the trustee relationship between the United States and an Indian Tribe with respect to tribal property was actionable as an illegal exaction under *United States v. Testan*, 424 U.S. 392, 400 (1976)).

      6.     The Doctrine of Constitutional Avoidance Requires Finding a Right of Action Against the FDIC for Breaching Its FDI Act Obligations

The FDIC asks this Court to endorse the FDIC's ability to act without regard to the actual powers and duties specified in the FDI Act.  The FDIC's demand for unreviewable authority is inherently lawless and should be rejected.  *See Nat'l Trust for Historic Preservation in U.S. v. FDIC*, 21 F.3d 469, 472 (D.C. Cir. 1994) ("Would the courts be powerless if the FDIC chose to sell crack cocaine in an effort to liquidate assets discovered in an unclaimed safety deposit box of a failed bank?") (Wald, J., concurring); *Adagio Inv. Holding Ltd.*, 338 F. Supp. 2d at 82 n.19 ("[A]ny assertion of unreviewable authority is contrary to law.").  Allowing Plaintiffs' claim for money damages against the FDIC to proceed provides a necessary check on the FDIC's actions, and does not unduly limit its legitimate authority to resolve a failed bank.  In particular, "if the FDIC could take property without due process, serious constitutional problems would be presented . . . ."  *Adagio Inv. Holding Ltd.*, 338 F. Supp. 2d at 82.  The Court should interpret the FDI Act to grant Plaintiffs a right of action, thereby avoiding the constitutional due process issue that the FDIC's position creates.[45]

---

[45] *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [a court should] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

## IV.   THE FDIC MUST PROVIDE JUST COMPENSATION FOR TAKING PLAINTIFFS' PORTION OF WMB'S LIQUIDATION VALUE

The FDIC sold WMB's assets to JPMC for less than their liquidation value.  One might presume that the FDIC believed that the sale of WMB to JPMC for less than its liquidation value served public policy in some way.  However, whether the FDIC had a valid public policy rationale for the JPMC sale is not the issue.  Rather, the issue is whether the FDIC can force Plaintiffs to bear the loss, notwithstanding their property interests in WMB.  To accomplish the JPMC sale, the FDIC sacrificed Plaintiffs' liquidation rights, shifting money that they would have received to JPMC, to accomplish whatever public policy goal the FDIC thought the JPMC sale served.  The FDIC must compensate Plaintiffs for the property that it took – the difference between the liquidation value of their property interest in WMB and the fraction of that value that actually will be paid due to the P&A Agreement's sub-liquidation purchase price.

The FDIC asserts three reasons why Plaintiffs have not stated a claim for taking Plaintiffs' property without just compensation.  First the FDIC argues that "WMB was closed by order of the OTS," presumably implying that Plaintiffs' takings claim should be asserted against the OTS, rather than the FDIC.  (FDIC-Receiver Mov. Br. 15.)  Second, the FDIC argues that a "constitutional tort" may not be asserted against it or any other federal agency.  (*Id.* at 15-16.)  Finally, the FDIC argues that placing WMB into receivership as purportedly allowed by applicable law cannot be a taking.  (*Id.* at 16-17.)

The FDIC's first and third points are premised on a mischaracterization of Plaintiffs' claim.  The FDIC asserts that Plaintiffs claim that the FDIC's appointment as receiver was a taking without just compensation.  (*Id.*)  Plaintiffs' takings claim, however, is not that the FDIC's appointment as WMB's receiver was a taking.  Rather, the FDIC's failure to pay the liquidation value of Plaintiffs' interests in WMB due to the FDIC's dissipation of WMB's assets

is a taking of Plaintiffs' property for which just compensation is due.  The FDIC's second argument seeks to stretch *FDIC v. Meyer*, 510 U.S. 471 (1994) well beyond its actual holding.

## A.    The FDIC's Sale of WMB's Assets Below Their Liquidation Value Is a Taking

As the FDI Act itself recognizes, the creditors and shareholders of a failed bank continue to have a property interest in the liquidation of the assets of the bank.  *See, e.g.*, 12 U.S.C. §§ 1821(d)(11), 1821(i)(2).  The receivership process, similar to the bankruptcy process, is a system to allocate the remaining assets of the failed bank among the claimants of the failed bank. *See id.* § 1821(d)(3)-(11); *Courtney v. Halleran,* No. 02 C 6926, 2004 WL 2095674, at *3 n.1 (N.D. Ill. Sept. 17, 2004) ("As receiver for the failed bank, the FDIC acts much like a trustee in bankruptcy, marshalling the assets and legal interests of the bank and distributing its assets to creditors, including the bank's depositors.").  When the FDIC sold WMB for substantially less than its liquidation value, it expropriated Plaintiffs' property and transferred it to JPMC.[46]  That expropriation is a taking of Plaintiffs' property for which compensation is due under the Just Compensation Clause.

## B.    Plaintiffs Do Not Claim that the OTS's Appointment of FDIC-Receiver Is a Taking

Plaintiffs do not claim that the appointment of FDIC-Receiver by the OTS was a taking. Rather, Plaintiffs claim that the FDIC expropriated the liquidation value of Plaintiffs' interests in WMB is a taking.  (Compl. ¶ 92.)  The FDIC attempts to dismiss this as "merely repeat[ing]

---

[46] *See*, *e.g.*, *United States v. Sec. Indus. Bank*, 459 U.S. 70, 76-77 (1982) (retrospective application of amendments to the Bankruptcy Code that would invalidate security interests acquired before the enactment date violates the Takings Clause, and thus such amendments should not be interpreted as applying retrospectively); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1288 (Fed. Cir. 1999) ("First Hartford, as a shareholder in Dollar, *has a property interest in any eventual liquidation surplus*.  The interest in that liquidation surplus is created by the statutory direction that, if funds remain after all depositors, creditors, and other claimants have been paid, the receiver is to distribute such funds to the depository institution's shareholders.") (citing 12 U.S.C. § 1821(d)(11)) (emphasis added).

[P]laintiffs' inactionable 'dissipation' claim" (FDIC-Receiver Mov. Br. 15), thereby ignoring Plaintiffs' uncontested argument that they have a property interest in the liquidation value of WMB. The FDIC's unwillingness to seriously dispute this point is effectively an admission of Plaintiffs' continuing property interest in their portion of WMB's liquidation value. The OTS is not the entity that expropriated Plaintiffs' liquidation interest in WMB. Rather, both FDIC-Receiver and FDIC-Corporate entered into the P&A Agreement to sell WMB's assets for substantially less than their liquidation value to JPMC. Therefore, Plaintiffs' takings claim is properly lodged against FDIC-Receiver and FDIC-Corporate, rather than the OTS.

        **C.**     ***FDIC v. Meyer* Does Not Shield FDIC-Receiver or FDIC-Corporate from Plaintiffs' Takings Claim**

The FDIC argues that a "constitutional tort" may not be sustained against a federal agency. (FDIC-Receiver Mov. Br. 15.) It is not clear whether the FDIC is arguing that *Meyer* shields the FDIC's conduct from any takings claim or merely that it believes the United States, rather than the FDIC, is the appropriate defendant for such a takings claim under *Meyer*. In either case, the FDIC stretches *Meyer* too far.

        1.     *FDIC v. Meyer* Addresses Claims Premised on a *Bivens* Action, Not Upon the Just Compensation Clause

*Meyer* involved an allegation by the employee of a failed savings and loan institution that his summary discharge from the institution after the Federal Savings and Loan Insurance Corporation ("FSLIC") was appointed receiver violated his rights under the Due Process Clause. The Supreme Court addressed three issues: (1) whether the Federal Tort Claims Act ("FTCA") was the exclusive remedy for the plaintiff's claim; (2) if the FTCA was inapplicable, whether sovereign immunity barred the claim; and (3) if the FTCA was inapplicable and sovereign immunity did not bar the claim, whether the plaintiff's allegations against FSLIC stated a claim.

The Supreme Court first found that the FTCA was inapplicable to the alleged breach of the plaintiff's due process rights. *Meyer*, 510 U.S. at 477. The Supreme Court then found that FSLIC's "sue and be sued" clause broadly waived FSLIC's sovereign immunity, allowing both claims that would be cognizable against a private entity (*e.g.*, breach of contract claims) and claims that are cognizable only against the government. *Id.* at 480.

Having decided that sovereign immunity was not a barrier, the Supreme Court then turned to the issue of "whether the source of substantive law upon which the claimant relies provides an avenue for relief." *Id.* at 484. The plaintiff asserted that the violation of his due process rights was actionable under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), even though his claim was against FSLIC, rather than employees of FSLIC. The Supreme Court declined to extend *Bivens* to an action against a federal agency. *Id.* at 485. The Court noted that the plaintiff's claim appeared to be an attempt to circumvent qualified immunity under the FTCA. *Id.* The Court was not willing to allow such a circumvention, particularly because doing so would undermine the deterrent effect of *Bivens* on federal officers. *Id.* The FDIC fails to explain how any of this relates to Plaintiffs' claim for just compensation.

2.      Because the Just Compensation Clause Is Self Executing, a Takings Claim Is Not a "Constitutional Tort" Proscribed by *FDIC v. Meyer*

The FDIC appears to assert that a takings claim may only be prosecuted against the FDIC via a *Bivens*-like "constitutional tort," but that such an action is unavailable because the Supreme Court has declined to extend "constitutional torts" to federal agencies. (FDIC-Receiver Mov. Br. 15.) The Supreme Court made no such claim in *Meyer* about a takings claim for just compensation. Nor does the FDIC offer any logic connecting the Supreme Court's rejection of a

*Bivens*-like claim against agencies in *Meyer* to a takings claim for just compensation after an agency has taken property.

The Just Compensation Clause is self-executing. *See First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315 (1987); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 953-54 (9th Cir. 2008) ("The Supreme Court has long recognized that the just compensation clause of the Fifth Amendment is self-executing . . . .") (citing *First English*). Plaintiffs do not need to rely on *Bivens*, or any other legal theory, as a basis for money damages. The Just Compensation Clause itself commands that such damages be paid. The FDIC fails to explain the asserted connection between *Bivens* and a just compensation claim, likely because linking the two defies history. Suits seeking just compensation for a taking substantially predate *Bivens*. *See, e.g.*, *Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893). Nor do the "qualified immunity" concerns that motivated the Supreme Court in *Meyer* apply in this context – the lawfulness of the FDIC's action is irrelevant to a claim for just compensation.[47]

> 3.    In the Alternative, If the United States is the Only Proper Party, the United States Should Be Substituted as the Defendant and Plaintiffs' Takings Claim Transferred to the Federal Court of Claims

If the FDIC's argument is not that *Meyer* shields its taking of Plaintiffs' property without just compensation, but rather that the United States, rather than the FDIC, sued in its own name, is the appropriate party, that claim also lacks merit. As discussed above, the *Meyer* court found that claims cognizable only against a governmental entity, as well as claims that also would be cognizable against private parties, could be brought under a sovereign immunity waiver found in

---

[47] The FDIC also cites *Salt Lick Bancorp. v. FDIC*, 187 Fed. App'x 428, 435 (6th Cir. 2006). There, the plaintiff expressly asserted a *Bivens* claim premised on an alleged due process violation. *Id.* Hence, unlike this case, there was a *Bivens* claim to which *Meyers* actually applied.

a "sue and be sued" clause.  *Meyer*, 510 U.S. at 480.  However, if the United States, rather than the FDIC, ultimately is found to be the proper party for Plaintiffs' takings claim, Plaintiffs respectfully request that this Court substitute the United States as the defendant for the takings claim and transfer the takings claim to the United States Court of Federal Claims.[48]

## V.    FDIC-RECEIVER HAS CONVERTED PLAINTIFFS' PROPERTY

Plaintiffs allege that the FDIC converted their property by exercising possession over property that either (i) belonged to Plaintiffs, rather than WMB, or (ii) must be returned to Plaintiffs under applicable law.  The FDIC argues that the United States, rather than the FDIC, is the appropriate defendant for Plaintiffs' FTCA claim.  Plaintiffs move to substitute the United States as the defendant for Plaintiffs' FTCA claim.  Plaintiffs' FTCA claim is otherwise cognizable, as discussed below and Plaintiffs have already provided a copy of the summons and the Complaint to the United States Attorney for the District of Columbia and the Attorney General for the United States pursuant to Rule 4(i) of the Federal Rules of Civil Procedure.  Accordingly, substitution of the United States is appropriate and substitution, rather than re-filing the FTCA claim, would serve judicial efficiency.[49]

The FDIC next argues that Plaintiffs' FTCA claim must fail because Plaintiffs have failed to provide a demand of a "sum certain" of Plaintiffs' damages.  (*See* FDIC-Receiver Mov. Br. 19.)  Plaintiffs, however, did provide the FDIC with notice that they seek payment of the full value of the Trust Preferred Securities, worth approximately $4 billion, which are Plaintiffs' property, or in the alternative, must be returned to Plaintiffs under applicable law.  Likewise,

---

[48] *See Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1304-05 (Fed. Cir. 2008) (finding transfer of a takings claim from the United States District Court of Guam to the United States Court of Federal Claims was appropriate); *Adams v. Walker*, No. 95-2015, 2000 U.S. Dist. LEXIS 22658, at *13 (D.D.C. March 30, 2000) (allowing the plaintiffs to amend their complaint and transfer their takings claim to the United States Court of Federal Claims).

[49] *See Hall v. Admin. Office of U.S. Courts*, 496 F. Supp. 2d 203, 206 (D.D.C. 2007) (substituting the United States as the appropriate defendant for the plaintiff's FTCA claim).

Plaintiffs specifically demanded the return of the Capital Contributions worth approximately $6.5 billion, which also must be returned to Plaintiffs under applicable law. While Plaintiffs allege that the FDIC converted other property as well (*see* Compl. ¶ 45), Plaintiffs are unable to provide more detailed demands with respect to such property because the FDIC has refused to provide an accounting of the property seized when FDIC-Receiver was appointed receiver and because the FDIC seized Plaintiffs' business records. (*See* Compl. ¶ 13.) The FTCA permits greater damages where the "increased amount [of such damages] is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency . . . ." 28 U.S.C. § 2675(b). Accordingly, Plaintiffs' inability to present more specific damages with respect to that part of their FTCA claim is not a barrier to such claim.

In arguing that Plaintiffs' Proof of Claim did not contain a specific demand for damages, the FDIC also effectively concedes that Plaintiffs' Proof of Claim otherwise is a sufficient settlement demand for the purposes of 28 U.S.C. § 2675(a).

The FDIC next argues that Plaintiffs' FTCA claim must be dismissed because it falls within the discretionary function exception. (FDIC-Receiver Mov. Br. 20-21.) The FDIC's argument is based on a mischaracterization of Plaintiffs' claim. The FDIC argues that Plaintiffs seek to have this Court second guess "operational decisions" made by FDIC-Receiver in administering the WMB Receivership. (*Id.* at 21.) In fact, Plaintiffs claim that the FDIC has converted the Trust Preferred Securities and the Capital Contributions (among other property) because that property never belonged to WMB or because WMB is obligated to return it under applicable law. It is not within the FDIC's discretion to violate the law by failing to return the value of such property to Plaintiffs. The FDIC attempts to fit Plaintiffs' claims within the discretionary function exception by mischaracterizing them. Contrary to the FDIC's suggestion,

Plaintiffs' claim is not premised on the FDIC's decision to transfer such property to JPMC, but rather on the FDIC's exercise of possession over and refusal to return the property at issue.  (*See* Compl. ¶ 94.)  The Court should reject that mischaracterization.

## VI.    SECTION 1821(J) DOES NOT BAR THIS COURT FROM DECLARING THE FDIC'S DISALLOWANCE TO BE VOID

The FDIC argues that section 11(j) of the FDI Act (12 U.S.C. § 1821(j)) prevents this Court from declaring the FDIC's disallowance of Plaintiffs' claims to be void.  (FDIC-Receiver Mov. Br. 22.)  However, the law of this Circuit is that section 11(j) bars restraining or affecting the FDIC's exercise of its powers as receiver until the FDIC has acted "beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions."  *Nat'l Trust for Historic Preservation in U.S. v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993); *accord Sharpe v. FDIC*, 126 F.3d 1147, 1155 (9th Cir. 1997).  Here, the FDIC is statutorily required to consider Plaintiffs' Proof of Claim and then to pay valid claims.   12 U.S.C. § 1821(d)(2)(H).  Notwithstanding this statutory obligation, the FDIC summarily denied even Plaintiffs' most well-documented claims with a boilerplate two sentence explanation that provides no indication that the FDIC considered Plaintiffs' claims – much less justification for their denial.  (*See* Compl. ¶¶ 64-65.)  The FDIC manifestly disregarded its statutory duties and simply rejected Plaintiffs' Proof of Claim out of hand.  This Court may void that action, notwithstanding section 1821(j).

## VII.    PLAINTIFFS HAVE STATED A CLAIM AGAINST FDIC-CORPORATE

FDIC-Corporate asserts that Plaintiffs have not alleged any facts that render it liable.[50] (*See* FDIC-Corporate Mov. Br. 3.)  The core of FDIC-Corporate's argument is that Plaintiffs must allege specific facts with respect to FDIC-Corporate.   This argument should be rejected on

---

[50] For the sake of clarity, only the Receivership, and thus FDIC-Receiver, is liable with respect to Count I.  That count seeks payment from the Receivership estate pursuant to 12 U.S.C. § 1821(d)(11).

several grounds.

*First*, Federal Rule of Civil Procedure 8(a)(2) does not require Plaintiffs to plead with the specificity that FDIC-Corporate advocates.  Plaintiffs have alleged joint action by FDIC-Corporate and FDIC-Receiver, and no further specifics about FDIC-Corporate's involvement are required.  (*See*, *e.g.*, Compl. ¶¶ 2, 8, 84, 90, 92, 94-95.)  Given that FDIC-Corporate and FDIC-Receiver are the same entity, working in different roles, but also in tandem, Plaintiffs' allegations of joint conduct by FDIC-Corporate and FDIC-Receiver are more than plausible.  Indeed, even the FDIC appears to have some difficulty distinguishing when it is acting in its capacity as receiver versus its corporate capacity.  (*See* FDIC-Receiver Mov. Br. 12 (asserting that FDIC-Receiver is bound by the "least cost" requirement applicable to FDIC-Corporate's use of the deposit insurance fund).)  The Federal Rules of Civil Procedure do not require Plaintiffs to allege more detail, and given the highly intertwined roles of the FDIC in the events culminating in the P&A Agreement, requiring Plaintiffs to do so without the benefit of discovery is unreasonable.

*Second*, Plaintiffs specifically allege that FDIC-Corporate was a party to the P&A Agreement.  (Compl. ¶ 8.)  (In fact, the P&A Agreement specified that JPMC would pay FDIC-Corporate the $1.88 billion purchase price.)  That fact alone is sufficient to establish that FDIC-Corporate specifically acted with respect to the sale of WMB's assets to JPMC for less than their liquidation value, which is the key factual allegation supporting Counts II and III.  (This fact also supports Plaintiffs' other allegations of joint action by FDIC-Corporate and FDIC-Receiver.)

Likewise, while not available to Plaintiffs when the Complaint was drafted, the Board of the FDIC specifically authorized FDIC-Corporate to use up to $500 million from the deposit insurance fund to indemnify JPMC.  That indemnity covers claims asserted for JPMC's breach

of the confidentiality agreement entered with WMI through its use of information gained pursuant to that agreement to negotiate the P&A Agreement.  (*See* Ex. 1 at 6.)  This also supports FDIC-Corporate's participation in the FDIC's illegal actions in connection with the JPMC sale.

FDIC-Corporate does not put forward any arguments for dismissal other than arguments made by FDIC-Receiver and its argument that Plaintiffs did not allege specific facts regarding FDIC-Corporate.  In particular, FDIC-Corporate does not argue that it has different legal duties than FDIC-Receiver in connection with the P&A Agreement and Counts II, III, and IV.  Nor would FDIC-Corporate be able to make such an argument.  With respect to the FDI Act, FDIC-Corporate assumed the same fiduciary duties owed by FDIC-Receiver (and thus the same liability) under 12 U.S.C. § 1823(d)(3)(C).  That provision grants FDIC-Corporate the same statutory rights, but also the same statutory obligations, as FDIC-Receiver when FDIC-Corporate acquires assets or assumes liabilities in connection with the resolution of a failed bank.  FDIC-Corporate acquired WMB assets and assumed liabilities related to WMB when FDIC-Corporate entered into the P&A Agreement.  Additionally, FDIC-Corporate, seeking to further whatever regulatory goals it believed the JPMC sale served, also induced FDIC-Receiver to breach its duties under the FDI Act and FDIC-Corporate should not be allowed to use FDIC-Receiver as a shield against liability.  With respect to Plaintiffs' takings claim for just compensation and the FTCA claim, FDIC-Corporate's conduct is subject to the Just Compensation Clause and the FTCA, like any other federal agency.  Accordingly, FDIC-Corporate should not be allowed to make new arguments for dismissal in its reply.

## VIII.  PLAINTIFFS HAVE STATED A CLAIM FOR AVOIDANCE OF THE CAPITAL CONTRIBUTIONS

The FDIC asserts that Plaintiffs' claim for the avoidance of capital contributions in the amount of $6.5 billion made by WMI to WMB (the "Capital Contributions") should be

dismissed because:  (i) the fact that WMB – the initial transferee of the Capital Contributions – is WMI's wholly-owned subsidiary, and Plaintiffs' purported failure to allege WMB's insolvency mandate finding that WMI received reasonably equivalent value for the transfers; and (ii) Plaintiffs have inadequately pleaded WMI's insolvency.  The FDIC misses the mark on both counts.  First, the fact that WMB is WMI's wholly-owned subsidiary does not bar Plaintiffs' claim, even if WMB were technically solvent.  Second, Plaintiffs adequately plead WMI's insolvency under Federal Rule of Civil Procedure 8.

A.    **WMI Did Not Receive Reasonably Equivalent Value for the Capital Contributions**

What constitutes "reasonably equivalent value" is a question of fact, *see, e.g., In re Roco Corp.*, 701 F.2d 978, 981-82 (1st Cir. 1983); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047-48 (2d Cir. 1979), which cannot be resolved on a motion to dismiss.  Despite this insurmountable obstacle, the FDIC contends that the Capital Contributions provided consideration to WMI as a matter of law, constituting reasonably equivalent value to the WMI.  The Complaint pleads two alternative factual predicates; in neither instance does WMI receive reasonably equivalent value. Moreover, even if the Capital Contributions did provide some consideration to WMI, the Court must engage in a factual comparison of any such consideration to the value of the Capital Contributions.[51]

---

[51]    *See Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 993-94 (2d Cir. 1981) (vacating the district court's judgment which had held that consideration to a wholly-owned subsidiary was per se fair consideration to its parent and remanding for a factual determination of the tangible economic benefit to the parent, including a comparison to the value of the property or obligation given up by the debtor-transferor to assess whether benefit, if any, was disproportionately small) (cited by the FDIC); *see also Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.*), 444 F.3d 203, 213 (3d Cir. 2006) (clarifying reasonably equivalent value criterion to mean that, when a court determines that the "debtor gained at least some value as a result of the transfer," "what follows is a comparison" of "whether the debtor got roughly the value it gave"); *In re R.M.L., Inc.,* 92 F.3d 139, 152-54 (3d Cir. 1996) (holding that where the value of an intangible benefit could equal or exceed the value surrendered by the debtor, precise calculations are essential to allow the court to determine equivalency properly).

The FDIC does not dispute that WMI received no tangible consideration in exchange for the Capital Contributions. The FDIC therefore asserts that because WMB was WMI's wholly-owned subsidiary, the claims must fail as a matter of law because of a "presumption" that WMI received value in exchange for the Capital Contributions. Plaintiffs do not dispute that value transferred to a solvent, wholly-owned subsidiary *may* constitute value to the parent. However, the authority on which the FDIC relies – *Rubin* and *Branch* – are better known for the proposition that value to a wholly-owned subsidiary *does not necessarily* constitute value to the parent. *See Rubin*, 661 F.2d at 993-94 (ordering that the district court consider whether any benefit obtained was disproportionately small when compared to transfer on remand); *Branch v. FDIC,* 825 F. Supp. 384, 400 (D. Mass. 1993) (agreeing with trustee's assertion for purposes of surviving a motion to dismiss that transfers from parent company to subsidiary banking entities did not produce reasonably equivalent value).

Where, as here, the debtor has transferred assets to its wholly-owned subsidiary, the transfer is for less than reasonably equivalent value if the subsidiary was insolvent at the time of the transfer. *See In re Duque Rodriguez*, 77 B.R. 939 (Bankr. S.D. Fla. 1987), *aff'd*, 895 F.2d 725, 728 (11th Cir. 1990) (affirming decision that reduction of subsidiary's insolvency is of no benefit to parent company).[52] Thus, to the extent WMB was insolvent as of the time of the respective Capital Contributions, WMI would not have received *any* consideration.

Even if purported benefits are alleged to exist, a court should discount this value for the risk that the debtor will not realize such benefits. *See Silverman v. Paul's Landmark, Inc. (In re*

---

[52] *See also In re First City Bancorp. of Tex., Inc*., No.392-39474-HCA-11, 1995 WL 710912 *18 n.9 (Bankr. N.D. Tex. May 15, 1995) ("While a transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's stock interest in the subsidiary may be correspondingly increased, that is not the case when the subsidiary is hopelessly insolvent, because the value of those shares is zero both before and after the transfer."); *Commerce Bank of Kansas City, N.A., v. Achtenberg*, No.90-0950-cv-W-6, 1993 WL 476510 *5 (W.D. Mo. Nov. 10, 1993) (stating that where "the debtor transferred actual funds . . . insolvency . . . eliminates any presumption created by the downstream nature of the transaction").

*Nirvana Restaurant, Inc.)*, 337 B.R. 495, 503-04 (Bankr. S.D.N.Y. 2006) ("In determining whether prospective benefits constitute 'fair consideration,' the court must determine the likelihood that the debtor will actually realize those benefits."). Therefore, if downstream transfers are made to a solvent subsidiary, any value allegedly received through the parent's equity interest must be discounted for the likelihood that the debtor's shares are in fact, or will be made, worthless, notwithstanding technical solvency.

For example, in *Branch* (cited by the FDIC)*,* the chapter 7 trustee of a bank holding company sought to avoid capital contributions made to its banking subsidiaries based on the theory that they were constructive fraudulent transfers. 825 F. Supp. at 399. Although certain of the capital contributions in question were made to the debtor's admittedly solvent banking subsidiaries, for purposes of ruling on a motion to dismiss, the court discounted the value of the debtor's stock in its banking subsidiaries (*i.e.*, the indirect value ostensibly returned to the debtor) for the "real possibility" that the FDIC would close and place into receivership the insolvent banking subsidiary, dragging the affiliated, solvent subsidiaries with it. *Id.* at 400. The court was satisfied that reasonably equivalent value may not have been afforded the parent and refused to dismiss the trustee's complaint, notwithstanding that the transferees were the debtor's wholly-owned subsidiaries. *Id.; see also In re First Republicbank Corp. & IFRB Corp.*, No. 388-34546-SAF-11, 1990 Bankr. LEXIS 2840, *13 (Bankr. N.D. Tex. June 19, 1990) ("Value must be property or satisfaction or securing of a present or antecedent debt of the debtor. Value does not include an unperformed promise to furnish support to the debtor.").

Further, after applying the appropriate discount to arrive at actual indirect value received, courts then must compare it to value transferred – a necessarily factual analysis precluding dismissal. *See In re Fruehauf*, 444 F.3d at 213; *R.M.L., Inc.*, 92 F.3d at 152-54; *Rubin*, 661 F.2d

at 993-94.  Applying this analysis by focusing on the tangible consideration received by WMI (realizable by its creditors) as pleaded in the Complaint, WMI received no benefit from the Capital Contributions.

*First*, WMB's insolvency is sufficient to overcome any presumption of reasonably equivalent value of a transfer to a subsidiary.  *See Branch,* 825 F. Supp at 399-400; *First City Bancorp.*, 1995 WL 710912 at *18 n.9; *Commerce Bank*, 1993 WL 476510, at *5.  Consistent with the Federal Rule of Civil Procedure 8, the Complaint pleads WMB's insolvency.  (Compl. ¶ 26.)  WMI received no indirect benefit for the Capital Contributions because its WMB equity was worthless.

*Second*, and in the alternative, if WMB was not insolvent at the time of at least one or more of the Capital Contributions, the OTS and the FDIC knew or should have known that WMB's closure was imminent.  (Compl. ¶ 27.)  WMB's closing would have effectively cancelled any equity value that WMI possessed in WMB.  Just as in *Branch*, Plaintiffs have pleaded sufficient facts and circumstances that support a finding that any equity value held by WMI should be discounted for the very "real possibility" that the OTS would close WMB (as it did), rendering WMI's WMB stock worthless.  *See Branch*, 825 F. Supp. at 400 ("[T]he value of the stock received by [the parent holding company] would have to be discounted for the probability that the FDIC would use its cross-assessment powers to render the stock valueless.").

*Third*, even if WMI did receive a benefit through its WMB equity interest (after application of any appropriate discount as discussed above), that benefit must be weighed against the significant tangible investments made by WMI (*i.e.*, $6.5 billion) to determine the "reasonably equivalent value" of the consideration received.[53]  Given the size of the Capital

---

[53] Moreover, if WMB were insolvent just prior to the Capital Contributions, but the transfers themselves created equity, pushing WMB solvent, the capital contributions would still be for less than reasonably equivalent value if the

Contributions, and the significant likelihood of WMB's closing, any WMB equity value was less than reasonably equivalent to the Capital Contributions. In any event, an intensive factual analysis is necessary to prove or disprove Plaintiffs' claim.

### B.  The Complaint's Allegations Are Consistent

Contrary to the FDIC's assertions, the Complaint does not include any inconsistent allegations. The FDIC lifts comments made by the OTS following its appointment of the FDIC as receiver for WMB from Complaint. These statements, concerning WMB's capitalization and liquidity issues, are not Plaintiffs' allegations concerning WMB's solvency, or lack thereof. Rather, Plaintiffs use them to show that the plausibility of their allegation that the FDIC sold WMB's assets for less than their liquidation value. WMB's solvency is a factual issue that will be tried by the Court.[54] Moreover, the fact that WMB suffered a $16.7 billion deposit withdrawal subsequent to the last Capital Contribution does not preclude WMB's insolvency or the significant likelihood of seizure on the dates of the respective Capital Contributions, and certainly does not constitute grounds for dismissal of Plaintiffs' claims. As the FDIC asserts, the "critical time is when the transfer is made . . . [neither] subsequent depreciation in nor appreciation in value of the consideration" is relevant to the Court's analysis. (FDIC-Receiver Mov. Br. 26.) And certainly, whether "anyone knew" of the impending withdrawals during this

---

equity value created was less than the dollar value of the capital contributions. *See Rubin,* 661 F.2d at 991-92 (fair consideration received only where the "value of the benefit received by the debtor approximates the value of the property or obligation he has given up"); *Duque Rodriguez,* 895 F.2d at 727 (affirming bankruptcy court's finding that payments to subsidiary require creation of equity *equal* to the payments made by parent-transferor). *See also First Republicbank*, 1990 Bankr. LEXIS 2840, *14-15 (noting that even if value was received, debtors will likely be able to establish that creditors will receive less than had transfer not been made). For example, if prior to the December 2007 Capital Contribution, WMB was insolvent by $800 million, although the $1 billion Capital Contribution would have in theory made WMB solvent by $200 million, the equity value received would still have been significantly less than reasonably equivalent value.

[54] Even if the Plaintiffs' Complaint did assert inconsistent assertions, this would be acceptable under the Federal Rules. *See RCI Entertainment (San Antonio) v. City of San Antonio*, No. Civ. A SA06CA48FB, 2006 WL 1149173, at *3 (W.D. Tex. Apr. 14, 2006) (approving of "[i]nconsistent and contingent claims pleaded in the alternative"); Fed. R. Civ. P. 8(d)(2).

ten-day period is irrelevant for constructive fraudulent transfer claims, which require no showing

of intent. *Webster v. Hope (In re Hope)*, 231 B.R. 403, 413 (Bankr. D.D.C. 1999).

### C.    **Plaintiffs Adequately Alleged WMI's Insolvency Under the Federal Rules**

The FDIC argues that Plaintiffs' insolvency allegations fail to satisfy the plausibility

standard of *Twombly*.  550 U.S. at 561.  The FDIC misapplies *Twombly*, which "leaves the long-

standing fundamental of notice pleading intact."  *Aktieselskabet AF 21. November 2001*, 525

F.3d at 15.

### 1.    Plaintiffs Have Adequately Pleaded Insolvency Under Rule 8

Under Rule 8, which applies to debtors' constructive fraudulent transfer claim,[55] a

sufficient complaint "contain[s] a short and plain statement of the claim showing that the pleader

is entitled to relief," enough to give a defendant "fair notice of the claims against him."  *Id.* at 15-

16 (quoting *Ciralsky v. CIA*, 355 F.3d 661, 668-70 (D.C. Cir. 2004)); *see also supra* note 17.

Rule 8(d)(2) "affords a party considerable flexibility in framing his pleading by expressly

permitting him to set forth his claims or defenses in an alternative or hypothetical manner."  5

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1282 (3d ed. rev. 2009);

Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense

alternatively or ***hypothetically***, either in a single count or defense or in separate ones.")

(emphasis added).  Plaintiffs allege, among other things, that "if WMI was insolvent at the time

any of the Capital Contributions were made, WMI asserts a fraudulent transfer claim pursuant to

---

[55] "Most cases have held that Rule 9(b) does not apply to [constructive fraudulent transfer claims]."  *Gold v. Winget (In re NM Holdings Co.)*, No. 04-4373, 2009 WL 1372982, at *17-18 (Bankr. E.D. Mich. May 18, 2009) (holding that Rule 9(b) does not apply to constructive fraudulent transfer claim); *accord In re AstroPower Liquidating Trust*, 335 B.R. 309, 333 (Bankr. D. Del. 2005); *Court-Appointed Receiver for Lancer Management Group LLC v. 169838 Canada, Inc.*, No. 05-60235-CIV, 2008 WL 2262063, at *2-3 (S.D. Fla. May 30, 2008) (Rule 9(b) does not apply to fraudulent transfer claims; given "lack of access to information on the part of a plaintiff in a fraudulent transfer case, the application of a heightened pleading standard is inappropriate"); *Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*, 03-93172 (AJG), 2006 WL 2400369, at *5 (Bankr. S.D.N.Y. May 11, 2006) (explaining that the "better and majority rule" is that a claim for constructive fraud need not be plead with particularity as such a claim is not premised on fraud but on a transfer made for inadequate consideration at the time the transferor was insolvent).

sections 544 and 548 of the Bankruptcy Code in an amount up to $6.5 billion . . . ."  (Compl.

¶ 28.)  This is the type of hypothetical allegation specifically contemplated by Rule 8(d)(2).

*General Acquisition, Inc. v. GenCorp Inc.*, 766 F. Supp. 1460, 1476-77 (S.D. Ohio 1990)

is instructive.  There, the plaintiff's allegation depended upon its belief that defendant's purchase

of stock "may have been motivated by" nonpublic information; and, "if this belief is true," then

defendant breached its fiduciary duty.  *Id.* at 1476-77.  Defendant moved to dismiss, arguing that

plaintiff's allegation of trading on nonpublic information was "founded entirely on conjecture."

*Id.* at 1476.  The court held that plaintiff's allegation complied with Rule 8 and was "a practical

and straightforward manner in which to assert a claim."  *Id.* at 1476-77.[56]

> 2.    Time Constraints Imposed on Plaintiffs' Skeleton Staff Further Support
> Denial of Dismissal

While not necessary to support hypothetical pleading,[57] it should be noted that Plaintiffs

were forced to plead their insolvency probabilistically or "hypothetically" because of conditions

beyond their control.  Specifically, since WMB's closing, Plaintiffs have been left with a

skeleton staff and without access to many of their business records.  Most of WMB's staff

transitioned to JPMC after the closure and sale, taking many historical files with them.  The FDI

Act compelled Plaintiffs to file their Proof of Claim and the Complaint within a short timeframe,

and when Plaintiffs were understaffed and without critical institutional knowledge and resources

to carefully review and confirm Plaintiffs' beliefs regarding insolvency.  Today, Plaintiffs have

---

[56] *See also Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 344 F. Supp. 2d 936, 944 (M.D. Pa. 2004) (allegation that conduct violated various state statutes "if" actions giving rise to cause of action took place in state was adequate in light of Rule 8(d)(2)); *Barr v. Dramatists Guild, Inc.*, 573 F. Supp. 555, 560 (S.D.N.Y. 1983) (allegation that "if [plaintiff] engaged in any illegal conduct then similar conduct of the counterclaim defendants is unlawful" was proper "hypothetical pleading").

[57] *See In re Sunrise Sec. Lit.*, 793 F. Supp. 1306, 1312 (E.D. Pa. 1992) (permitting party to plead fraud hypothetically (i.e. that if certain loans were made, defendants concealed them) and finding hypothetical pleading is *not* limited to "when the pleader is in doubt about the factual background or legal theories supporting his claim").

access to only seventeen employees – less than one-tenth of one percent (0.1%) of the employees in the Washington Mutual organization prior to WMB's closing.

If Plaintiffs did not timely assert these claims, they may have been lost – to the detriment of Plaintiffs' bankruptcy estate.  Under such circumstances, courts have approved the pleading of claims that a party believes will be supported by evidence where the party was "required . . . to plead it . . . even though they may not have had sufficient evidentiary support for it at the time." *Geisinger Med. Ctr. v. Gough,* 160 F.R.D. 467, 469 (M.D. Pa. 1994).  Courts have been particularly receptive to hypothetical pleading under such circumstances.[58]

Finally, Rule 8(e) requires that pleadings be construed "so as to do justice."[59]  To the extent there is any ambiguity in Plaintiffs' pleading of insolvency, justice requires, in light of the above-mentioned circumstances, that Plaintiffs' allegations be found sufficient under Rule 8.

## IX.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court deny FDIC-Receiver's Partial Motion to Dismiss and FDIC-Corporate's Motion to Dismiss.

---

[58] *See, e.g., Geisinger,* 160 F.R.D. at 470 (denying motion to dismiss counterclaims found to be compulsory where defendants were required to plead hypothetically, "[b]ecause of the force of circumstances"); *General Acquisition,* 766 F. Supp. at 1476 (recognizing "importance of permitting parties to draft and respond in a hypothetical manner" where a party needs extensive discovery to assert a claim).

[59] *See also Owens v. Republic of Sudan,* 531 F.3d 884, 895 (D.C. Cir. 2008) (denying motion to dismiss and noting that "[p]leadings must be construed so as to do justice") (internal quotation omitted); *Starks v. Perloff Bros., Inc.,* 760 F.2d 52, 55 (3d Cir. 1985) ("An overly restrictive reading of a complaint is inconsistent with the mandate that 'pleadings shall be so construed as to do substantial justice.'") (quoting Rule 8(e)).

Dated:  July 16, 2009                                    Respectfully submitted,


                                                         /s/ Adam P. Strochak
Daniel H. Bromberg (D.C. Bar No. 442716)                 David R. Berz, Esq. (D.C. Bar No. 182105)
Quinn Emanuel Urquhart Oliver & Hedges, LLP              Adam P. Strochak, Esq. (D.C. Bar No. 439308)
555 Twin Dolphin Drive, Suite 520                        Weil, Gotshal & Manges LLP
Redwood Shores, CA 94306                                 1300 Eye Street, NW, Suite 900
Telephone: (650) 801-5008                                Washington, DC 20005
Facsimile:  (650) 801-5100                               Telephone: (202) 682-7001
                                                         Facsímile: (202) 857-0939
– and –
                                                         – and –
Peter E. Calamari
David L. Elsberg                                         Marcia L. Goldstein, Esq.
Deborah K. Brown                                         Brian S. Rosen, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP              Weil, Gotshal & Manges LLP
51 Madison Avenue                                        767 Fifth Avenue
New York, New York 10010                                 New York, New York 10153
Telephone:  (212) 849-7000                               Telephone: (212) 310-8000
Facsimile:  (212) 849-7100                               Facsímile:  (212) 310-8007


                                                         *Attorneys for Plaintiffs WMI and WMI Investment*

**CERTIFICATE OF SERVICE**

The undersigned attorney for Plaintiffs WMI and WMI Investment certifies that on this 16th day of July 2009, I caused a copy of the foregoing document to be filed via ECF which will cause electronic notice of its filing to be served on all parties who have appeared in this action.

/s/ Adam P. Strochak

Adam P. Strochak