UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WASHINGTON MUTUAL, INC.,

and

WMI INVESTMENT CORP.,

        Plaintiffs and Counterclaim
        Defendants,

    v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its corporate capacity,

        Defendant,

 and

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as receiver of
Washington Mutual Bank,

        Defendant and Counterclaim
        Plaintiff.

Case No. 1:09-cv-00533 RMC

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION TO DISMISS THE AMENDED
COUNTERCLAIMS OF DEFENDANT FEDERAL DEPOSIT INSURANCE
<u>CORPORATION, AND TO STAY THE PROCEEDINGS IN THEIR ENTIRETY</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..............................................................................................................3

I.     THE FDIC'S COUNTERCLAIMS MUST BE DISMISSED .............................................3

       A.     The Counterclaims Violate the Automatic Stay Under the Bankruptcy
              Code ..................................................................................................................3

              1. Counts V-VIII of the Counterclaims Are Indisputably Subject to the
                 Stay ...................................................................................................3

              2. The Remaining Counterclaims Are Subject to the Stay ......................4

                     a. Tax Refund Counterclaims (Counts I and II)............................5

                     b. Trust Preferred Securities Counterclaims (Counts III and IV) ...............7

                     c. Goodwill Litigation and Insurance Proceeds (Counts IX and X) ...........8

              3. None of the Counterclaims are Claims for Recoupment ....................9

              4. Debtors Have An Equitable Interest In the Estate's Property ...........13

       B.     The FDIC's Claims Must be Resolved in the Bankruptcy Court ...........................16

              1. The Bankruptcy Court has Exclusive Jurisdiction Over the FDIC's
                 Counterclaims .................................................................................17

              2. The FDIC's Claims Are Barred By Collateral Estoppel ....................17

II.    THE DC ACTION SHOULD BE STAYED IN ITS ENTIRETY TO PROMOTE
       EFFICIENCY ...............................................................................................19

III.   IF THE COURT ELECTS TO PROCEED TO THE MERITS, THERE ARE
       SEVERAL GROUNDS TO DISMISS THE INDIVIDUAL COUNTERCLAIMS..........20

       A.     Counts I and II of the Counterclaims are Deficient ...............................................21

       B.     Counts III and IV of the Counterclaims are Deficient...........................................22

       C.     Count VI of the Counterclaims is Deficient ..........................................................23

       D.     Count VII of the Counterclaims is Deficient.........................................................24

i

E.     Counts IX and X of the Counterclaims are Deficient ............................................25

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ades & Berg Group Investors v. Breeden (In re Ades & Berg Group Investors)*,
    550 F.3d 240 (2d Cir. 2008)................................................................13, 14, 15

*Amsave Credit Corp. v. R.T.C. (In re Am. Mortgage & Inv. Servs.)*,
    141 B.R. 578 (Bankr. D.N.J. 1992) .................................................17

*Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*,
    744 F.2d 332 (3d Cir. 1984)................................................................5

*Baker v. Leonard*,
    120 Wash. 2d 538 (1993)................................................................14, 25

*Bellini Imp. v. Mason and Dixon Lines, Inc.*,
    944 F.2d 199 (4th Cir. 1991) .................................................4

*Blue v. Fremont Inv. & Loan*,
    562 F. Supp. 2d 33 (D.D.C. June 23, 2008)................................................23

*Borman v. Raymark Indus., Inc.*,
    946 F.2d 1031 (3d Cir. 1991).................................................7

*Charlestown Holdings, Inc., v. FDIC (In re Competrol Acquisition P'ship, L.P., et al.)*,
    176 B.R. 723 (Bankr. D. Del. 1994) .................................................8

*Checkers Drive-in Rests., Inc. v. Comm'r of Patents and Trademarks*,
    No. 93-1024, 1994 WL 869570 (D.D.C. Jan. 7, 1994)................................3

*Eggemeyer v. Internal Revenue Service (In re Eggemeyer)*,
    75 Bankr. 20 (Bankr. S.D. Ill. 1987)................................................6

*EXDS, Inc. v. RK Electric, Inc. (In re EXDS, Inc.)*,
    No. 03-532, 2004 WL 503545 (D. Del. Mar. 5, 2004) ................................16

*Fairview Hosp. v. Leavitt*,
    2007 WL 1521233 (D.D.C. May 22, 2007)................................................19

*First City Asset Servicing Co. v. FDIC*,
    158 B.R. 78 (Bankr. N.D. Tex. 1993)................................................16

*In re Glenn*,
    207 B.R. 418 (E.D. Pa. Jan. 6, 1997)................................................6

*Gov't of Rwanda v. Johnson*,
    409 F.3d 368 (D.C. Cir. 2005)................................................17

*Harris v. Ramsey*,
    496 F. Supp. 2d 64 (D.D.C. June 12, 2007)................................................25

*Kosadnar v. Metro. Life Ins. Co. (In re Kosadnar)*,
   157 F.3d 1011 (5th Cir. 1998) ........................................................................9

*Langenkamp v. C.A. Culp*,
   498 U.S. 42 (1990).........................................................................................16

*Maritime Elec. Co. v. United Jersey Bank*,
   959 F.2d 1194 (3d Cir. 1992)..........................................................................3

*Nickels v. Nickels*,
   No. 45066-2-I, 2001 WL 316194 (Wash. App. Div. 1 Apr. 2, 2001)............24

*Noletto v. Nationsbanc Mortgage Corp. (In re Noletto)*,
   244 B.R. 845 (Bankr. S.D. Ala. 2000)...........................................................17

*Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*,
   236 F.3d 1246 (10th Cir. 2001) ....................................................................22

*R.T.C. v. FirstCorp, Inc. (In re FirstCorp, Inc.)*,
   973 F.2d 243 (4th Cir. 1992) ........................................................................22

*Rozel Indus., Inc. v. Internal Revenue Service (In re Rozel Indus., Inc.)*,
   120 B.R. 944 (Bankr. N.D. Ill. 1990) .............................................................6

*Shipping Corp. of India, Ltd. v. Pan Am. Seafood, Inc.*,
   583 F. Supp. 1555 (S.D.N.Y. April 26, 1984) .................................................9

*Superintendent of Ins. for the State of N.Y. v. Ochs (In re: First Cent. Fin. Corp.)*,
   377 F.3d 209 (2d Cir. 2004)...........................................................14, 21, 23

*United States v. MCorp Fin., Inc. (In re MCorp Fin., Inc.)*,
   170 B.R. 899 (S.D. Tex. July 18, 1994).......................................15, 20, 23

## Statutes

11 U.S.C. § 101(4) ...............................................................................................5

11 U.S.C. § 362 ...............................................................................................3, 7

11 U.S.C. § 362(a) ...............................................................................................8

11 U.S.C. § 362(a)(3)...................................................................................1, 3, 4

11 U.S.C. § 362(a)(4).........................................................................................4

11 U.S.C. § 365 ...............................................................................................22

11 U.S.C. § 365(o)......................................................................................21, 22

11 U.S.C. § 544 .........................................................................................10, 12

11 U.S.C. § 547 .............................................................................................10

11 U.S.C. § 548 .........................................................................................10, 12

iv

11 U.S.C. § 553 ................................................................................................................................6

12 U.S.C. § 1831o(e)(2)(A) ............................................................................................................24

12 U.S.C. § 1831o(e)(2)(C) ............................................................................................................24

Plaintiffs Washington Mutual, Inc. and WMI Investment Corp. (collectively, "Debtors" or "Plaintiffs"), respectfully submit this Reply Memorandum in Further Support of Plaintiffs' Motion to Dismiss the Amended Counterclaims of Defendant Federal Deposit Insurance Corporation and to Stay the Proceedings in their Entirety.

## PRELIMINARY STATEMENT

The Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as receiver for Washington Mutual Bank ("WMB"), has asserted a series of counterclaims in this action that plainly violate the automatic stay that is now in force pursuant to the Bankruptcy Code.  In an attempt to avoid the automatic stay, the FDIC argues that the stay does not apply to claims that arise *post-petition* (*i.e.*, subsequent to the commencement of Debtors' bankruptcy cases), and asserts, without any support or analysis, that several of its counterclaims are post-petition claims. But significantly, the FDIC does not (and cannot) assert that Counts V, VI, VII and VIII of the counterclaims arose post-petition and thus those Counts are indisputably pre-petition claims that are subject to the automatic stay.  Furthermore, it is clear that the FDIC's remaining counterclaims are likewise subject to the automatic stay.  Not only are these claims based on alleged rights to payment that arose prior to WMI's filing for bankruptcy protection (and thus are pre-petition in nature), but pursuant to Bankruptcy Code § 362(a)(3), "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is subject to the stay.  Therefore, regardless of the timing of the FDIC's claims, all of the counterclaims are subject to the automatic stay because they seek to obtain possession or control over property of the bankruptcy estate.  Accordingly based on the automatic stay provision alone, each of the counterclaims should be dismissed.

In addition, the FDIC's counterclaims should be dismissed on the separate grounds that the FDIC, by filing its proof of claim, has submitted its claims to the Bankruptcy Court's

1

exclusive jurisdiction.  Ironically, the FDIC argues that "the principles underlying compulsory counterclaims – fairness and considerations of convenience and economy – strongly favor litigation of the counterclaims here."  The Bankruptcy Court, however, has correctly recognized that it has exclusive jurisdiction, in the first instance, to resolve competing claims by Debtors and the FDIC (and JPMC) over potential bankruptcy estate assets.  Thus, the principles of fairness and considerations of convenience and economy favor litigating the FDIC's counterclaims in Bankruptcy Court – where claims virtually identical to the FDIC's counterclaims have already been submitted.

Furthermore, the FDIC is fully aware that the Bankruptcy Court has already asserted its exclusive jurisdiction over the very matters at issue here.  Thus, collateral estoppel applies and the FDIC cannot simply ignore the Bankruptcy Court's ruling by pursuing its claims here.  Rather, if the FDIC disagrees with the Bankruptcy Court's ruling (as it repeatedly advises this Court that it does), its appropriate recourse is to pursue an appeal in that jurisdiction.  The FDIC knows this – it has sought interlocutory appeal of the Bankruptcy Court's ruling and briefing on that matter is now pending.  The FDIC also has sought extraordinary, direct review by the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 157(d)(2).  It is both inefficient and improper for the FDIC, at the same time it is seeking to appeal the Bankruptcy Court's assertion of its exclusive jurisdiction, to defy that ruling by pursuing its claims here.

Finally, in the event the Court chooses to proceed despite the FDIC's clear violation of the automatic stay, the FDIC's filing of mirror-image claims with the Bankruptcy Court, and the exclusive jurisdiction invoked by the Bankruptcy Court, several of the individual Counterclaims must be dismissed as a matter of law.  In its Opposition Brief, the FDIC has failed to identify any

allegations in the Counterclaims that could possibly overcome these pleading deficiencies, and thus the counterclaims should be dismissed.

## ARGUMENT

### I.     THE FDIC'S COUNTERCLAIMS MUST BE DISMISSED

#### A.     The Counterclaims Violate the Automatic Stay Under the Bankruptcy Code

Once a party files a bankruptcy petition, 11 U.S.C. § 362 automatically stays all proceedings against a debtor in bankruptcy and all proceedings that "could affect the property of a debtor in bankruptcy."  This automatic stay is a fundamental and essential element of bankruptcy law.  *See Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1207 (3d Cir. 1992) ("Consolidating all pre-petition claims against the debtor in one collective proceeding before a bankruptcy court is the essence of bankruptcy."); *Checkers Drive-in Rests., Inc. v. Comm'r of Patents and Trademarks*, No. 93-1024, 1994 WL 869570, at *2 (D.D.C. Jan. 7, 1994) ("The automatic stay . . . is recognized as the linchpin of the bankruptcy system and, as intended by Congress, is quite broad.").

##### *1. Counts V-VIII of the Counterclaims Are Indisputably Subject to the Stay*

In its Opposition Brief, the FDIC concedes that all pre-petition claims asserted against Debtors are subject to the automatic stay.  In an attempt to avoid the automatic stay, however, the FDIC repeatedly argues that the automatic stay does not apply to claims that arise ***post-petition***. The FDIC further asserts, without any support or analysis, that several of its counterclaims arose post-petition and thus cannot be stayed.  Even if the FDIC's position were correct (which it is not), it is significant that the FDIC does not (and cannot) assert that Counts V, VI, VII and VIII arose post-petition.  Thus, those Counts are indisputably pre-petition claims that are subject to the automatic stay.  Those claims must therefore be dismissed.

### 2. The Remaining Counterclaims Are Subject to the Stay

With respect to the remaining counterclaims, it is clear that they are likewise subject to the automatic stay. Pursuant to Bankruptcy Code § 362(a)(3), "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is subject to the stay. Therefore, regardless of the timing of the FDIC's claims, all of the counterclaims are subject to the automatic stay because they seek to obtain possession or control over property of the bankruptcy estate. *See Bellini Imp. v. Mason and Dixon Lines, Inc*., 944 F.2d 199, 201 (4th Cir. 1991) ("Because attachment or execution of a judgment obtained as a result of a post-petition claim would fall within the stay provision of subsections 362(a)(3) and (4), a creditor must obtain relief from the stay to satisfy a judgment against property of the bankruptcy estate.").

Furthermore, despite the FDIC's claims to the contrary, each of its counterclaims is pre-petition in nature. Any allegations by the FDIC that the Debtors took steps to ensure that their property is collected and distributed by the bankruptcy estate does not change that result because those steps were taken in compliance with the bankruptcy laws so that no creditor (including the FDIC as receiver for WMB) receives an unwarranted preference over other creditors.[1] To determine whether a claim arises pre- or post-petition, it is crucial to understand how a "claim" is defined under bankruptcy law. The Bankruptcy Code defines a "claim" as follows:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, dispute, undisputed, legal, equitable, secured, or unsecured; or

---

[1]    Specifically, the FDIC asserts that the following claims arose post-petition:  (1) "property rights in WMB's tax refunds" (Opp. Br. at 22), *i.e.*, Counts I and II; (2) "counterclaims with respect to the trust preferred securities" (Opp. Br. at 22), *i.e.*, Counts III and IV; and (3) "WMB's attributable share of pending goodwill litigation and for insurance proceeds received by WMI on account of losses sustained by WMB" (Opp. Br. at 23), *i.e.*, Counts IX and X.

> (B) right to an equitable remedy for breach of performance if such
> breach gives rise to a right to payment, whether or not such right to
> an equitable remedy is reduced to judgment, fixed, contingent,
> matured, unmatured, disputed, undisputed, secured, or unsecured;

11 U.S.C. § 101(4) (1982).  It is clear that "the threshold requirement of a claim [is] … a 'right to

payment.'"  *Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d

332, 336 (3d Cir. 1984) ("The crucial issue, however, is when did A & B's right to payment arise,

for the automatic stay provision applies only to claims that arise pre-petition.").  As set forth in

detail below, the automatic stay applies to Counterclaims I-IV, IX and X because the alleged

right to payment for each of these claims arose pre-petition.

### a. Tax Refund Counterclaims (Counts I and II)

The FDIC concedes that WMI, WMB, WMBfsb, and certain other direct and indirect

subsidiaries of WMI and WMB are parties to a Tax Sharing Agreement, dated as of August 31,

1999.  (Answer ¶ 20.)  Prior to the Receivership and bankruptcy petition, pursuant to the Tax

Sharing Agreement, WMI paid taxes due and owing by the consolidated tax group, including

amounts due and owing by WMB.  However, as of the Receivership Date, WMB had not paid or

reimbursed WMI for tax payments that were made on its behalf, and thus WMI has asserted a

claim against the FDIC for the amount of these tax payments.  (Complaint ¶ 20.)

In addition, as a result of losses incurred by the consolidated tax group *prior to the time

of WMI's bankruptcy petition*, WMI is expected to receive certain tax refunds estimated to be

approximately $3 billion (the "Tax Refunds").  Consistent with the historic consolidated group

tax reporting, and the Tax Sharing Agreement, these refunds are payable to WMI, which, once

received, may distribute them pursuant to the terms of the Tax Sharing Agreement.  (Complaint ¶

22.)  Prior to the Receivership Date, if a tax refund was received by WMI that would be payable

to WMB under the Tax Sharing Agreement, WMI would first offset the refund amount against

tax payments still owed to WMI from WMB, thus ensuring that WMB would not receive a refund for tax payments that it never actually made.  Because WMI, as the entity responsible for the consolidated tax reporting, should receive all refunds from pre-petition consolidated or combined tax returns, in the event that the FDIC obtains any portion of the Tax Refunds directly or indirectly from the Internal Revenue Service or any other taxing authority, WMI has asserted a claim for such amounts.  *Id.*

Without even addressing the fact that WMB owes WMI for tax payments made in prior years on behalf of WMB and its subsidiaries, and in a weak attempt to re-characterize the Tax Refunds as a post-petition claim, the FDIC claims that "WMI asserted for the first time in its proof of claim against the WMB receivership that its alleged tax sharing agreement with WMB gave it property rights in WMB's tax refunds."  (Opp. Brief at 22.)  Not only does this argument completely ignore the way the Tax Sharing Agreement has operated among WMI and WMB for years prior to the Receivership Date, it fails to acknowledge the proper date upon which WMB's alleged right to payment for the Tax Refunds arose.

Courts that have addressed this issue have found that the right to payment for a tax refund arises at the end of the pertinent tax year – not when the funds are actually received from the taxing authority.  *See, e.g., In re Glenn*, 207 B.R. 418, 420 (E.D. Pa. Jan. 6, 1997) ("[T]he vast majority of courts . . . have held that a taxpayer's interest in a tax refund arises at the end of the taxable year . . . ."); *Rozel Indus., Inc. v. Internal Revenue Service (In re Rozel Indus., Inc.)*, 120 B.R. 944, 951 (Bankr. N.D. Ill. 1990) ("…a tax refund for purposes of § 553 arises at the end of the taxable year to which it relates, and not when that right of refund is claimed by the taxpayer/debtor"); *Eggemeyer v. Internal Revenue Service (In re Eggemeyer)*, 75 Bankr. 20, 21-22 (Bankr. S.D. Ill. 1987) ("…income tax refunds are 'absolutely owing' on December 31 of the

year in which the overpayment is made or the liability accrues.  The date the return is actually filed is not relevant in determining when the debt arose.").  Therefore, the timing of the receipt of any tax refunds is irrelevant to the analysis of whether the FDIC's tax refund counterclaims arose pre- or post-petition.  The tax refunds at issue in Counterclaims I and II indisputably relate to tax years and payments made prior to the petition date.  Therefore, Counts I and II are pre-petition claims that are subject to the automatic stay.

### b. Trust Preferred Securities Counterclaims (Counts III and IV)

WMI disputes the FDIC's claims that it is entitled to the trust preferred securities. However, even assuming that the FDIC were to have some claim to the securities, it is clear based on the allegations in the counterclaims that the FDIC's alleged right to the trust preferred securities arose prior to WMI's filing for bankruptcy.  The FDIC alleges that on "September 25, 2008, WMI entered into an Assignment Agreement with WMB (the 'Assignment Agreement'). Under the Assignment Agreement, and effective upon its execution, the FDIC further alleges WMI transferred to WMB, without recourse, all of its right, title and interest in and to all of the trust preferred securities…."  (Answer ¶ 27.)  The FDIC also alleges that on "September 25, 2008, the OTS notified WMI that an 'exchange event' occurred triggering the 'conditional exchange' feature of the trust preferred securities."  (Answer ¶ 28.)  On September 26, 2008, the Plaintiffs each commenced a voluntary case pursuant to chapter 11 of the Bankruptcy Code. (Complaint ¶ 9; Answer ¶ 9.)

Based on its own allegations, it is clear that the FDIC's alleged right to the trust preferred securities is based upon the events of September 25, 2008 – the day before WMI filed for bankruptcy.  Thus, the FDIC's attempt to put itself ahead of, or obtain a preference in relation to, the other creditors of WMI, by claiming that the trust preferred securities claims arose post-petition, should not be permitted.  *Borman v. Raymark Indus., Inc.,* 946 F.2d 1031, 1036 (3d Cir.

1991) (The automatic stay exists to "prevent certain creditors from gaining preference for their claims against the debtor…").  Counterclaims III and IV clearly arose pre-petition and thus under § 362 are automatically stayed.

### c. Goodwill Litigation and Insurance Proceeds (Counts IX and X)

The allegations in counterclaims IX and X make it equally clear that those claims arose pre-petition.  In Count IX, the FDIC alleges that "WMB is or was a plaintiff or the successor in interest to a plaintiff in certain litigation ***prior to the receivership***, or if it was not a named plaintiff, was the real party in interest in such litigation being prosecuted by WMI."  (Answer ¶ 61, emphasis added.)  The FDIC then alleges that to the extent WMI receives any proceeds from such litigation, those amounts belong to WMB.  (Answer ¶ 62.)  The possible receipt of funds by WMI at some point in time in the future is irrelevant to the determination of when the FDIC's counterclaim arose.  The goodwill litigation indisputably arose pre-petition, and thus any claim that WMB has with respect to that litigation also arose pre-petition and is subject to the automatic stay.

In Count X, the FDIC alleges that it is entitled to proceeds that should eventually be paid under insurance coverage for losses submitted to the insurers on or about July 18, 2008, September 17, 2008, September 18, 2008, and October 3, 2008.  (Answer ¶¶ 66-67.)  The alleged right to payment with respect to each of those claims arose on the date of the covered loss event – not the date the claim was submitted or when payment will actually be received.  Thus, the FDIC's counterclaim related to insurance proceeds arose pre-petition and should be automatically stayed.[2]

---

[2]    As further evidence that each of the counterclaims arose pre-petition, the counterclaims are essentially identical to the proof of claim that the FDIC asserted separately against Debtors' estates in the bankruptcy proceeding, in which the FDIC asserts amounts allegedly owed it *as of the Debtors' petition date*.  (*See* Abensohn Decl., Ex. D.)  By filing these

### 3. None of the Counterclaims are Claims for Recoupment

The FDIC incorrectly asserts that its counterclaims (except for Count IX) are outside the scope of the automatic stay because they are claims for recoupment. "Recoupment allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim." *Kosadnar v. Metro. Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1013 (5th Cir. 1998) (internal quotations and citations omitted). There are two general requirements to characterizing a counterclaim as recoupment – "first, some type of overpayment must have been made, and second, both the creditor's claim and the amount owed to the debtor ***must arise from a single contract or transaction***." *Id*. at 1014 (emphasis added). A court must use caution when characterizing a claim as recoupment because "[w]hen applied, the doctrine allows a bankrupt's unsecured creditors to obtain preferential treatment." *Id*.

Furthermore, recoupment is a purely defensive claim, merely entitling the defendant to a reduction of the plaintiff's claim. Thus, the matters raised by a claim of recoupment can only operate to reduce the amount of damages to which a plaintiff is entitled – no affirmative judgment is allowed. *See Shipping Corp. of India, Ltd. v. Pan Am. Seafood, Inc.*, 583 F. Supp. 1555, 1557 (S.D.N.Y. April 26, 1984) ("[A] shipper's recoupment is limited to the amount demanded by the carrier for the transaction on which the setoff is based … It does not operate as a cross-demand, but merely lessens or defeats a plaintiff's recovery.").

---

same claims here, and asserting them as post-petition in nature, in addition to being wholly inconsistent, the FDIC has violated the stay. *See Charlestown Holdings, Inc., v. FDIC (In re Competrol Acquisition P'ship, L.P., et al.)*, 176 B.R. 723, 729 (Bankr. D. Del. 1994) (holding that the "FDIC's post petition possessory activities violated the automatic stay of section 362(a) and are void *ab initio* . . . . In this Circuit, acts in violation of the automatic stay have no force and effect . . . .").

*Counterclaims for Tax Refunds (Counts I and II )* – Debtors claim that WMB owes WMI for tax payments that were made on its behalf as part of consolidated federal, state, local and foreign tax filings.  In addition, Debtors claim that any tax refunds received from consolidated tax returns previously filed by WMI should be remitted to WMI so that it can allocate the refunds appropriately in accordance with the Tax Sharing Agreement and with the prior practice of the parties.  This is to ensure that a refund is not distributed to an entity that did not pay the tax in the first instance.  (Complaint ¶¶ 20-24.)  Counts I and II of the FDIC's counterclaims, on the other hand, claim that all tax refunds related to WMB should be remitted to WMB without regard to the parties' prior practice under the Tax Sharing Agreement or who paid the tax in the first instance.  (Answer ¶¶ 12-20.)

There is no plausible way these counterclaims could be for recoupment.  At its essence, Debtors claim that WMB owes WMI money for taxes.  A valid claim for recoupment would have to allege that WMI owes WMB money arising out of the exact same underlying tax transaction, thus reducing WMI's claimed damages.  A recoupment claim, by its nature, cannot exceed the amount that WMI claims it is owed.  The FDIC's allegations fail to meet this standard.  The counterclaims assert that all tax refunds, in their entirety, should be paid to the FDIC regardless of WMI's tax-related claims.  These type of counterclaims, which affirmatively seek declaratory judgment and "judgment against WMI for any and all tax-related funds…" (Answer ¶ 20) cannot be recast as "recoupment" claims in order to, transparently, attempt to avoid the automatic stay.

*Counterclaims for Trust Preferred Securities (Counts III and IV)* – Debtors claim that the purported transfer of the Trust Preferred Securities from WMI to WMB on September 25, 2008 – before the commencement of WMI's chapter 11 bankruptcy case – constitutes a fraudulent

transfer pursuant to section 544 and 548 of the Bankruptcy Code. Alternatively, WMI further asserts a claim to recover such securities as a voidable preference pursuant to sections 544 and 547 of the Bankruptcy Code. (Complaint ¶¶ 29-35.) In sum, to the extent WMB has any of the trust preferred securities, WMI seeks the return of such assets. Counts III and IV of the FDIC's counterclaims, on the other hand, claim that the Trust Preferred Securities are owned by WMB and seek judgment directing WMI to turnover to the FDIC all of the trust preferred securities. (Answer ¶¶ 21-35.)

Counts III and IV are not claims for recoupment – they are competing claims for the same assets in their entirety. First and foremost, the FDIC is seeking an affirmative judgment requiring Debtors to turnover assets to the FDIC, it is not seeking to have Debtors' claim reduced by an amount previously overpaid by WMB. In fact, there are no allegations in the counterclaims that WMB overpaid WMI with respect to the trust preferred securities. The dispute is simply over who owns such securities – an issue that is fully and completely before the Court without the counterclaims.

*Counterclaim for Intercompany Balances (Count V)* – Because WMI and WMB were affiliated entities prior to the Receivership Date, amounts due and owing between these entities were historically accounted for using intercompany accounts. The simple fact that WMI and WMB both claim that amounts charged through the intercompany accounts are still due and owing does not mean that these claims arise from a single contract or transaction. In fact, the allegations make it clear that each party's claims are completely unrelated.[3] Debtors claim that

---

[3]  Courts are clear that "transaction" for purposes of recoupment should not be construed liberally, choosing instead a more circumscribed, stricter definition. *See Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984) ("The fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, however, does not mean that the two arose from the 'same transaction.' In bankruptcy, the recoupment doctrine has been applied primarily where the

WMB owes WMI intercompany amounts for (a) promissory notes; (b) stock-based compensation; and (c) debt servicing agreements. (Complaint ¶¶ 14-18.) While the FDIC claims that WMI owes WMB intercompany amounts for (a) change in accounting for pension contributions; (b) payroll; (c) certain clearing accounts; (d) management fees; (e) stock option amortization; and (f) rent. (Answer ¶¶ 36-39.) Because Count V does not arise from the same contract or transaction as Debtors' claim, it cannot possibly be a claim for recoupment.

     *Counterclaim for funds in Deposit Accounts (Count VI)* – Debtors claim "the FDIC does not have any right of setoff with respect to" certain deposit accounts that were transferred to JPMorgan Chase pursuant to the Purchase and Assumption Agreement. Furthermore, Debtors claim that WMB owes WMI damages, including interest, for lost use of the funds in the deposit accounts. (Complaint ¶¶ 47-50.) The FDIC, on the other hand, seeks judgment awarding it "the amount of the Deposit Funds that are the property of WMB in an amount to be proven at trial." (Answer ¶ 48.)[4] The FDIC's counterclaim is nothing more than an obvious attempt to give the FDIC a preference over other creditors of WMI by using WMI's funds currently on deposit at WMB to satisfy any and all claims it has against WMI. Count VI is clearly not a claim for recoupment, which would require the FDIC's claim for funds to arise out of the same transaction as Debtors' claims, as stated in ¶¶ 47-50 of the Complaint.

---

creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract."); *In re Am. Home Mortg. Holdings, Inc.*, 401 B.R. 653, 656 (D. Del. 2009) (finding that use of a "stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed").

    [4] FDIC's request to "unwind[] the fraudulent transfers" between deposit accounts is a red herring – all accounts are indisputably deposit accounts, and JPMorgan Chase acquired the accounts of WMB and WMBfsb, so a transfer between these entities is of no relevance to the claims.

*Counterclaim for failure to account and reserve for WMB's losses (Count VII)* – Debtors claim that if WMI was insolvent at the time any of the $6.5 billion in capital contributions were made from WMI to WMB during December 2007 through September 2008, such contributions were fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code.  (Complaint ¶¶ 25-28.)  The FDIC's counterclaim, on the other hand, does not relate to these capital contributions at all, but rather relates to whether WMI properly accounted and reserved for anticipated losses of WMB.  (Answer ¶ 51-53.)  On their face Debtors' and the FDIC's claims do not arise from the same contract or transaction and thus Count VII is not a claim for recoupment.

*Counterclaim for recovery of unlawful dividends (Count VIII)* – There are no claims in the Complaint related to cash dividends paid between September 2003 and September 2008 (Answer ¶ 58).  Therefore, Count VIII, which relates to such dividends, does not arise from the same contract or transaction as any of Plaintiffs' claims and cannot be a claim for recoupment.

*Counterclaim for Insurance Proceeds (Count X)* – WMI claims that WMB owes it for "any and all premiums and other charges paid by WMI on account of BOLI-COLI Policies owned by WMB."  (Complaint ¶ 56.)  The FDIC, on the other hand, claims that to the extent amounts have been, or are to be paid in the future to WMI, those funds "are held in trust for the FDIC-Receiver as the rightful recipient thereof."  (Answer ¶¶ 67-68.)  The FDIC does not allege that WMB overpaid WMI with respect to the insurance policies.  The dispute is simply over premium amounts unpaid by WMB, and who owns the proceeds of certain insurance claims – issues that are fully before the Court without the counterclaims.

### 4. Debtors Have An Equitable Interest In the Estate's Property

In a final attempt to avoid the automatic stay imposed by the Bankruptcy Code, the FDIC incorrectly asserts that the property at issue in its counterclaims for taxes, trust preferred securities, deposits, good will litigation, and insurance are being held by WMI in constructive

trust for the FDIC.  Such constructive trust theories, however, are disfavored in bankruptcy-related proceedings, where they run counter to fundamental principles of bankruptcy such as equality amongst creditors.  For example, in *Ades & Berg Group Investors v. Breeden (In re Ades & Berg Group Investors)*, 550 F.3d 240 (2d Cir. 2008), Ades & Berg filed a counterclaim in the Bankruptcy Court seeking a judgment declaring that the proceeds of a certain reinsurance policy were not property of the Debtors' estate and directing the Trustee, as trustee of a constructive trust, to pay Ades & Berg the amount of any proceeds received from the reinsurance policy.  The bankruptcy court dismissed the constructive trust counterclaim, acknowledging that "bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so."  *Id*. at 242 (internal quotations and citations omitted).  In addition, in *Superintendent of Ins. for the State of N.Y. v. Ochs (In re: First Cent. Fin. Corp.)*, 377 F.3d 209 (2d Cir. 2004), the court held that a constructive trust could not be imposed on federal income tax refunds held by the bankrupt corporate parent of an insurance company, even though the insurance company on whose behalf trust was sought had generated all of the income and most of the losses reported on their joint return.  In making this determination, the Court noted the "tension between constructive trust law and bankruptcy law":

> The chief purposes of the bankruptcy laws are to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period, to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors, and to protect the creditors from one another.  But by creating a separate allocation mechanism outside the scope of the bankruptcy system, the constructive trust doctrine can wreak havoc with the priority system ordained by the Bankruptcy Code. … In light of the fact that these goals can be compromised by the imposition of a constructive trust, bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so.

14

*Id.* at 217 (internal quotations and citations omitted). Consistent with the reasoning in *In re Ades & Berg Group Investors* and *In re: First Cent. Fin. Corp.*, a constructive trust cannot be found in this case with respect to any of the FDIC's counterclaims.

"A constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Baker v. Leonard*, 120 Wash.2d 538, 547-48 (1993). The FDIC has not, and cannot, allege that Debtors have been unjustly enriched by retaining the assets that are the subject of the FDIC's counterclaims. "[R]etention by the bankruptcy estate of assets that, absent bankruptcy, would go to a particular creditor is not inherently unjust." *In re Ades & Berg Group Investors*, 550 F.3d at 245. Significantly, a bankruptcy trustee "marshals the assets of the estate under judicial supervision, for distribution according to federal law, under circumstances in which unsecured creditors receive fair but not full returns." *Id.* at 244. "While the estate may be enriched by the retention of funds due to others under a contract, the estate is not unjustly enriched in this context." *Id. See also United States v. MCorp Fin., Inc., (In re MCorp Fin., Inc.)*, 170 B.R. 899, 902 (S.D. Tex. 1994) (recognizing that "[t]he equities of unjust enrichment do not appear between a post-bankruptcy purchaser out of a receivership and the creditors" of the parent company's bankruptcy estate). Without an allegation of unjust enrichment, the FDIC's unsupported claim that Debtors have no equitable interest in the disputed property fails as a matter of law.

As set forth in more detail in Debtors' Moving Brief, all of the FDIC's counterclaims are subject to the automatic bankruptcy stay. The FDIC has failed to provide any legal or factual basis that could possibly exempt it from the stay, and the FDIC does not even attempt to argue that the FIRREA Exhaustion Provisions exempts it from application of the stay. Accordingly,

the FDIC's filing is in clear violation of the stay, and the Counterclaims are therefore void and must be dismissed.

### B.    The FDIC's Claims Must be Resolved in the Bankruptcy Court

Debtors filed this action as specifically required under FIRREA in order to ensure that they would not waive claims against the WMB receivership.  The FDIC now argues that because Debtors filed this action, "it is also appropriate for the Court to preside over the FDIC-Receiver's counterclaims…."  (Opp. Brief at 30.)  Ironically, the FDIC argues that "the principles underlying compulsory counterclaims – fairness and considerations of convenience and economy – strongly favor litigation of the counterclaims here."  (Opp. Br. at 30.)  Even putting aside that the FDIC has affirmatively submitted to the Bankruptcy Court's jurisdiction by filing its proof of claim,[5] the Bankruptcy Court has already held that it has "exclusive jurisdiction to decide what is property of the estate."  (Abensohn Decl., Ex. C, at 95.)[6]  Thus, the principles of fairness and considerations of convenience and economy favor litigating the FDIC's counterclaims in Bankruptcy Court – where claims virtually identical to the FDIC's counterclaims have already been submitted (*see* Abensohn Decl., Ex. D), and where the Bankruptcy Court has already held that it will determine what belongs to the estate.

---

[5]    *See Langenkamp v. C.A. Culp*, 498 U.S. 42, 44-45 (1990) ("In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power.") (internal citation omitted).

[6]    Debtors have limited resources, and, as Congress envisioned when it enacted the automatic stay, it is essential that they be permitted to conserve those resources and focus their energy on the resolution of the estates in bankruptcy court.  *First City Asset Servicing Co. v. FDIC*, 158 B.R. 78, 82 (Bankr. N.D. Tex. 1993) ("Allowing the FDIC to violate the automatic stay and force bankruptcy debtors to go through the FIRREA claims process before the debtor can remedy the violation in the bankruptcy court would threaten the operation of the bankruptcy system.").

### 1. The Bankruptcy Court has Exclusive Jurisdiction Over the FDIC's Counterclaims

Without even acknowledging that it has already filed a proof of claim in the Bankruptcy Court claiming ownership of the same assets at issue in the Counterclaims, the FDIC argues that "this Court may determine whether a disputed asset is, or is not, property of WMI…." (Opp. Br. at 31.) First, this Court's jurisdiction to determine the ownership of disputed estate property cannot be considered independent of the FDIC's filing of a proof of claim – it is the very act of filing such proof of claim that triggers the exclusive jurisdiction of the Bankruptcy Court. *See EXDS, Inc. v. RK Electric, Inc. (In re EXDS, Inc.)*, No. 03-532, 2004 WL 503545, at *1 (D. Del. Mar. 5, 2004) ("[B]y filing its proof of claim, Defendant had subjected itself to the exclusive jurisdiction of the Bankruptcy Court and lost its right to a jury trial.") Second, the FDIC's reliance upon *Noletto v. Nationsbanc Mortgage Corp. (In re Noletto)*, 244 B.R. 845 (Bankr. S.D. Ala. 2000) and *Amsave Credit Corp. v. R.T.C. (In re Am. Mortgage & Inv. Servs.)*, 141 B.R. 578 (Bankr. D.N.J. 1992) to support its argument is misplaced. Neither case addresses the issue of whether a district court can retain jurisdiction to determine the ownership of disputed estate property *after* a bankruptcy court has already asserted its exclusive jurisdiction over the very same property. By choosing to proceed with its proof of claim, the FDIC submitted to the Bankruptcy Court's exclusive jurisdiction and its attempt to place those same claims at issue in a second forum must be rejected.

### 2. The FDIC's Claims Are Barred By Collateral Estoppel

The Bankruptcy Court specifically held, in denying the FDIC's motion to stay nearly identical claims as set forth in the FDIC's counterclaims, that it has exclusive jurisdiction to resolve the very ownership issues that the FDIC seeks to place at issue in this Court. While the FDIC apparently disagrees with that ruling (and with the analysis above), the fact remains that it

17

cannot simply ignore the Bankruptcy Court's assertion of its exclusive jurisdiction. *See Gov't of Rwanda v. Johnson*, 409 F.3d 368, 374 (D.C. Cir. 2005) ("The doctrine of issue preclusion bars parties from relitigating any issue 'contested by the parties and submitted for judicial determination in [a] prior case…"). The appropriate mechanism for the FDIC to challenge that ruling is through appeal – not by trying to litigate the same issue again in another jurisdiction.[7]

       The FDIC's refusal to adhere to the Bankruptcy Court's authority, in clear disregard of collateral estoppel, is also wildly inefficient. At the same time that it is seeking to pursue its counterclaims here, the FDIC, along with JPMC, have filed notices of appeal with the District Court from the Bankruptcy Court's denial of the FDIC's stay motion and from the Bankruptcy Court's denial of JPMC's motion to dismiss Debtors' counterclaims (both of which rulings the Bankruptcy Court issued, in part, based on its exclusive jurisdiction over disposition of estate assets). The FDIC and JPMC have also filed requests with the District Court for the District of Delaware to have their appeals certified to the Court of Appeals for the Third Circuit. It is clear from these filings that the FDIC recognizes the significance of the Bankruptcy Court's ruling – *i.e.*, the Court asserted its exclusive jurisdiction over the very assets that the FDIC wishes to place at issue here – and the FDIC must comply with that ruling until and unless it is reversed on appeal. While the FDIC is appealing that result in the District of Delaware and in the Third Circuit, this Court should not countenance its blatant disregard for those proceedings by asserting jurisdiction over the same assets as the Bankruptcy Court.

---

      [7]  The FDIC addresses the collateral issue only briefly (Opp. Br. at 32), and with the feeble argument that the Bankruptcy Court issued its ruling in part because Debtors' claims were asserted against JPMC, not the FDIC. The fact remains that the FDIC intervened in the Bankruptcy Court, submitted motions to stay and dismiss Debtors' claims, and fully participated in briefing and argument on both matters. The FDIC's motions were denied specifically because the Bankruptcy Court determined that it has exclusive jurisdiction over disposition of the very assets that the FDIC now seeks to place at issue here. In short, the FDIC fully litigated these issues and cannot now simply ignore an unfavorable outcome in those proceedings.

## II.  THE DC ACTION SHOULD BE STAYED IN ITS ENTIRETY TO PROMOTE EFFICIENCY

The Bankruptcy Court has asserted "exclusive jurisdiction" over a broad range of assets and, now that the FDIC has intervened in the bankruptcy proceedings, all interested entities— *e.g.,* JPMC, Plaintiffs and the FDIC—can assert their competing claims to those assets in those proceedings.  It would clearly waste judicial resources and be burdensome upon the parties if the District Court in this case were mandated to permit discovery, and upon completion of pretrial proceedings, to take evidence and determine the merits of the case at the same time the Bankruptcy Court is going through a substantially parallel process.  In the interests of efficiency and judicial economy, this Court should exercise its broad discretion to stay this action.

The FDIC acknowledges this Court's authority to issue a discretionary stay of this action. (Opp. Br. at 33-34.)  However, the FDIC argues that the Court should not issue the stay because "the adversary proceedings are no further along than proceedings in this action."  (Opp. Br. at 35.)  This is simply not true.  The Bankruptcy Court has already decided several motions, including a motion to dismiss the Turnover Action, motions to stay both Adversary Proceedings, and the FDIC's Motion to Intervene in the Turnover Action.  Furthermore, the Bankruptcy Court has received extensive briefing, supported by affidavits and evidence, in support of Debtors' pending motion for summary judgment in the Turnover Action, as well as lengthy opposition papers both by the FDIC and JPMC.[8]

---

[8]  The FDIC repeatedly emphasizes that Debtors have "failed" to identify any cases in which the courts granted a stay at a plaintiff's request.  That is not correct.  In *Fairview Hosp. v. Leavitt*, 2007 WL 1521233 (D.D.C. May 22, 2007), cited in Debtors' moving brief, the court granted a plaintiff's request to stay proceedings pending the outcome of related litigation.  As should be obvious, there is no reason that a plaintiff cannot request that an action be stayed where such relief would promote efficiency and avoid simultaneous consideration of identical issues by different courts.

Moreover, since Debtors have filed their motion, the Bankruptcy Court has denied a motion to dismiss Debtors' counterclaims in the JPMC Adversary Proceeding. Also, as discussed *supra*, JPMC and the FDIC have filed notices of appeal with the District Court in connection with the Bankruptcy Court's denial of JPMC's motion to dismiss Debtors' counterclaims. Further, in connection with the JPMC Adversary Proceeding, the parties have served document requests upon each other and on third-parties and negotiated a discovery and briefing schedule. In connection with Debtors' summary judgment motion in the Turnover Action, both JPMC and the FDIC have filed two sets of opposing papers each, and the Debtors have produced their affiant, Doreen Logan, for deposition, which JPMC has moved to strike. A set of WMB bondholders have been allowed to intervene in the Turnover Action and have filed opposition papers to Debtors' summary judgment motion as well as answered Debtors' complaint. JPMC and the FDIC have also filed requests with the District Court for the District of Delaware to have their appeals certified to the Court of Appeals for the Third Circuit.

In sum, the Bankruptcy Court has already made significant progress in addressing a number of issues that may narrow the issues now before this Court—including, for instance, the status of Debtors' deposits—and it simply makes sense, as a matter of efficiency both for the Court and the parties, that this action be stayed pending the resolution of the bankruptcy action.

## III. IF THE COURT ELECTS TO PROCEED TO THE MERITS, THERE ARE SEVERAL GROUNDS TO DISMISS THE INDIVIDUAL COUNTERCLAIMS.

If the Court chooses to proceed to the merits of the FDIC's Counterclaims, Debtors respectfully request that several of those Counterclaims be dismissed because the FDIC has failed to assert cognizable claims.

A.    **Counts I and II of the Counterclaims are Deficient**

The FDIC's first and second counterclaims, in which it claims that it "owns" certain tax refunds purportedly held in "trust" on its behalf by WMI, must be dismissed based on the plain language of the Tax Sharing Agreement.  (*See* Abensohn Decl., Ex. E ("TSA").)  Significantly, the FDIC neither disputes that the parties are subject to the TSA, nor that WMI should receive all refunds or overpayments on account of each of the members of the group pursuant to that agreement.  The FDIC argues, however, that once WMI receives any tax refunds, WMI should be deemed to be holding those refunds in "trust" on behalf of the members of the consolidated tax group.

There can be no doubt that the FDIC's claim to certain tax refunds, to the extent it has one, arises under the TSA and is thus a contract claim that is no different than any other creditor claim that should be made in the Bankruptcy Court.  *See, e.g., In re MCorp Fin., Inc.*, 170 B.R. at 902 (interpreting similar tax sharing agreement, finding that no "part of the allocation agreement suggests that [parent of failed bank subsidiary] is a trustee to the subsidiaries, holding mere nominal claim to the refund.  The contract created an account, a debtor-creditor relation, which is the quintessential business of bankruptcy . . . . The refund must be paid to the estate; then if [failed bank] is the owner and wants to enforce its property right, it must file a claim.").

The FDIC's argument that the federal bank regulators issued a uniform policy statement regarding intercompany tax allocation agreements does not change this result.  (Opp. Brief at 10.)  Significantly, the FDIC does not allege that the TSA does not comply with the Policy Statement, and thus the statement has no bearing on the tax refunds at issue here.  The FDIC's only argument is that the cases relied upon by Debtors pre-date the Policy Statement.  However, the Policy Statement plainly does not guarantee a subsidiary a direct ownership interest in its proportionate share of tax refunds collected in connection with a tax sharing agreement – indeed,

21

courts have continued to reject such claims pursuant to the terms of various tax sharing agreements after the Policy Statement was issued. *See*, *e.g.*, *In re First Cent. Fin. Corp.*, 377 F.3d 209. In any event, this is of no moment, since the issue is not how the taxes are being allocated under the TSA, but rather whether the refunds received are subject to the TSA in the first instance, such that WMB has only a contractual claim to any tax refunds. Because the FDIC's tax refund claims are based on the TSA, its recourse to recover on any amounts allegedly due is to file a proof of claim in the Bankruptcy Court—a course of action it has already taken. Accordingly, Counterclaims I and II should be dismissed.

### B.     Counts III and IV of the Counterclaims are Deficient

Counterclaims III and IV fail because any supposed capital commitment by WMI to WMB subject to section 365(o) can be enforced only in the Bankruptcy Court. By its terms, section 365(o) assists a federal banking agency in recovering the amount owed under a capital maintenance agreement by making assumption of that agreement mandatory in a chapter 11 bankruptcy (*i.e.*, the capital maintenance agreement cannot be rejected pursuant to Bankruptcy Code section 365). Furthermore, a claim for breach after assumption may be afforded priority. Neither of these rights has any application outside Debtors' bankruptcy. If a banking agency believes that a debtor has failed to assume an agreement as section 365(o) requires, then the agency must seek relief in the relevant bankruptcy court. *See, e.g.*, *Office of Thrift Supervision v. Overland Park Fin. Corp., (In re Overland Park Fin. Corp.)*, 236 F.3d 1246, 1250 (10th Cir. 2001) (seeking an order that the debtor assumed an agreement).

The cases cited by FDIC do not reach a different result. In each case the matter was presented to the bankruptcy court for resolution, and then appealed to the Federal Circuit court. For example, in *R.T.C. v. FirstCorp, Inc. (In re FirstCorp, Inc.)*, 973 F.2d 243, 245-46 (4th Cir. 1992), both OTS and RTC, in separate motions made pursuant to 11 U.S.C. § 365(o), "asked the

bankruptcy court to order Firstcorp to assume its commitment under FHLBB Resolution No. 85-219 and to immediately cure the deficiency in the capital maintenance obligation existing as of the date of the bankruptcy filing."  The bankruptcy court denied the motions, the district court reversed, and Firstcorp then appealed.  *See also In re Overland Park Fin. Corp.*, 236 F.3d at 1253 ("We hold the bankruptcy court is the appropriate initial forum to hear and address Overland Financial's remaining defenses not addressed in this opinion.").  Accordingly, and for the reasons set forth in Debtors' Moving Brief, this Court is not the proper forum for any purported claim the FDIC believes it has under section 365(o).

### C.    Count VI of the Counterclaims is Deficient

The FDIC has failed to plead any facts that would entitle it to payments from Debtors' Deposit Accounts.  For context, of the approximately $4 billion on deposit, the only funds that the FDIC alleges belong to WMB is approximately $234 million in tax refunds.  (Answer ¶ 42.)  As discussed in Debtors' Moving Brief, Section III.A, however, those refunds are property of the estate, as a matter of law, and any claims the FDIC may have as to those amounts must therefore be made before the Bankruptcy Court (as the FDIC has in fact done).  *See In re MCorp Fin., Inc.*, 170 B.R. at 902; *In re: First Cent. Fin. Corp.*, 377 F.3d at 497-98, 502.

The FDIC's argument that it has a "stake" in the $4 billion on deposit because it has alleged an ownership interest in $234 million of tax refunds (Opp. Br. at 16) is completely unavailing.  It is clear that, as a matter of law, the FDIC has no stake of its own in the Deposits, and does not have standing to ask this Court to resolve a supposed dispute as to which it is not an actual party.  *See, e.g., Blue v. Fremont Inv. & Loan*, 562 F. Supp. 2d 33, 40 (D.C. Cir. 2008) (where plaintiffs sold interest in property prior to transaction at issue court found that plaintiffs "lack standing to assert any of the claims in their Complaint").  WMI and JPMC are currently litigating the status of these accounts in the Bankruptcy Court, where Debtors have moved for

summary judgment in their Turnover Action.  Accordingly, and for the reasons set forth in Debtors' Moving Brief, Count VI should be dismissed.

### D.    Count VII of the Counterclaims is Deficient

The FDIC also seeks to recover an unspecified sum because: "As a thrift holding company, prior to the WMB receivership, WMI had statutory and regulatory obligations to maintain and guarantee the appropriate capital levels of WMB pursuant to applicable capital and liquidity requirements." (*Washington Mutual, Inc., et al. v. FDIC,* No. 1:09-cv-00533 (RMC), Dkt. No. 34, Counterclaim ¶ 51.)  As discussed in its Moving Brief, WMI did not enter into any agreement to maintain WMB's capital.  (Moving Br. at 31.)

In an apparent concession that the FDIC has no basis to invoke the "source of strength doctrine," the FDIC argues for the first time in its Opposition Brief that Count VII is brought under "applicable 'prompt corrective action' statutes and regulations."  (Opp. Br. at 18.)  This however, is nothing more than a blatant attempt by the FDIC to shoehorn its counterclaim into a regulatory scheme that clearly does not fit.  Pursuant to the prompt corrective action statute and regulations, a federal banking regulator (the OTS, in WMB's case) must order a depository institution, *inter alia*, to submit a capital restoration plan if the regulator determines that such institution is "undercapitalized," "significantly undercapitalized," or "critically undercapitalized." 12 U.S.C. § 1831o(e)(2)(A).  The regulator may accept such a capital restoration plan only if it contains a guarantee from "each company having control of the [depository] institution" that "the [depository] institution will comply with the plan . . . ." *Id.* § 1831o(e)(2)(C).  The FDIC fails to allege that WMB submitted a capital restoration plan to the OTS pursuant to the prompt corrective action statutes and regulations or that WMI provided a guarantee of WMB's performance of such a capital restoration plan.  Accordingly, the FDIC has failed to plead a

cause of action under the "prompt corrective action" statutes and regulations and thus Count VII should be dismissed.

  **E.**  <u>**Counts IX and X of the Counterclaims are Deficient**</u>

  In Counts Nine and Ten of the Counterclaims, the FDIC makes conclusory allegations that WMI is holding certain funds from goodwill litigation and insurance proceeds "in trust" for WMB's benefit.  In its Opposition Brief, the FDIC does not allege that the counterclaims properly state the elements of an express trust.  In an attempt to support these claims, however, the FDIC asserts that a constructive trust has been properly alleged and simply recites facts regarding identification of the property in dispute.  (Opp. Br. at 19.)  Significantly, the FDIC points to no allegations of "fraud, misrepresentation, bad faith, overreaching, or 'some element of wrongdoing." *Nickels v. Nickels*, No. 45066-2-I, 2001 WL 316194, at *6 (Wash. App. Div. 1 Apr. 2, 2001) ("A court sitting in equity may impose a constructive trust when there is clear, cogent, and convincing evidence of the basis for imposing a trust, including fraud, misrepresentation, bad faith, overreaching, or 'some element of wrongdoing.'" (quoting *Baker,* 120 Wash.2d at 548).

  Claims resting on such a bald legal conclusion, unsupported by any pertinent factual allegations, are insufficient as a matter of law and should be dismissed.  *See Harris v. Ramsey*, 496 F. Supp. 2d 64, 68 (D.D.C. June 12, 2007) (finding that plaintiff's "bald assertions are insufficient to sustain a claim").  Accordingly, Counts IX and X of the Counterclaims should be dismissed.

<u>**CONCLUSION**</u>

  For the foregoing reasons, Debtors respectfully request that the Counterclaims be dismissed and that the remainder of this action be stayed.

25

Dated:  New York, N.Y.
        September 25, 2009

                                         _s/ Deborah K. Brown_____

                                         Peter E. Calamari
                                         (petercalamari@quinnemanuel.com)
                                         Michael B. Carlinsky
                                         (michaelcarlinsky@quinnemanuel.com)
                                         David L. Elsberg
                                         (davidelsberg@quinnemanuel.com)
                                         Deborah K. Brown
                                         (deborahbrown@quinnemanuel.com)
                                         Quinn Emanuel Urquhart Oliver &
                                         Hedges, LLP
                                         51 Madison Avenue, 22nd Floor
                                         New York , NY 10010
                                         (212) 849-7000
                                         Fax: (212) 849-7100

                                         -and-

                                         David R. Berz
                                         Adam P. Strochak
                                         Weil, Gotshal & Manges, LLP
                                         1300 Eye Street, NW, Suite 900
                                         Washington, DC 20005
                                         Telephone: (202) 682-7001
                                         Facsimile: (202) 857-0939

                                         *Attorneys for Plaintiffs Washington
                                         Mutual, Inc. and WMI Investment Corp.*